UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>BRIAN KELSEY and<br>JOSHUA SMITH,<br><br>    Defendants. | No. 3:21-cr-00264 |

**DEFENDANT KELSEY'S REPLY MEMORANDUM
ON MOTION TO WITHDRAW PLEA AND FILE MOTION TO DISMISS**

Defendant Brian Kelsey entered his plea agreement hastily with an unsure heart and confused mind. He pleaded guilty to a set of facts that do not constitute the crimes alleged in Counts 1 and 5, under theories of liability so muddled that even now the government and Mr. Kelsey do not agree on the operative theory. Accordingly, it would be fair and just to permit Mr. Kelsey to withdraw his plea and contest the charges against him.

**I.  Mr. Kelsey entered his plea agreement hastily with an unsure heart and confused mind.**

Losing a parent is hard. And in the case of a year-long, slow decline of pancreatic cancer, the emotional toll on loved ones is even harder. This is the struggle that Kelsey was experiencing as he contemplated what to do with the rest of his life.

Likewise, new parents develop a confused mind when they are deprived of sleep due to the constant stress of not one crying baby, but two. Kelsey's twin sons, born September 10, 2022, were not even two months old when Kelsey was forced to hastily make a decision on entering his plea (Oct. 25-27, 2022). *See* Resp. 5. On top of that, his daughter was three years old and equally needing attention. And he was balancing not one but two occupations. The fog and sleep deprivation of taking care of his newborns while dealing with everything else in his life led to his confused mind.

Once his mind began clearing, Mr. Kelsey acted quickly to seek to withdraw his plea. This was no "tactical decision" to delay, Resp. 14, for he had moved up his sentencing date. Dkt. 77. Kelsey's dad died February 2. It was only then that Kelsey's head began to clear, and he was able to shift his focus away from his father's illness to his own criminal matter. Remarkably, in *less than ten days* from his father's February 6th funeral, he called his counsel and definitively told them to draft the motion to withdraw and file it as soon as possible.

**II. Kelsey has consistently and vigorously maintained his innocence for seven years except for the narrow time window surrounding his changed plea.**

The government seems to have misinterpreted Kelsey's repeated and vigorous attempts to prove his innocence as one protracted plea negotiation that "spanned years" or "nearly a year and a half." Resp. 10, 13, 21, 22. The factual background the government presents shows that Kelsey has consistently and vigorously maintained his innocence throughout seven years of communications with the government.

On July 30, 2021, Kelsey's attorneys "presented via WebEx a broad outline of several errors and inconsistencies in the government's theory of the case." Resp. Ex. E, Howard Letter to Klopf, 10/1/21, at 1. This began the first in a series of whack-a-mole games, where Kelsey's attorneys would refute the government's theory of the case, only to have new ones appear.

As the government correctly states, Kelsey sat for a reverse proffer session August 17, 2021. Kelsey and his attorney's reaction was that the circumstantial evidence presented did not prove the government's narrative of what had occurred in 2016 and, instead, proved Mr. Kelsey's innocence. Therefore, when Mr. Kelsey's attorney agreed to pursue "pre-charging plea negotiations" three days later, Mr. Kelsey assumed the matter could be settled with a civil payment—not a criminal conviction. Resp. Ex. C, Howard Email to Klopf, Taddei, and Pritchard, 8/20/21. Kelsey vehemently rejected the government's offer to plead guilty to a criminal felony. Resp. Ex. D, Howard Letter to Klopf, 9/3/21, at 1. And more importantly, he continued to maintain his innocence: "We continue to have grave concerns about the government's case[.]" *Id*.

On October 1, 2021, Kelsey sent his most important and detailed letter explaining his innocence: "we have strong and credible evidence that refutes the government's theory of the case." Resp. Ex. E. Next, his counsel met with Corey Amundson to protest his innocence. Then, he sent another letter maintaining his innocence and highlighting lost exculpatory evidence.

Howard Ltr. to Amundson, 10/12/21, Exhibit 1 attached. Finally, he maintains his innocence now.

### III. The Government's Response Brief makes clear that Mr. Kelsey did not enter the agreement with a clear head.

In its Response, the government suggests that Mr. Kelsey does not know the legal theory to which he pleaded guilty. *See* Resp. 20. That alone demonstrates that Mr. Kelsey did not enter the agreement with a clear head.

The government correctly points out that Mr. Kelsey did not understand that he was pleading guilty to a *Klein* conspiracy. *See* Resp. 20. Prior to reading the response, Mr. Kelsey had never heard of a *Klein* conspiracy. Mr. Kelsey thought his conspiracy count was dependent on the other count to which he pled guilty and not a stand-alone claim. In other words, Mr. Kelsey thought he was pleading guilty to a campaign finance violation and conspiring to do so with other people.[1]

The government also suggests that Mr. Kelsey misunderstood the allegations in Count 5. As discussed below, Mr. Kelsey does not agree with the government's assertion. Nevertheless, the mere fact of this dispute suggests that Mr. Kelsey did not enter a guilty plea with a clear head and clear understanding of what he was pleading guilty to.

