| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:21-cr-00264-1 |
| v. | ) | |
| | ) | CHIEF JUDGE CRENSHAW |
| BRIAN KELSEY | ) | |

### UNITED STATES' SENTENCING MEMORANDUM ADDRESSING 18 U.S.C. § 3553(a) FACTORS

The United States of America, through Henry C. Leventis, United States Attorney for the Middle District of Tennessee, Assistant United States Attorney Amanda J. Klopf, Corey R. Amundson, Chief of the Public Integrity Section of the United States Department of Justice, Trial Attorney John P. Taddei, Reagan Fondren, First Assistant United States Attorney for the Western District of Tennessee, and Assistant United States Attorney David Pritchard (collectively, "United States" or "government"), in accordance with Local Criminal Rule 32.01(e), hereby provides its statement addressing the sentencing factors set forth in 18 U.S.C. § 3553(a). The government recommends a sentence of **41 months of imprisonment**, which is within the advisory Sentencing Guidelines range in this case. For the reasons set forth below, the recommended sentence is sufficient but not greater than necessary to satisfy all of the factors the Court must consider under 18 U.S.C. § 3553(a).

### SENTENCING FACTORS

**I. All of the Factors that the Court Must Consider Support the Recommended Sentence.**

In fashioning a sentence, the Court must address each of the factors set forth at 18 U.S.C. § 3553(a), including the kinds of sentences and the range established by the United States Sentencing Guidelines (the "Guidelines"); the nature, circumstances, and seriousness of the offense; the history and characteristics of the defendant; the need to promote respect for the law;

the need to justly punish the offense; the need to adequately deter criminal conduct and protect the public from further crimes; and the need to avoid unwarranted sentencing disparities. These factors support the recommended sentence of 41 months of imprisonment, which is within the Guidelines range.

**A. The Guidelines support the recommended sentence.**

One of the factors the Court must consider is the range recommended by the Guidelines. As discussed in the concurrently filed Position of the United States Regarding Presentence Report ("Position Regarding PSR"), the Probation Office calculates a total offense level of 20. PSR ¶ 63. The defendant has no known criminal history, which puts him in Criminal History Category I. PSR ¶¶ 64-69. In that category, an offense level of 20 yields a recommended Guidelines range of 33-41 months of imprisonment. PSR ¶ 89. Therefore, a term of 41 months of imprisonment would be consistent with the Guidelines.

Furthermore, the Guidelines range provides a useful framework for evaluating all of the other factors together because it provides a "rough approximation" of sentences that will achieve all of § 3553's objectives. *Rita v. United States*, 551 U.S. 338, 350 (2007); *United States v. Perez-Rodriguez,* 960 F.3d 748, 754 (6th Cir. 2020). As set forth in more detail below, this conclusion is not an abstract or academic one; the particular facts of this case, viewed through the prism of § 3553(a), fully support a within-Guidelines sentence.

**B. The nature and circumstances of the offense and the history and characteristics of the defendant support the recommended sentence (§ 3553(a)(1)).**

The nature and circumstances of the offenses to which the defendant pleaded guilty are described in the Factual Basis section of the parties' plea agreement (DE 73 ¶ 7) and the PSR (at

2

¶¶ 13-44).  Coupled with the defendant's history and characteristics, all of these facts weigh in favor of a term of imprisonment at the top of the advisory Sentencing Guidelines range.

The defendant's crimes were serious.  He was a sitting Tennessee State Senator and practicing attorney who willfully violated federal campaign finance laws and defrauded the Federal Election Commission ("FEC") in multiple ways through hidden and illegal efforts to support his own campaign for the U.S. House of Representatives.  Early in the defendant's federal campaign, he asked a political advisor whether the defendant could use the money he controlled in his state Senate campaign fund to support his congressional race.  He was told he could not and that it would be illegal.  PSR ¶ 21.  Apparently unsatisfied with that answer, in late-June 2016, the defendant consulted attorneys specializing in election law.  DE 131-2 at 1-6 (Declaration of Kory Langhofer & Ex. A).  Those attorneys provided the same advice, telling the defendant that he "could transfer those funds to a state committee that is *completely independent* from [the defendant], *without directly or indirectly guiding or controlling their use of the funds*."  *Id.* at 6 (emphasis added).  The attorneys repeatedly warned the defendant that, after transferring the funds out of his State campaign fund, the defendant "cannot in any way suggest or direct how the funds should be used."  *Id.*; *see id.* at 7 (advising that the recipient of the funds must be "entirely independent of [the defendant] and his campaign organizations"); *id.* ("Importantly, though, [the defendant] would be strictly prohibited from 'directing' how the funds would be used.").