---

[1] Even assuming *arguendo* that Count 1 references a *Klein* conspiracy, Kelsey's motion to withdraw and proposed motion to dismiss accurately describe that, without a violation of one of the other four counts in the Indictment, Count 1 must be dismissed. The statements made to the FEC become fraudulent only if another crime was committed. Mr. Kelsey accurately and openly reported to the FEC the almost $850,000 he received in campaign contributions for his congressional race. Similarly, Political Organization 1 accurately and openly reported to the FEC that it spent $80,000 on radio and digital ads in favor of Mr. Kelsey's congressional campaign. Political Organization 1 reported these ads as "independent expenditures." Under the government's theory of the case, these ads were not independent expenditures but were coordinated expenditures; therefore, they should have been reported as an in-kind contribution to Kelsey's congressional campaign. But the government's position as to how they *should have been* reported turns on its position that the expenditures were coordinated. Without the underlying coordination violation, they were reported correctly.

**IV. The Government's theory of Count 5 is premised on the movement of money from the State Committee to Political Organization 1—movement that is not coordination.**

The government's Response highlights that its theory of how Mr. Kelsey coordinated with Political Organization 1 is incoherent. The Response claims that "[t]he fact that some of the money that Political Organization 1 spent can be traced back to the defendant's State committee accounts is irrelevant for purposes of Count 5." Resp. 19. This claim is belied by the Plea Agreement and the government's own Response.

The factual recitation in the Plea Agreement spills much ink describing how Mr. Kelsey contributed a large sum of money from his state committee to PAC 1 and tracing contributions from PAC 1 and individuals associated with it to Political Organization 1. *See* Plea Agreement ¶¶ 7(m)-(t), (v), (x)-(cc). Most directly, the factual statement claims, "In total, KELSEY cause approximately $91,000 to be transferred to Political Organization 1. The purpose of these transfers was to provide funds for federal election activity to benefit KELSEY[]." *Id*. ¶ 7(cc).

The government doubled down on this theory in its Response, stating, "The defendant admitted that he arranged the movement of $91,000 to Political Organization 1 and that he, through his agents, then coordinated Political Organization 1's expenditures *of that money* . . . ." Resp. 18 (emphasis added). If these transfers are "irrelevant," this statement—which is the heart of the government's allegation—and much of the factual recitation in the Plea Agreement are a non-sequitur. This cannot be correct.

Rather, the alleged transfer of money from Mr. Kelsey's state committee through intermediaries to Political Organization 1 to benefit his federal campaign is *the* crux of the government's coordination allegation. And it fails because, as stated in the proposed Motion to

4

Dismiss, federal candidates cannot "coordinate" regarding ads paid for by their own state committees.

To further complicate its position, the government posits that perhaps the correct figure for the charge is "$25,000." Resp. 19. Yet, this figure (and supporting theory) is not specifically mentioned in the Plea Agreement, which, again, focuses on the movement of money between the State Committee and ultimately Political Organization 1 as the purported coordinating conduct. To the contrary, the Plea Agreement makes only passing reference to a $25,000 transfer from Political Organization 2 to Political Organization 1 and sets forth *no* theory for how that $25,000 transfer was coordinated by Mr. Kelsey. *See* Plea Agreement ¶ 7(w).[2] The lack of clarity on the correct dollar amount of the supposed violation, which has sentencing implications, reflects the lack of clarity on how and whether the supposed violation took place. This lack of clarity deprived Kelsey of due process and notice, thus ensuring his confused mind when deciding to plead. Most importantly, the facts fail to support a violation of Count 5.

**V.** **The Government is responsible for any potential prejudice caused by the length of time since the underlying actions occurred.**

The government complains that it will be prejudiced at trial due to faded "memories of specific, detailed events that occurred seven years ago." Resp. 25. But the government is directly and solely responsible for five of the seven years' delay. Even though the events occurred in July 2016, the government waited five years to bring charges against Kelsey. In fact, the government still did not have its case ready before the five-year statute of limitations ran, so it forced Kelsey to sign a tolling agreement to merely discuss his innocence with them pre-indictment and then brought the indictment in October 2021.

---

[2] There is a reference to an "Individual 3," associated with Political Organization 2, in the definition portion of the factual recitation; however, Individual 3 does not reappear in the operative facts, and his connection to any alleged coordination is not stipulated in the Plea Agreement.

## CONCLUSION

For the reasons stated above, the Court should allow Kelsey to withdraw his plea and allow him to file his proposed Motion to Dismiss.

Respectfully submitted,

s/ David A. Warrington
David A. Warrington, *pro hac vice*
Dhillon Law Group, Inc.
2121 Eisenhower Avenue, Suite 608
Alexandria, VA 22314
Telephone: 415-520-6593
DWarrington@dhillonlaw.com

*Counsel for Defendant Brian Kelsey*

# CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing *Defendant Kelsey's Reply Memorandum on Motion to Withdraw Plea and File Motion to Dismiss* has been electronically delivered via the Court's electronic filing system on this the 21st day of April 2023 to:

Hal Hardin
Hal D. Hardin
211 Union Street, Suite 200
Nashville, TN 37201

Amanda Klopf
Assistant United States Attorney
110 Ninth Avenue, South, Suite A961
Nashville, TN 37203-3870

John P. Taddei
U.S. Department of Justice
1301 New York Ave. NW
Washington, DC 20530

Paul J. Bruno
David A. Rivera
Jerry E. Martin
Barrett, Johnston, Martin & Garrison, LLC
414 Union Street, Suite 900
Nashville, TN 37219

Phillip Georges
Phillip S. Georges, PLLC
501 Union St., Ste. 200d
Nashville, TN 37219

David Pritchard
Assistant United States Attorney
167 North Main Street, Suite 800
Memphis, TN 38103

 

s/ David A. Warrington
David A. Warrington