Over the course of the following month, the defendant willfully disregarded the advice he received.  He spurned campaign finance laws that he knew applied to everyone in an effort to seek unfair advantages over his opponents.  The defendant knew that, under federal election law, contributions to his campaign were subject to financial limits and that any expenditures made by

3

an outside organization in support of his campaign that were coordinated with him or one of his agents were subject to those limits. He also knew that federal law prohibited a person from making a political contribution in the name of another person, which would disguise its true source. The defendant also knew that the FEC required campaigns and political committees to file accurate reports to combat corruption or the appearance of corruption.

As the defendant admitted before this Court when he pleaded guilty, in July 2016, with the assistance of codefendant Joshua Smith and others, the defendant carefully orchestrated the concealed movement of $91,000—$67,000 of which came from Kelsey's state Senate campaign committee—to a national political organization ("Political Organization 1") for the coordinated purpose of funding advertisements that urged voters to support the defendant in the looming August 4 Republican primary. DE 73 at 6-9 (plea agreement). In addition to violating the prohibition on using state campaign funds to support his federal campaign, these actions caused Political Organization 1 to make illegal excessive contributions to the defendant's campaign in the form of coordinated expenditures. *Id.* Through his intermediaries, and even direct communications with a high-level Political Organization 1 employee who would later become the defendant's wife, the defendant secretly pulled the strings on what were supposed to be "independent" political advertising campaigns, directing Political Organization 1's decisions regarding the content of the ads (Kelsey's legislative accomplishments that had polled well), their audience (residents of West Tennessee), the medium (radio and online), and the timing (the days leading up to the August 4 primary).

As the Probation Office found, PSR ¶¶ 39-41, the defendant's misconduct was not limited to the scheme he engaged in with Smith and others to secretly and illegally funnel funds to Political

Organization 1 and then illegally coordinate the messaging of that organization's pro-defendant ad campaigns. Rather, from the start of his 2016 congressional campaign, the defendant engaged in a full-court press of campaign finance fraud, executing multiple, separate schemes to squeeze every last dollar out of his state campaign account and his financial benefactors in support of his federal congressional campaign despite knowing his multi-pronged efforts were illegal.

In another scheme beginning early in 2016, the defendant used the connections he had forged during the more than a decade in the Tennessee General Assembly to funnel other soft-money and conduit contributions through his legislative colleagues. Kelsey did this by either fronting or reimbursing state legislators' contributions to his federal campaign with funds that originated from the defendant's state campaign committee. In a further effort at concealment, the defendant routed these funds through a Tennessee state political action committee ("PAC") that he controlled to disguise the illegal source.

In yet another, third illegal scheme to benefit his 2016 congressional campaign, in July 2016, the defendant directed private benefactors who had already made a maximum legal contribution to his federal campaign to pay costs associated with a U.S. Senator and former Presidential candidate's late-July 2016 travel to West Tennessee to campaign on the defendant's behalf in the days just before the primary election. The defendant instructed these benefactors to disguise these in-kind contributions to his federal campaign as campaign contributions to the U.S. Senator's then-suspended 2016 Presidential campaign. This resulted in these benefactors making secret, and illegal, excessive contributions to Kelsey's campaign.

The defendant's campaign finance violations were not isolated errors in judgment. His actions were calculated, multifaceted, and complex. He leveraged his power, his connections,

5

and the money he had raised as a State Senator to facilitate his self-serving criminal objectives. He manipulated Smith and others close to him to shield himself from scrutiny regarding illegal financial transactions and to hide illegal coordination with a purportedly "independent" political organization; an intricate scheme that the defendant carefully planned and initiated for the benefit of his own political aspirations. His concealment of contributions from publicly filed reports defrauded the FEC and subverted the transparency that is essential for the proper functioning of the federal electoral system. His actions provided further reasons for public cynicism about the processes we use to fund campaigns for public office.

There is nothing in the defendant's background that would mitigate, excuse, or explain his conduct. He had a comfortable and peaceful upbringing anchored by parents who provided him with a loving and supportive home free of abuse or neglect. The defendant achieved great academic and professional success, graduating from an elite college and elite law school, securing immediate employment at a law firm, and, a year later, becoming an elected member of the Tennessee House of Representatives and, later, the Tennessee Senate and chairman of its powerful Judiciary Committee. In adulthood, the defendant has a stable family life and considerable financial resources, with a spouse who independently earns more than $13,000 per month. PSR ¶ 85. In sum, the defendant has had every opportunity that life could have presented him. He has experienced no hardships that could even arguably justify or explain his criminal conduct. Quite simply, the defendant chose to use his considerable advantages and opportunities to engage in conduct that was selfish, corrupt, and criminal. This factor weighs in favor of a within-Guidelines sentence.

> C. **The recommended sentence would reflect the seriousness of the offense, promote respect for the law, and justly punish the offense (18 U.S.C. § 3553(a)(2)(A)).**

The defendant's serious offense conduct, admitted perjury, and post-plea denialism demonstrate a profound disrespect for the law. At the time the defendant committed his offenses, he was an attorney and elected Senator of the State of Tennessee. He held an office of trust as a lawmaker representing the people of Tennessee, and as a member of the Tennessee Bar he swore an oath to respect and uphold the law. During the defendant's time in the Tennessee General Assembly, he sponsored or co-sponsored hundreds of pieces of legislation, including bills that specifically addressed consequences for criminal convictions. The defendant served as chairman of the Senate Judiciary Committee, through which many bills and rules related to the criminal justice system passed. He betrayed the trust the citizens placed in him by misusing funds that he had raised in pursuit of his state position to feed his ambition for federal office and by willfully violating federal law.

It is difficult to overstate the seriousness of the defendant's crimes. The defendant denied the public its most powerful tool for casting informed ballots: transparency. Secretly coordinated campaign expenditures with purportedly independent entities enable the possibility and the appearance of *quid pro quo* arrangements between donors and current and potential officeholders, as the Supreme Court has recognized for decades. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 26-27, 46-47 (1976). Transparency about contributions allows the public to judge a candidate, and those to whom he might be beholden, at the voting booth. The federal election laws exist to assure that transparency. These laws require all federal candidates to make a true, accurate accounting of the contributions they have received, so that the citizens can properly police their own leaders.

7

The efficacy of these laws is already subject to suspicion by much of the American public.[1] The defendant's actions only fanned the flames of that cynicism. By imposing a 41-month term of imprisonment, the Court can address the seriousness of the defendant's crimes and assure the public of its government's ability to police and punish conduct that would corrupt elections and deny the public the right to cast informed votes.

Furthermore, the defendant has repeatedly displayed a troubling lack of respect for the law and the public good. In the immediate aftermath of the grand jury's decision to indict the defendant, he arranged a press conference in which he spoke with the backdrop of the floor of the Tennessee Senate behind him and issued the following statement:

> Look this is nothing but a political witch hunt. The Biden administration is trying to take me out because I'm conservative. And I'm the number one target of the Tennessee Democratic Party. I won my seat only 51 to 49 percent last time and the Democrats think this will make the difference. They're wrong. These five-year-old unfounded allegations have been reviewed and rereviewed. They were wrong then and they're wrong now. I'm totally innocent and I look forward to being cleared at trial.[2]

*See* PSR ¶ 42.

---

[1] *See, e.g.*, *Most Americans Want to Limit Campaign Spending, Say Big Donors Have Greater Political Influence*, PEW RESEARCH CENTER, May 8, 2018 ("There is widespread – and bipartisan – agreement that people who make large political donations should not have more political influence than others, but Americans largely don't see that as a description of the country today."), *available at* https://www.pewresearch.org/fact-tank/2018/05/08/most-americans-want-to-limit-campaign-spending-say-big-donors-have-greater-political-influence/ (last visited Aug. 4, 2023); *Americans' Views on Money in Politics*, NEW YORK TIMES, June 2, 2015 ("In a rare show of unity, Americans, regardless of their political affiliation, agree that money has too much influence on elections, the wealthy have more influence on elections, and candidates who win office promote policies that help their donors."), *available at* https://www.nytimes.com/interactive/2015/06/02/us/politics/money-in-politics-poll.html (last visited Aug. 4, 2023).

[2] *Sen. Brian Kelsey Press Conference*, WRAL, Oct. 25, 2021, *available at*: https://wreg.com/video/sen-brian-kelsey-press-conference-10-25-21/7093987/ (last visited Aug. 4, 2023).

This statement was a cynical attempt by the defendant to use his public platform as a State Senator to deflect from his own misconduct by painting the independent decision of the grand jury—an arm of this Court—to indict him as a partisan political exercise. Moreover, the defendant sought to erode trust in the criminal justice system by disparaging the grand jury and the government and by lying to the public about his criminal culpability.

As described in detail in the government's Position Regarding PSR (at pp. 2, 5), the defendant lack of respect for the law carried over into other post-indictment and, even, post-plea conduct before this Court. At the evidentiary hearing related to the defendant's unsuccessful motion to withdraw his guilty pleas, the defendant repeatedly testified that he had knowingly and intentionally lied under oath at his change of plea hearing when he told the Court that he was guilty of Counts 1 and 5 of the Indictment. And he repeatedly asserted that he did not commit the acts set forth in the factual basis supporting his pleas, despite his earlier sworn written and oral statements that the factual basis was correct. Just this week, the defendant filed purported "mitigation evidence" in the form of an affidavit from one of his former campaign attorneys. DE 131, 131-1, 131-2. This filing yet again demonstrates the defendant's ongoing post-plea refusal to accept responsibility for his crimes, to ignore the sworn statement of facts contained in his plea agreement, and to blame others for his misconduct. As described on p. 3, *supra*, this late-disclosed information does not serve as a basis for mitigation. Rather, it further inculpates the defendant by underscoring the degree to which he ignored advice that he received from campaign advisors and willfully violated campaign finance laws.

The defendant's behavior stands in stark contrast to that of his codefendant Joshua Smith, who, since pleading guilty, has not wavered in his acceptance of criminal responsibility for his

conduct, and has endured delays in his own sentencing based on the defendant's repeated efforts to avoid or delay judgment in this case. The defendant's unrepentant conduct warrants a term of imprisonment at the top of the advisory Guidelines range.

    **D.    The recommended sentence would afford adequate deterrence (18 U.S.C. § 3553(a)(2)(B)).**

The defendant's actions show a need for specific and general deterrence. The defendant now rejects the very facts that he swore were true when he pleaded guilty and falsely contends that he did nothing wrong. The defendant's refusal to accept responsibility shows that he presents a risk of recidivism. That is even more clear given the defendant's apparent continued involvement in the political and lobbying spaces. *See* PSR ¶ 12 (reporting that, in or around January 2023, the defendant established his own lobbying firm and has registered to represent at least one trade association).

Courts have also observed that white collar criminals are "prime candidates for general deterrence." *United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.") (citations omitted); *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015). The defendant's scheme was successful primarily because he found others—coconspirators like Joshua Smith, as well as unwitting participants—to go along with his criminal conduct. A 41-month term of imprisonment would deliver a message to all who have the privilege of participating in campaigns for public office that no political victory is worth the risk of a lengthy term in federal prison. To anyone who believes that a campaign finance crime is unlikely to be detected or unlikely to lead to a meaningful criminal penalty, this sentence would show that violations of these laws carry a high cost.

10

**E. The need to avoid unwarranted sentencing disparities supports the recommended sentence (§ 3553(a)(6)).**

Finally, a 41-month term of imprisonment in this case would be commensurate with many sentences imposed on defendants convicted of crimes arising from campaign finance fraud schemes. *See, e.g.*, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y.) (36 months); *United States v. Stockman*, No. 4:17-cr-116 (S.D. Tex.) (60 months; concurrent with 120 month sentence on mail/wire fraud and money laundering convictions); *United States v. Rowland*, No. 3:14-cr-79 (D. Conn.) (30 months); *United States v. Braddock*, No. 3:12-cr-157 (D. Conn.) (38 months); *United States v. Bigica*, No. 2:12-cr-318 (D.N.J.) (60 months); *United States v. Danielcyzk*, No. 1:11-cr-85 (E.D. Va.) (28 months); *United States v. Hsu*, No. 1:07-cr-01066 (S.D.N.Y.) (52 months; concurrent with 292 month sentence on mail and wire fraud convictions). Most, if not all of these cases did not involve a defendant who had perjured himself before the Court.

## CONCLUSION

WHEREFORE, based upon the factors set forth in § 3553(a), the United States respectfully requests this Court impose a within-Guidelines sentence of 41 months of imprisonment.

Respectfully submitted,

| | |
|---|---|
| HENRY C. LEVENTIS<br>United States Attorney<br>Middle District of Tennessee | COREY R. AMUNDSON<br>Chief<br>Public Integrity Section |

By:

/s/ Amanda J. Klopf
AMANDA J. KLOPF
Assistant U.S. Attorney
110 Ninth Avenue South, Suite A-961
Nashville, TN 37203
(615) 736-5151
Email: amanda.klopf@usdoj.gov

By:

/s/ John P. Taddei
JOHN P. TADDEI
Trial Attorney
1301 New York Ave. NW
Washington, DC 20530
(202) 514-3885
Email: john.taddei@usdoj.gov

REAGAN FONDREN
Attorney for the United States, Acting
under Authority
Conferred by 28 U.S.C. § 515
Western District of Tennessee

By:

/s/ David Pritchard
DAVID PRITCHARD
Assistant U.S. Attorney
Western District of Tennessee
167 North Main Street, Suite 800
Memphis, TN 38103
(901) 544-4231
Email: david.pritchard2@usdoj.gov

# CERTIFICATE OF SERVICE

      I certify that a true and correct copy of the foregoing response was electronically filed with the Clerk on August 4, 2023, and service was made upon all persons registered in that case via CM/ECF and/or by email.

                                                   /s/ John P. Taddei
                                                   JOHN P. TADDEI
                                                   Trial Attorney