# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:21-cr-00264-1 |
| BRIAN KELSEY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

## BRIAN KELSEY'S SENTENCING MEMORANDUM
## IN SUPPORT OF A PROBATIONARY SENTENCE

---

J. ALEX LITTLE
ZACHARY C. LAWSON
BURR & FORMAN LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3200
alex.little@burr.com
*Attorneys for Brian Kelsey*

August 4, 2023

# TABLE OF CONTENTS

SUMMARY ..................................................................................................................1

BACKGROUND ..........................................................................................................6

    *The Statute and Its Purpose* .........................................................................6

    *Factual Background* ......................................................................................8

    *The Offense Conduct in the Plea Agreement* .............................................11

ARGUMENT IN SUPPORT OF PROBATION ..........................................................13

  I.   PROBATION AVOIDS A SENTENCING DISPARITY ......................................14

    *Similarly situated defendants in cases across the country*
      *have either been sentenced to probation or not charged at all* ......................14

    *Similarly situated defendants in this case*
      *have either faced no charges or will likely receive probation* .........................24

  II.   THE HISTORY AND CHARACTER OF BRIAN KELSEY .............................28

  III.  THE PURPOSES OF SENTENCING
       AND COLLATERAL CONSQUENCES OF CONVICTION ........................36

  IV.  THE KINDS OF SENTENCES AVAILABLE...................................................40

    *Probation* ......................................................................................................40
    *Imprisonment* ...............................................................................................41

  V.  PERTINENT POLICY STATEMENTS ............................................................42

CONCLUSION............................................................................................................43

EXHIBITS

    *Table of Election Finance Cases and Sentences*...............................................Ex. 1
    *Declaration of Kory Langhofer* .....................................................................Ex. 2
    *FBI Report 302 of Jeremy Durham* ...............................................................Ex. 3
    *FBI Report 302 of Jeremy Durham* ...............................................................Ex. 4
    *FBI Report 302 of Layne Provine* ..................................................................Ex. 5

CHARACTER LETTERS

## SUMMARY

No district court has ever sentenced a defendant like Brian Kelsey to prison. This court should not be the first.

Brian Kelsey pleaded guilty to a federal campaign finance violation involving less than $100,000 in excess contributions. Those funds did not come from a hidden donor trying to conceal his or her identity, nor were these "excess" contributions meant to influence and corrupt Brian's future decision-making. This case is nothing like that. Rather, the "excess contributions" at issue were funds that donors already had legally given Brian when he ran for state office, but which (in the government's telling) he improperly tried to use to support his federal campaign. It is important to note that many candidates use state funds to help them in federal elections. But the process for doing so is complex and has limits. Here, the government charged Brian for breaking this complex set of rules.

Normally, when a candidate breaks this type of election finance rule, the candidate is *not* thrown in jail. Far from it. Since 2018 (when data became available) to the present, the Federal Election Commission ("FEC") has opened more than 1,000 civil cases against alleged campaign finance violators. In that same period, the U.S. Department of Justice ("DOJ") has brought just twenty-four criminal cases for alleged election finance crimes. And it has only brought three cases that (like this one) involved less than $100,000 in "excess" contributions. In those three cases, which implicated five different defendants, one defendant pled guilty (she received one year of probation), and the other four defendants went to trial. Even after trial, three of

1

the four received sentences of probation (two years each), while the remaining defendant was sentenced to jail for 3 months—and his scheme involved a quid-pro-quo bribe paid to him by a presidential campaign to secure his endorsement.

This case is nothing like that, or for that matter like any of the other campaign finance cases that DOJ has pursued criminally. It appears to be the only case in which the Justice Department has charged a candidate with a federal crime for trying to use legitimately raised state campaign funds in support of a federal election. In choosing to bring this case, however, the Justice Department chose *not* to charge the entity that facilitated the "excess" contribution (the American Conservative Union or "ACU") or the two individuals who arranged it (Jeremy Durham and Andrew Miller), despite both of them having long and serious histories of misconduct. All told, of the five people or entities the government has alleged were involved in the conduct here, it seeks a felony conviction and lengthy jail time for only one of them: Brian Kelsey.

But there is no reason for the Court to grant the government's wish, and at least three good reasons it should not.

*First*, sentencing Brian to prison would create a sentencing disparity in exactly the sort of case where those disparities can do the most harm.

Election finance crimes by their very nature involve political actors. In turn, prosecutions for these crimes carry the extra scrutiny that accompanies partisan politics. Political supporters of a defendant are inclined to assume the worst intentions of prosecutors and courts, while opponents are happy to cheer on such a case (and jail time!) no matter the merits. Such cases therefore rest on a razor's edge,

with even the slightest imperfections capable of destroying public confidence in the outcome. This is why the explicit directive in the sentencing statute to "avoid unwarranted sentence disparities" is at its apex in political cases. Disparities between any two similarly situated defendants can harm the appearance (and pursuit) of equal justice. Disparities between two similarly situated defendants *in a political case* are profoundly more damaging. As detailed below, sentencing Brian to jail time would create a serious discrepancy between similarly situated individuals both in this case and between all other election finance cases across the country.

*Second*, Brian Kelsey is exactly the sort of defendant for whom probation is appropriate, and the conduct at issue here is exactly the sort of isolated misjudgment that alternative sentences are best suited to address.

As detailed below, Brian has been a model citizen for more than forty years. He is a truly religious man who has dedicated his life to public service instead of personal gain. Since he has been married, he has been a devoted husband and father who is fully invested in the day-to-day work of raising a toddler and infant twins. This is hard work, and he does it well. He already has and certainly will continue to face the collateral consequences of his conviction: the destruction of his reputation, the loss of his political career and law license (and, in turn, his livelihood), and the many other restrictions placed on felons that will accompany him for the rest of his life. This is plenty punitive. Removing him from his home solely to punish him accomplishes nothing more.

This is particularly true because the conduct at issue represents, at worse, an isolated misjudgment in a long career marked by following rules to the letter. As detailed below, Brian sought legal advice about the transfer of funds from his state to federal campaign and took steps to abide by that advice. And as the government's primary witness, Jeremy Durham, repeatedly said: Brian was "careful not to direct" Durham's activities, particularly in the early days after he gave away his campaign funds. The line between conduct that is kosher and conduct that is illegal in a federal campaign is a fine one. If Brian slipped over that line, it was exactly the sort of isolated misjudgment that alternative sentences are best suited to address.

*Third*, the alleged conduct at issue in this case is far afield from the core illegality that federal campaign finance laws are meant (and limited by the Constitution) to address, and the plea's factual basis hardly makes out a crime at all. In these circumstances, a probationary sentence is appropriate.

Although there is a compelling state interest in stopping quid-pro-quo corruption that is served in a narrowly tailored manner by imposing contribution limits on direct giving to a candidate's own campaign, the Justice Department's entire case here is built on the theory that Brian is both the donor and the recipient of the funds. That is, the government has alleged that Brian took his own campaign's money to use for another one of his campaigns. But because Brian cannot corrupt himself, nor is there a danger that he might *appear* do so, there is no compelling state interest here. Brian's sentence should reflect the unusual nature of this particular crime being charged on these particular facts.

This is especially true given that the line separating permitted coordination and illicit activity is a blurry one. Here, it was perfectly legal for Jeremy Durham to recommend to ACU what to do with its funds, and for ACU to take his advice. What converted this back-and-forth to a federal felony in the plea agreement was the statement that this activity was done at Brian's "implicit" direction. As reflected below, however, nearly every PAC that supports federal candidates follows the implicit direction of that candidate's campaign to some degree; the law permits a great many winks and nods. Where, as here, there is no clear distinction between what happens in countless other campaigns and what happened here, a probationary sentence both creates consequences for crossing the blurry line while also reflecting the similarity of Brian's conduct to actions taken by campaigns across the country that subjects them to no sanction at all.

Taken together, these three reasons—which align with the other sentencing factors this Court must consider under § 3553—support a sentence of probation.

## BACKGROUND

This case is unlike most excessive contribution cases. Although Brian has pleaded guilty to accepting an excessive contribution from ACU, this case does not involve the corruptive dangers that most excessive contribution cases share—that is, when a candidate is indebted, or appears indebted, to an individual or organization that made a large contribution to his or her campaign. This is because $67,000 of the $80,000 ACU spent on radio ads supporting Brian can be traced to "hard money" donations within the permissible limits that Kelsey's state campaign received from individual donors through legitimate fundraising. This fact sets Brian's case far apart from the few cases where courts have imposed jail time for election finance crimes *and* from the entire purpose of the post-*Buckley* election law regime.

### *The Statute and Its Purpose*

Since the landmark decision of *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court has evaluated the limitations that the First Amendment imposes on the government's ability to regulate campaign expenditures and contributions made to federal candidates. The *Buckley* Court reviewed a challenge to the Federal Election Campaign Act of 1971 ("FECA"), which imposes financial limits in the election of candidates for federal office and provides for public disclosure of the financing of federal election campaigns. 52 U.S.C. § 30101, *et seq*.

The *Buckley* Court applied different levels of scrutiny to statutory limitations on campaign contributions as opposed to those on independent expenditures—upholding contribution limits if "a sufficiently important interest" supported them

and if they "employ[] means closely drawn to avoid unnecessary abridgement of associational freedoms," 424 U.S. at 25, while subjecting limits on independent expenditures to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression," *id*. at 44-45.

In upholding the contributions limit, the Court relied on the government's significant interest in "limit[ing] the actuality and appearance of corruption resulting from large individual financial contributions," finding that "the integrity of our system of representative democracy is undermined" where "large contributions are given to secure a political quid pro quo from current and potential office holders." *Id*. at 26-27. The Court also noted a significant interest in reducing the "appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions" because such appearance of corruption could erode confidence in the government. *Id*. at 27. It held that the $1,000 contribution limit (which has been increased over time) was "closely drawn" to the asserted interests because the limitation targeted the "problem of large campaign contributions," which is "the narrow aspect of political association where the actuality and potential for corruption have been identified." *Id*. at 28. And following *Buckley*, the Supreme Court has maintained "quid pro quo corruption" as the only legitimate interest that the government has in regulating individual campaign contributions. *McCutcheon v. FEC*, 572 U.S. 185, 192 (2014). These concerns are absent here.

## *Factual Background*

Brian was a practicing attorney and state lawmaker for nearly two decades, including as a member of the Tennessee Senate from 2009 to 2022. More than seven years ago, and while he was a state senator, he ran for an open seat to represent Tennessee's 8th Congressional District in the U.S. House of Representatives. His campaign was ultimately unsuccessful, as he came in fourth place in the primary.

When Brian began his congressional campaign, he spoke with another state senator who recommended he look into transferring his state campaign funds to an entity which could help his federal effort. His state committee still retained around $106,000 in hard money donations from his various campaigns for state office. These funds came from individual donations within both the state and federal limits. (The federal contribution limits are greater than Tennessee's limits for state senate campaigns.) Brian wanted to make sure that his colleague's advice was correct, so he sought legal advice on the issue from Kory Langhofer, a prominent federal election lawyer that Brian's campaign had already retained to help navigate the tangled web of campaign finance law.[1] Langhofer advised Brian that he could transfer funds from his state committee to an independent state committee, which could in turn transfer the funds to a federal independent committee that could then spend the money on advertisements in support of Brian.[2] Langhofer reduced his advice to writing in an email to Brian, which included citations to legal authorities.[3]

---

[1]     Ex. 2: Langhofer Decl.
[2]     *Id.* at Ex. A.
[3]     *Id.*

Langhofer's advice was legally sound. And campaigns commonly use such tactics. For example, Ron DeSantis' state political action committee ("PAC") (which he had distanced himself from so it could be considered "independent") recently transferred $82.5 million left over from his past gubernatorial campaigns to a federal PAC supporting him for president.[4]

Similarly, but on a *much* smaller scale, Brian decided to transfer the funds from his state committee to an independent state PAC, in hopes that the funds would then be transferred to a federal PAC that would spend the funds in support of him. Brian decided to transfer the roughly $106,000 to The Standard Club PAC ("SCPAC"), which was run by co-defendant Josh Smith. Langhofer advised Brian that it was important that SCPAC be independent, and he pre-approved a statement for Brian to say to Smith when handing over the check so that Smith would be clear that Smith could spend the money however he wanted.

Brian acted in accordance with this advice. In July 2016, Brian attended a dinner at the Standard Club, owned by Smith, with then-state representative and attorney Jeremy Durham and his wife.[5] At the time, Brian and Durham were friendly and commonly sought one another's professional counsel. (Their relationship later soured, however, after Durham was expelled from the General Assembly for having

---

[4]     *See* Steve Contorno, *Desantis' Former State Political Committee Transfers $82.5 Million to Allied Super* PAC, CNN.com, (June 13, 2023) https://www.cnn.com/2023/06/13/politics/desantis-money-super-pac-transfer/index.html#:~:text=Ron%20DeSantis%20transferred%20%2482.5%20million,from%20his%202022%20reelection%20bid.

[5]     Ex. 3: Durham 302 dated 4/28/21 at 6.

inappropriate "sexual interactions" with 22 women, causing Brian to distance himself from Durham.)

At the end of the dinner, Brian gave Smith a check for approximately $106,000 from his state committee to SCPAC. (*Id.* at 6.) When he handed Smith the check, he recited the following statement that was pre-approved by his counsel: "There are no strings attached to this money whatsoever. You can spend it however you want. I suggest you speak to an attorney before you spend it."[6] Brian then promptly left. These facts are corroborated by Durham.[7]

Brian's counsel also advised that, because the legal lines are blurry and can be crossed by a misplaced word, Brian should record what he told Smith as contemporaneously as possible by email.[8] Brian did as he was advised.[9]

There was nothing unlawful about this transaction. Smith has recently confirmed in a verified petition in a separate matter that he also believed—and still believes—that this transfer was lawful, stating the following:

> The check Mr. Smith accepted during a dinner at The Standard did not constitute a crime . . . . It was also not a violation of the FECA for Mr. Smith to deposit these funds into his PAC bank account, nor was it a violation for the PAC controlled by Mr. Smith to contribute funds directly to Mr. Kelsey's federal campaign.[10]

---

[6] Ex. 2: Langhofer Decl. at 2-3, Ex. B.

[7] Ex. 3: Durham 302 dated 4/28/21 at 6-7.

[8] Ex. 2: Langhofer Decl. at 2-3.

[9] *Id.* at Ex. B.

[10] *The Standard Restaurant, LLC et. al. vs. Tennessee Alcoholic Beverage Commission*, Davidson Co. Chancery Court, Case No. 23-0497-IV at Verified Petition dated 4/18/2023, ¶ b.

In that case, Chancellor Perkins agreed.[11]

Nor was it a violation for SCPAC to transfer the funds, in any amount, to a federal PAC, like Governor DeSantis's state PAC did. And that is what SPAC did. After receiving the funds, Smith transferred $30,000 from SCPAC to ACU and $37,000 to a different PAC, called Citizens 4 Ethics in Government ("CEG"). CEG later transferred $36,000 to ACU. In addition, the Judicial Crisis Network ("JCN") transferred $25,000 to ACU, purportedly to be spent to support Brian's campaign. Shortly after, ACU spent a total of $80,000 on three "radio ad buys" in support of Brian's congressional campaign. The mere transfer of these funds, along with ACU's $80,000 in spending to support Brian's campaign, is permitted by law and does not form the basis of the offense conduct, despite the government's attempt to characterize it as money "funneling." As explained more fully below, under the plea agreement, this otherwise lawful behavior was rendered unlawful because Durham was involved in coordinating the transactions and was acting at Brian's "implicit" direction.

### The Offense Conduct in the Plea Agreement

Brian's plea contains only one substantive count, Count 5, which charged that he accepted excessive contributions in violation of 52 U.S.C. § 30116(f). The other

---

[11]    *Id.*, May 11 Order at ¶ 12 ("This transaction, standing alone, was apparently illegal.)

count in the plea (Count 1) charges a conspiracy aimed at receiving the same excessive contributions.

As explained above, the flow of money from Brian's state committee to ACU through the two PACs was not, by its own nature, unlawful. The issue raised in the indictment, and what Brian pleaded guilty to in Count 5, is that ACU's ultimate expenditure "was coordinated by [Brian's] agents and was not independent." This fact, taken as true, renders ACU's expenditures (and the transfers made to achieve the expenditures) contributions that were impermissible.

In other words, although ACU could spend as much money as it wanted to support Brian if it did so independently, because it allegedly coordinated with Brian's agents on how to spend the money, it could not do so. Here, the plea agreement states that Brian's agents coordinated with ACU on the radio advertisements. The plea agreement does not say who the "agents" were. But, based on the discovery provided, the person that spoke to ACU about Brian's campaign was Durham.

When Durham was interviewed by law enforcement and the prosecutors, Durham said he believed that Brian had given him ACU's phone number prior to or at the dinner at The Standard. (Ex. 3 at 8.) This alone, however, does not constitute coordination, as Langhofer explains to his clients. (Ex. 2 at 4.) Durham said that, at the dinner, Brian told Smith that Durham would be an excellent advisor and political mind if Smith needed advice about how to use the funds. (Ex. 3 at 7.) Durham understood this to mean that Brian wanted Durham to help Smith get the funds where they needed to be in order to benefit Brian. (*Id.*)

In a later interview, Durham's told investigators that, during subsequent calls with Schneider, he offered his opinions on how to best target specific geographic areas.[12] Durham did not say that Brian asked him to provide these opinions to Schneider. Nor would Brian have wanted Durham to advise ACU to buy radio advertisements, because Brian's political consultant did not believe radio buys were a good use of campaign funds since "radio ads are an antiquated approach to campaigning."[13] Durham claimed only that he later relayed the conversations back to Brian, "who did not disapprove of them."[14] He did not say that Brian approved them.

This is the alleged coordination referenced in the plea agreement.[15] Under the plea agreement, Durham's involvement rendered ACU's expenditures as excessive contributions in the amount of $80,000.

## ARGUMENT IN SUPPORT OF PROBATION

After *United States v. Booker*, 543 U.S. 220 (2005), the overarching legislative command for district courts at sentencing is that a sentence must be sufficient, but not greater than necessary, to comply with the sentencing goals mandated by Congress: including punishment, respect for the law, and deterrence. *See* 18 U.S.C. § 3553(a). A sentence of probation in this case meets that directive.

---

[12]     Ex. 4: Durham 302 dated 7/12/21 at 1-2.

[13]     Ex. 5: Provine 302 dated 2/6/20 at 4.

[14]     Ex. 3 at 7-8.

[15]     *See* Doc. 73 at PID 214, at ¶ dd.

Before imposing a sentence, the Court must first calculate the applicable guideline range. Defense counsel has objected to the calculations suggested by the Probation Office in the Presentence Investigation Report. For the reasons explained in Brian's objections, the appropriate Office Level is 18 rather than 20, and the resulting Guidelines Range should be 27-33 months. In any event, the arguments below outline various reasons why the Guidelines Range proposed by the Probation Office conflicts with the overarching goals of sentencing mandated by Congress. To this end, the Court must consider the recommended guidelines range together with the statutory factors listed in 18 U.S.C. § 3553(a) and determine the appropriate sentence, which may vary upward or downward from the range suggested by the Guidelines. Here, justice requires that the sentence should vary downward from the Guidelines to a sentence of probation.

## I.  PROBATION AVOIDS A SENTENCING DISPARITY

Sentencing Brian to jail time would create a serious discrepancy between similarly situated individuals in election finance cases across the country, as well as between those involved in the conduct that the government has charged here.

### Similarly situated defendants in cases across the country have either been sentenced to probation or not charged at all.

Pursuant to § 3553(a)(6), district courts are obligated to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" Subsection (a)(6) is generally "concerned with national disparities among the many defendants with similar criminal backgrounds convicted of similar criminal conduct." *United States v. Simmons*, 501

14

F.3d 620, 623 (6th Cir. 2007). The purpose of this subsection is "to ensure nationally uniform sentences among like offenders so as to leave room to depart downward for those defendants who are truly deserving of leniency." *Id*. at 624.

To avoid sentencing disparities in this case, the Court must consider sentences imposed on similarly situated defendants involving campaign finance violations. This effort is complicated here because the federal government rarely chooses to exercise its extraordinary power and discretion to criminally prosecute campaign finance violations at all. Presumably, the dearth of such cases is due to the fact that prosecutors generally recognize that campaign finance regulations are "baffling and conflicted." *N. Carolina Right to Life, Inc. v. Leake*, 525 F.3d 274, 296 (4th Cir. 2008) (*Majors v. Abell*, 361 F.3d 349, 355 (7th Cir. 2004)). Indeed, the overwhelming number of cases involving alleged campaign finance violations are resolved in civil proceedings before the FEC through fines, non-monetary sanctions, or dismissal.[16] That is the case even in extremely high profile matters, such as those involving the Democratic National Party and Hillary Clinton,[17] and matters involving particularly

---

[16]    In a news article from July 19, 2015, Bloomberg reporter, Kenneth P. Doyle, reported that, since 2008, the FEC referred zero campaign finance enforcement cases to the Department of Justice for criminal prosecution, prior to 2008, the FEC almost never made such referrals. *See* Kenneth P. Doyle, *FEC Rarely Votes to Refer Criminal Cases to Justice, Bloomberg BNA Daily Report for Executives*, Bloomberg Law, (July 29, 2015), https://news.bloomberglaw.com/white-collar-and-criminal-law/fec-rarely-votes-to-refer-criminal-cases-to-justice.

[17]    See Jill Colvin, DNC, *Clinton Campaign Agree To Steele Dossier Funding Fine*, APNews.com, (Mar. 31, 2022), https://apnews.com/article/russia-ukraine-2022-midterm-elections-business-elections-presidential-elections-5468774d18e8c46f81b55e9260b13e93;

egregious conduct, such as Barry Zekelman, who allegedly funneled $1,750,000 to an American super-PAC in violation of federal campaign finance laws.[18]

In fact, a review of the FEC's administrative fine database shows that, since 2018, the FEC has closed approximately 1,016 civil cases against alleged campaign finance violators.[19] Whereas, based on data from United States Sentencing Commission (the "Sentencing Commission"), there have only been twenty-four cases across the country between 2018 and 2022 (the most recent year for which data is available) where the federal government has obtained criminal convictions for crimes where, like here, the primary sentencing guideline is U.S.S.G. § 2C1.8.[20]

This is an important marker, as the Sixth Circuit has "explained that sentencing data released by the Sentencing Commission should serve as a starting point for district judges to avoid unwarranted sentence disparities." *United States v. Perez-Rodriguez*, 960 F.3d 748, 756–57 (6th Cir. 2020) (cleaned up). According to data from the Sentencing Commission, between 2018 and 2022, district courts across the country have imposed probation or probation and alternatives in nearly half of the cases where, like here, the defendant had a criminal history category of I and a

---

[18]     *See* Eric Lipton, *Donations Steered to Trump Super PAC by Canadian Are Found to Be Illegal*, NYTimes.com, (Apr. 9, 2022) https://www.nytimes.com/2022/04/08/us/politics/trump-super-pac-illegal-donations.html.

[19]     *See* Fed. Election Comm'n., *Administrative Fines Database*, https://www.fec.gov/data/legal/search/admin_fines/ (last visited July 29, 2023).

[20]     *See* U.S. Sentencing Comm'n, *Interactive Data Analyzer*, https://ida.ussc.gov/analytics/saw.dll?Dashboard (last visited July 29, 2023).

primary guideline of U.S.S.G. § 2C1.8(b).[21] And, even in the remaining half of the cases where district courts have imposed terms of imprisonment, the average length of the sentences has been nine months, and the median length of the sentences has been eight months. *See* Sentencing Commission Database.

Given that as a starting place, Brian's sentence should be far below his current Guidelines Range and, based on the specifics of his case compared to other similar cases discussed below, should be limited to probation.

In the analogous cases involving federal candidates and politicians convicted of violating campaign finance laws, district courts have imposed sentences of probation.[22] For example, in *United States v. Fortenberry*, the defendant, a career politician, was the sitting U.S. Representative for Nebraska's First Congressional District. The government charged the defendant with one count of knowingly and willfully falsifying and concealing $30,000 of illegal contributions made to his 2016 re-election congressional campaign and two counts of making false statements to federal authorities investigating the illegal contributions. After a seven-day trial, the defendant was convicted on all three counts. Despite the defendant proceeding to trial and being convicted of three felony counts, the court sentenced him to two years of probation and imposed a fine of $25,000—over the government's adamant demand for a sentence of imprisonment.

---

[21]     *See* Ex. 1: Table of Election Finance Cases and Sentences.

[22]     *See, e.g.*, *United States v. Fortenberry*, No. 2:21-cr-00491-SB (C.D. Cal. June 28, 2022); *United States v. Bennett*, No. 1:23-cr-00030-CRC (D.D.C. July 6, 2023).

Similarly, in *Bennett*, the defendant had run for the office of U.S. Representative for North Carolina's 11th Congressional District in the 2020 primaries. The government charged her with one count of violating federal election laws for taking a $25,000 loan from a family member and illegally using those funds for her campaign by misrepresenting the source of the funds. The defendant pled guilty on March 8, 2023. Notably, in its sentencing memorandum, the government recommended a sentence of probation—despite a guidelines calculation scoring her for a term of imprisonment—based, in part, on the fact that the defendant pled guilty and "there [wa]s little risk of any sentencing disparities" given that "[c]onvictions for violations of FECA often involve more serious concealment, with higher dollar amounts, than the concealment and dollar amount here."[23] Just two months ago, the court sentenced the defendant to twelve months' probation and imposed a $7,500 fine.

Only in the more egregious cases—where individuals have violated campaign finance laws totaling hundreds of thousands to millions of dollars, engaged in corrupt illegal conduct, sometimes for years, and/or unsuccessfully gone to trial—have district courts imposed sentences of imprisonment.[24]

---

[23] Gov't's Sentencing Memo. (D.E. 16), *United States v. Bennett*, No. 1:23-cr-00030-CRC (D.D.C. June 13, 2023).

[24] *See United States v. Sorenson*, 233 F. Supp. 3d 690 (S.D. Iowa 2017), *aff'd,* 705 Fed. App'x 481 (8th Cir. 2017); *United States v. Whittemore*, 776 F.3d 1074, 1078 (9th Cir. 2015) (sentencing a defendant to 24 months of imprisonment where the defendant went to trial and was convicted of making excessive contributions totaling $145,000.00); *United States v. Emmons*, 8 F.4th 454, 465 (6th Cir. 2021); *United States v. Taub*, No. 1:19-cr-00015-WES-PAS-1 (D.R.I. Mar. 21, 2021) (sentencing a former candidate for the U.S. House of Representatives to 36 months of imprisonment followed by 3 years supervised release and $1,102,439 in restitution where the

For example, in *Harber*, the campaign violations involved $325,000, more than three times the amount at issue here. There, the campaign manager for a federal candidate created a supposedly independent expenditure committee to support his candidate using a false name, and then lied to the FBI when confronted about it. He ultimately received a sentence of twenty-four months.

Similarly, in *United States v. Sorenson*, the defendant, an Iowa state senator, was charged with and pled guilty to one count of willfully causing false reports of federal campaign expenditures in violation of 52 U.S.C. § 30109(d)(1)(A)(i) and one count of falsifying records in contemplation and relation to a federal investigation intending to obstruct justice in violation of 18 U.S.C. § 1519. 233 F. Supp. 3d at 692. There, the defendant unlawfully received over $130,000 in payments from two potential presidential candidates' campaigns, which were paid for the purposes of securing the defendant's endorsement, over the course of several years. *Id.* at 692–93. The court sentenced the defendant to 15 months of imprisonment. *Id.*

*Sorenson* is a particularly notable case because the government, like in *Bennett*, recommended a sentence of 2 years of probation because even the prosecutors recognized that there would be a substantial sentencing disparity if the

---

defendant violated the FECA by operating fraudulent and unregistered political action committees totaling $1,630,439); *United States v. Harber*, No. 1:14-cr-00373-LO, 2015 WL 3659342 (E.D.Va. June 12, 2015) (imposing a 24-month sentence on a former campaign manager and political consultant for a federal congressional candidate convicted of directing approximately $325,000 in super PAC spending that aided his candidate's campaign).

defendant was sentenced to a custodial sentence.[25] Specifically, the government relied on the sentences imposed on the defendant's three co-conspirators, all of whom went to trial and were ultimately convicted of similar offenses. The government noted that, for two of the co-conspirators both of whom scored at level 22 under the Guidelines (41–51 months), the district court imposed sentences of 2 years' probation, 6 months of home confinement, 80 hours of community service per year, and a $10,000 fine each. The government further noted that, for the third co-conspirator who the government described as the "most active" offender and scored at level 24 (51–63 months), the district court imposed a sentence of 3 months imprisonment, 3 months home confinement, 80 hours of community service per year, and a $10,000 fine. Notwithstanding the fact that the defendant was an elected official, the government explicitly stated that the co-conspirators' sentences "require[d] that the government recommend probation."

As it relates to courts within this Circuit, in *Emmons*, the Sixth Circuit affirmed the judgments of two defendants who were convicted by a jury for knowingly and willfully making unlawful corporate contributions aggregating $25,000 or more; conspiracy to defraud the United States; willfully causing the submission of materially false statements; and falsifying records or documents. 8 F.4th at 458. There, the defendants unlawfully funneled more than $200,000 into a campaign for the daughter of one of the defendants, who was the former Kentucky secretary of

---

[25]    *See* Gov't's Sentencing Memo. (D.E. 61-1), *United States v. Sorenson*, No. 4:14-cr-103-RWP, at *7–8 (S.D. Iowa January 11, 2017).

state and running for the U.S. Senate—and lied to federal authorities about those funds to. *Id.* at 459. Pursuant to their PSRs, the defendants' calculated guideline ranges were 63 to 78 months and 41 to 51 months, respectively. *Id.* However, at the sentencing hearing, the district court sentenced the higher-scoring defendant to 21 months in prison, followed by 2 years of supervised release, and imposed a fine and special assessment of $151,000. *Id.* at 465. That said, as to the lower scoring defendant, who had a range of 41 to 51 months, the district court sentenced him to 3 years of probation, 9 months of which he would be required to reside in a halfway house, and imposed a fine and special assessment of $50,600. *Id.*

The data is clear: Not only have defendants with similar cases (and even large Guidelines Ranges) been sentenced to probation; the government has recommended such a sentence repeatedly, noting the disparities that might otherwise result.

The cases cited above have one important bias—they only include cases where criminal defendants have faced sentencing. They do not include the sizeable number of campaign finance violation cases in which the government has exercised its extraordinary discretion and resolved the cases by way of deferred or non-prosecution agreements. We have cited <u>six</u> such cases below.[26] For example, the government

---

[26]     *See, e.g.*, (1) Deferred Prosecution Agreement (D.E. 21), *United States v. Dannenbaum Engineering Corporation*, No. 4:19-cr-00795 (S.D. Tx. Nov. 22, 2019) (deferring prosecution of and ultimately dismissing federal election contribution law violations over the course of three years totaling $323,300 spent on over 24 separate candidates); (2) Deferred Prosecution Agreement (D.E. 3), *United States v. Arsan*, No. 2:21-cr-00159-PSG (C.D.Cal. Mar. 31, 2021) (deferring prosecution of and ultimately dismissing with prejudice federal election contribution law violations over the course of more than 2 years totaling approximately $150,000.00); (3) Deferred Prosecution Agreement (D.E. 3), *United States v. Baaklini*, No. 2:21-cr-00160-DMG (C.D.Cal.

entered into a non-prosecution agreement with Ray LaHood ("LaHood"), who, while serving as the U.S. Secretary of Transportation, illegally took a $50,000 loan from a billionaire foreign national, which he did not disclose and about which he repeatedly lied to federal investigators. Despite explicitly acknowledging and agreeing that he was responsible for this conduct, LaHood never suffered the life-altering consequences of federal charges being filed against him or a sentence of any kind.

Needless to say, there are likely countless other examples of the government entering into similar agreements for conduct equal to or far worse than Brian's, and yet those defendants, like the ones listed in footnote 15, have entirely avoided both a felony conviction and sentence of any kind. In fact, as discussed below, the government has entered into non-prosecution agreements with two of Brian's co-conspirators, including a former Tennessee House member, in this exact case. So, even though these individuals were never sentenced, the Court must nevertheless consider how these matters were resolved—and the lack of jail that these resolutions involved—when attempting to avoid disparate treatment of Brian.

The facts and circumstances of this case, particularly when taking Brian's background into account, fall squarely within the national cases in which district

---

Mar. 31, 2021) (deferring prosecution of and ultimately dismissing with prejudice federal election contribution law violations totaling approximately $30,000.00); (4) Non-Prosecution Agreement (unfiled), *United States v. LaHood* (C.D.Cal. December 4, 2019), (5) https://www.justice.gov/media/1133316/dl?inline (last visited July 31, 2023)[26]; (6) Deferred Prosecution Agreement (unfiled), *United States v. Chagoury* (C.D.Cal. October 10, 2019) (deferring prosecution of federal election contribution law violations totaling approximately $180,000), https://www.justice.gov/media/1133301/dl?inline (last visited July 31, 2023).

courts have imposed sentences of probation or probation along with prison alternatives (i.e., fines, community service, and/or home confinement). Brian's conduct was extremely limited in terms of both the scope and time and pales in comparison to the cases in which district courts have imposed custodial sentences.

For example, in terms of amount of money at issue, only one defendant in any of the above-referenced cases whose conduct involved less than $100,000—like here—was sentenced to prison, and, in that one case, the defendant was convicted at trial for receiving a bribe and was only sentenced to 3 months. The overwhelming majority of cases in which defendants were sentenced to prison involved considerably more money: $1,630,439 in *Taub* (sentenced to 36 months in prison); $325,000 in *Haber* (sentenced to 24 months in prison); more than $200,000 in *Emmons* (21 months in prison for one defendant); $145,000 in *Whittemore* (sentenced to 24 months in prison); over $130,000 in *Sorenson* (sentenced to 15 months in prison). That said, even in cases where the defendants conduct involved over $100,000 *and* the defendants went to trial, district courts have still imposed sentences of probation. *See, e.g.*, *Emmons*, 8 F.4th at 465 (sentencing the other defendant to 3 years of probation).

Further, Brian's conduct is not analogous to, nor as egregious as, the defendant's in *Sorenson*. There, the defendant sold his endorsement to the highest bidder. Here, Brian's conduct is more like the defendants' in *Fortenberry* and *Bennett*—both of whom, like Brian, merely funded their own campaigns with donations that the regulations restrict.

For these reasons, Brian's conduct most similarly compares to the defendants in *Fortenberry* and *Bennett* (or the many who have avoided sentencing altogether), making a probationary sentence the most appropriate result.

### Similarly situated defendants in this case have either faced no charges or will likely receive probation.

In addition to Subsection 3553(a)(6), district courts may and should consider the sentencing disparity between co-defendants. *See, e.g.*, *United States v. Douglas*, 634 F.3d 852, 864 (6th Cir. 2011); *United States v. Presley*, 547 F.3d 625, 631 (6th Cir. 2008); *Simmons*, 501 F.3d at 624. Here there are at least three individuals who were or should have been charged alongside Brian: his co-defendant Josh Smith, Jeremy Durham, and Andrew Miller. (Schneider was not charged, either, even though he made the ultimate decision to spend the funds on Brian's behalf and, allegedly, coordinated with Brian's agents.)

As noted above, the reason Durham and Miller are not co-defendants is because the government agreed not to prosecute either of them. Due solely to the prosecutor's preference, Durham (who, like Brian, was a member of the Tennessee General Assembly) and Miller (who, like Smith, operated a PAC) avoided all charges and any sentence whatsoever arising out of their admitted engagement in what the government considered a crime. Even according to the plea agreement, Durham was the primary actor who coordinated the money transfers and ACU's expenditures.

At just a surface level, the Court should take the government's decision not to prosecute Durham and Miller as evidence that Brian's sentence should not be severe.

But this is particularly true given the very different criminal histories of Brian, Durham, and Miller. While this case is an anomaly in Brian's otherwise law-abiding life, Durham and Miller have extensive histories of unrelated bad acts. Consider Durham. Law enforcement in Williamson County have accused him of altering a prescription to receive a controlled substance, presumably due to addiction.[27] Later, in 2016, the Tennessee Attorney General determined that Durham engaged in inappropriate sexual conduct with 22 women, including sexual harassment, which led to his nearly unanimous expulsion from the Tennessee House of Representatives.[28] After his expulsion from the House, in February 2017, the Tennessee Registry of Election Finance released an audit of Durham's campaign finances, which found a combined total of approximately 300 unique statutory violations of the State's campaign finance and disclosure laws.[29] Because several of these violations involved using campaign funds for personal expenses, the state violations likely constituted federal crimes, which the Justice Department often prosecutes but chose not to in his case.[30] More recently, Durham also faced charges

[27]    *See* Dave Boucher, Jill Cowan, and Stacey Barchenger, *GOP leaders: Rep. Durham investigation raises concerns*, The Tennessean.com (Dec. 10, 2015).

[28]    *See* Joel Ebert & Dave Boucher, *Jeremy Durham Expelled from Tennessee House in 70-2 Vote*, The Tennessean.com (Sept. 21, 2016).

[29]    *Durham v. Tennessee Registry of Election Fin.*, 666 S.W.3d 459, 463 (Tenn. Ct. App. 2022).

[30]    *See, e.g.*, Justice Dep't Press Release, *State Senator Indicted for Misuse of Campaign Funds*, https://www.justice.gov/usao-mdnc/pr/state-senator-indicted-misuse-campaign-funds (Sept. 27, 2016).

for driving under the influence, possessing drug paraphernalia, and resisting arrest after crashing into another vehicle while intoxicated.[31] Despite knowing about his involvement with drugs, his illicit history with women, his expulsion from the General Assembly, and his extensive campaign finance violations, the government still gave Durham immunity in exchange for his testimony in this case and presumably stood by that grant of immunity despite his further illegal conduct in driving under the influence and injuring another person—which almost undoubtedly violated the terms of his non-prosecution agreement.

Not to be out done, Miller also has a long and well-publicized history of campaign finance violations and fraud—accompanied by an aggressive anti-Muslim streak. On the campaign front, for example, one of Durham's 300 state campaign finance violations was for improperly lending $100,000 in campaign funds to a business Miller owned.[32] In 2014, Miller was investigated by the FEC for a similar but larger $200,000 loan to the same company by then-U.S. Senate candidate Joe

---

[31]     *See* Jonathan Mattise, *Ousted Tennessee Ex-Lawmaker Arrested on DUI Charge in Crash*, APNews.com (Oct. 24, 2022), https://apnews.com/article/driving-under-the-influence-arrests-tennessee-nashville-48d4c0a012cff1d84a58511ff05e0cf5.

[32]     *See* Cari Wade Gervin, *Durham campaign money invested in donor's company?*, NashvillePost (Aug. 31, 2016), https://www.nashvillepost.com/durham-campaign-money-invested-in-donors-company/article_7326424b-2cc1-50c9-ba64-3abb8ff6dd2b.html.

Carr.[33] And in a civil lawsuit, Miller was accused of using the same company, Life Watch Pharmacy, to hire some of those same legislators for no-show jobs.[34]

Even more egregious, Miller entered a settlement agreement with the United States Attorney's Office for the Middle District of Florida, agreeing to pay the government $7,750,000 to resolve allegations that he and others violated the False Claims Act through QMedRx, which bilked TRICARE for millions of dollars.[35] Miller was never criminally prosecuted for the fraud he committed against the United States and, instead, was rewarded with a non-prosecution agreement in this case. When giving Miller immunity in a case involving the Standard, prosecutors knew that he regularly held meetings there to strategize about how to marginalize Muslims in public life. Durham described these meetings to prosecutors as "Muslim hate meetings."[36]

Finally, Smith was charged in the same indictment as Brian and controlled one of the PACs involved. Without Smith and his PAC, this case and the underlying actions never would have occurred. Yet, Smith has now entered an agreement with

---

[33] *See* Steve Cavendish, *Joe Carr's Campaign Made $200K Loan to Company Owned by Andy Miller*, Nashville Scene (July 15, 2014).

[34] *See* Joel Ebert and Dave Boucher, *Lawsuit says GOP donor Andy Miller hired political allies for no-show jobs*, The Tennessean (Dec. 11, 2016) https://www.tennessean.com/story/news/politics/2016/12/11/lawsuit-says-gop-donor-andy-miller-hired-political-allies-no-show-jobs/94697536/.

[35] *See* Justice Dep't Press Release, *United States Settles False Claims Act Allegations Against Compound Pharmacy Owners For $7.75 Million* (Sept. 14, 2016).

[36] Ex. 3 at 5.

the government, pursuant to which the government appears posed to recommend probation as an appropriate sentence in his case.

It is difficult to imagine a scenario where the government in good faith could argue on the one hand that Brian should be sentenced to a term of imprisonment, while all his equally or more so culpable co-conspirators (two of whom have much lengthy histories of misconduct) have received either a complete pass or a likely probation recommendation. As such, the Court should take Brian's co-conspirators' sentences (or lack thereof) into consideration when fashioning an appropriate sentence in this case.

## II.     THE HISTORY AND CHARACTER OF BRIAN KELSEY

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006), *aff'd* 301 Fed. Appx. 92 (2d Cir. 2008). That's how one district court aptly summarized the importance of a defendant's history and characteristics as part of the § 3553(a) analysis. "This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'" *Id. See also United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (affirming below guideline sentence based,

28

in part, on finding that defendant guilty of two counts of wire fraud had made an "isolated mistake").

The crime for which Brian was convicted is an aberration in his otherwise law-abiding life. For nearly 20 years, Brian has devoted his life and career to serving the needs of others and advocating for the most vulnerable members of society. Born and raised in Memphis, Brian was an exemplary leader who poured his time, resources, and energy into his community from a young age. He was appointed student body chaplain in high school, volunteered at the local soup kitchen and Boys Club, and served as the youngest volunteer trained as a mediator for an organization focused on intervening in the lives of first- and second-time juvenile offenders through victim-offender mediation.

At the University of North Carolina, Brian continued his service to others. His friend Scott Bowen credits Brian for his decision to become an ordained pastor.[37] In Scott's telling, Brian received unrelenting abuse from fellow fraternity members for abiding by the law not to drink alcohol before age 21 and for leading a Bible study on campus for fraternity men. Friend Brew Davis tells how Brian went out of his way to befriend a person with special needs.[38]

Brian's focus on service only grew at Georgetown University Law Center. There, he served as President of the Christian Legal Society, spent his spring break

---

[37]    Letter of Scott Bowen, p. 1. The character letters in support of Mr. Kelsey are being filed separately.

[38]    Letter of Brew Davis, pp. 1-2.

building a Habitat for Humanity house, organized trick-or-treating at the law school for local children, and taught a Street Law seminar at a homeless shelter.

After graduating from Georgetown, Brian moved back to Memphis and began working in private practice at a well-respected law firm. While there, he invested his time and resources into the Memphis community. But Brian quickly realized that he didn't want public service to be a hobby—rather, he knew he wanted to devote his personal and professional life to serving others. And that is precisely what he did.

In 2008, Brian volunteered over one hundred hours *pro bono* defending a local nonprofit. For his efforts, Memphis Area Legal Services awarded Brian their annual *pro bono* award, and S.H.I.E.L.D.'s CEO agreed:

- Without Brian's very generous giving of his time, S.H.I.E.L.D., Inc. very well could have gone away. Because of Brian's help, S.H.I.E.L.D., Inc. was saved, and Miracle Manor has been able to provide subsidized housing to thousands of individuals who are low-income, homeless, disabled, mentally ill, and veterans. I am forever grateful for Brian's help to us.[39]

He also spent significant time tutoring underprivileged children at Lester Community Center and Kingsbury Middle School, teaching Sunday School to children at his church, serving as a greeter at his church, leading two Bible studies at his former high school, mentoring a young professional for Memphis Nexus Leadership, teaching as an adjunct professor at the University of Memphis and at its law school, going on foreign mission trips, and teaching democracy-building seminars in Somalia. As a colleague explained,

- Brian must care about the people in this routinely crummy world if he would go to Somalia to teach classes on democracy building. That is dangerous, dirty, thankless work with challenging living conditions and arduous travel. I

---

[39]    Letter of Valerie Bobo, p. 2.

also know a little about trying to make a difference (it was South Sudan for me) in a hostile, lawless land, and even I won't go to Somalia![40]

In the letters submitted to the Court, Brian's friends, family, and colleagues describe Brian's exemplary community service:

- I worked as a youth-work practitioner in Memphis in 2005, hosting community events for Asian and African refugees from low-income neighborhoods. Brian Kelsey was . . . a consistent presence at these events. When these gatherings paved a way for a racial reconciliation program at Kingsbury High School . . . Brian would come help out, interacting in Spanish with all of our Hispanic students.[41]

- [When] my wife and I moved to Colombia . . . and began working in one of Bogota's many troubled neighborhoods, Brian was one of the first of my friends from Memphis who came to visit and help out. At the time, we had between 30 and 40 kids coming to our house every day and we urgently needed to move them to a larger space at a nearby church. [T]o make this happen, Brian and three other friends . . . helped print flyers announcing a community festival and passed them out in the streets on a rainy morning. Brian helped pay for food and purchased paint, brushes, and art materials with which dozens of children and youth in the community created a 40-foot colorful banner. We repaired a community garden, picked up trash and broken glass from the park, and seized the opportunity to launch what would become our signature tutoring program running out of the local church, which today is a full-fledged training for at-risk youth.[42]

- Over the years, in our multi-cultural church in Memphis, I saw Brian's heart for service exhibited in various volunteer roles. He was a greeter for several years. He packed baskets of food for homeless shelters. He volunteered to read with children at Lester Community Center. And he poured himself into the failing public school that our church had adopted: Kingsbury elementary, middle, and high school. Brian tutored middle school children and used his position as a State Representative to recognize achievements at the school, even though it wasn't in his district.[43]

---

[40]  Letter of Chris Crider.
[41]  Letter of Jorge E. Enciso.
[42]  *Id.*
[43]  Letter of Jennifer Martinez, p. 1.

During his time in the legislature, Brian spent countless hours advocating for the most vulnerable members of society and was especially instrumental in improving the lives of low-income families and creating better educational opportunities for children. He served as Chairman of the Senate Judiciary Committee for six years and Chairman of the Senate Education Committee for one. And, even after this case, his elected colleagues and staff continue to speak highly of him:

- When you spoke to [Brian], you could tell the thing he cared most passionately about was giving low-income children scholarships, like the one he had received . . . . That's the type of legislator he was, and that's the type of person he is.[44]

- Brian is a "good, kind man, who always does what he thinks is best for the people of Tennessee."[45]

- Brian has dedicated his entire professional career to the service of others. Both in the way he has conducted his public service and in the issues he has elected to champion, he has demonstrated a sincere focus on making our state better for our citizens.[46]

- What I did not know, and what became apparent to me during the time I worked closely with him in his legislative office, is that Brian is a kind, generous, thoughtful, and selfless man.[47]

This spirit of caring for others carried over to Brian's professional work. During his four years working at the nonprofit law firm Liberty Justice Center, Brian took a special interest in cases involving low-income families seeking better education options for their children. One of Brian's former law partners, Daniel Suhr, remarked that Brian was "totally engaged" in his cases and noted that "[t]hough we had a

---

[44]     Letter of Denise and Harold Ware, p. 1.
[45]     Letter of Brenda Gilmore.
[46]     Letter of Lt. Gov. Randy McNally, p. 1.
[47]     Letter of Dillon E. Barker, p. 1.

member of our team dedicated to client relations, Brian took on the task of personally getting to know every client on our education cases, and he cared deeply about their individual circumstances."[48]

While giving himself to others, Brian has been a devoted husband and father to three children, all under the age of three. His daughter Reagan is four years old, and his twin boys Kirk and Hardin are eleven-months old. Brian's wife, Amanda, is now supporting the family financially. Amanda and the kids have always been Brian's top priority. Amanda has described Brian as "the rock" of their family. "He is patient. He is kind. He is honest. He never raises his voice, and he puts me and our family first." She also describes him as uncommonly thoughtful: "When Brian and I were dating, unbeknownst to me, he saved every flyer, brochure, and ticket from things that we did together: plays, movies, concerts, sporting events, etc. He collected it all and put it into a scrapbook and presented it to me hours before we married. It was such a thoughtful gift, and it showed how much he cared about our relationship even from the very beginning."[49]

Similarly, one friend of the family commented on Brian's close relationship with his children, describing him as "a compassionate" "joyful" and "hands-on" father. "I have seen him play with, teach, and love his children. I visited them at home a few weeks after their twin boys were born last year. Reagan, their oldest, had been at school and when she arrived home, Brian noticed that her favorite hair clip was

---

[48]     Letter of Daniel R. Suhr, p. 2.
[49]     Letter of Amanda Bunning Kelsey, p. 3.

missing from her bag. Brian walked back over to the school and went through Reagan's cubby and looked on the playground to find this errant hairclip. I can't think of many fathers that would even notice their daughter's hairclip was missing, much less go on a quest to find it. I realize this is a seemingly small and insignificant story to relay, but it encapsulates Brian as a father – he shows up, is interested, tries, and loves . . . [Brian] shows up for the big and small things and doesn't need recognition. I am confident that Brian's family is better because of him, and I am confident that I am better because Brian is my friend."[50]

In addition to his close relationship with his wife and children, Brian had an extremely close relationship with his parents. Sadly, Brian's father recently passed away earlier this year after losing his battle with pancreatic cancer. Brian's mother has her own health issues and relies extensively on Brian to help care for her. Before he passed away, Brian's father described the sincerity with which Brian cared for him during his illness. "During my illness," his late father wrote, "Brian has been invaluable to us. Recently, I spent almost a month in the hospital. On days when my wife couldn't be there, Brian went out of his way to be there for me. Then he went to our home and moved furniture, setting up the hospital bed and getting the room ready for me when I left the hospital."[51] Brian's dad also remarked "when I am gone, my wife and Brian's mother, Kay, will need him to be out of prison to help her. She has several medical conditions that we just found out about recently, and she is going to

---

[50]     Letter of Bess McWherter, p. 2.
[51]     Letter of Bob Kelsey, p. 2.

need more care than in the past. She will not have me around to take care of her like I had her to take care of me."

As shown in the letters to the Court, Brian's love for his family is obvious to all who know him:

- Not only is Brian a loving and present father, but he also continues to be a caring and supportive husband…Today I live in the same neighborhood as the Kelsey family, and it puts a big smile on my face to see Brian helping Reagan learn to ride her bike and chasing her down the street. Children with involved fathers have higher levels of confidence and emotional intelligence. The role a father plays greatly affects a child's cognitive and social development. Reagan, Kirk, and Hardin are so blessed to have a father like Brian…[52]

- Brian is a hands-on father. He has changed more diapers and done more night shifts with the twins than anyone could count…I can't comprehend Amanda being able to do any of this without him. Reagan so loves [Brian], and the twins are going to be mobile in no time. Amanda needs her husband and those babies need their daddy.[53]

In addition to his devotion to his family, Brian has remained a constant, loyal, and caring friend to those around him. As one friend described in her letter to the Court, "[a] few years ago, a mutual friend needed more professional clothes than he could afford, and Brian literally went through his closet and passed along shirts, ties, and suits that he could spare so that our friend would be able to present himself professionally.[54]

Additionally, in the letters submitted to the Court, Brian's friends, family, and colleagues have recognized Brian as a person of integrity and honesty and that he has held himself to the utmost moral standards:

---

[52]     Letter of Amanda Want, p. 2.
[53]     Letter of Amy Bunning Towles.
[54]     Letter of Abigail Braddock Simone, p. 2.

- Senator Kelsey is a good, kind man, who always does what he thinks is best for the people of Tennessee. I enjoyed working with him, and we had a great relationship. While he and I did not always agree on political issues, he always treated me with respect.[55]

- [Brian] is the type of person who writes heart-filled, handwritten notes for each birthday card. He takes the time to pick up the phone to call and let me know when he's praying for me and/or my family. [And h]e's the type of uncle who makes a concerted effort to be an important presence in my children's lives.[56]

- Brian is a good man, a man who has worked hard to selflessly serve the people of Memphis and Tennessee. His heart has always been in the right place, and I think that is why he went into politics—he wanted to help people.[57]

These letters reflect the core of who Brian the *person*—not Brian the *defendant*—truly is.

## III.  THE PURPOSES OF SENTENCING AND COLLATERAL CONSEQUENCES OF CONVICTION

Numerous Courts of Appeals have recognized the importance of considering the collateral consequences a conviction may have on a particular defendant when determining a sentence. *See e.g.*, *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009); *United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007). Many of these collateral consequences are statutorily mandated. In fact, one federal court has noted that "[t]here are nationwide nearly 50,000 federal and state statutes and regulations that impose penalties, disabilities, or disadvantages on convicted felons." *United States v. Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *5 (E.D.N.Y. May 24, 2016). This broad range of collateral consequences "serve no useful function other than to further

---

[55]     Letter of Brenda Gilmore.
[56]     Letter of Katelyn Conner Bunning, p. 1-2.
[57]     Letter of Thomas Marino.

punish criminal defendants after they have completed their court-imposed sentences." *See id*. at *1.

In addition to the statutory restrictions, Mr. Kelsey will face "the general reluctance of private employers to hire ex-convicts." *Nesbeth*, No. 15-CR-18 (FB), 2016 WL 3022073, at *5.[58] Undoubtedly, Brian's record will be a subject of any job interview he may get and will follow him for the rest of his life.

While some Courts of Appeal, including the Sixth, have expressed concerns that the consideration of collateral consequences may disproportionally assist individuals with privileged backgrounds, numerous federal circuits have embraced collateral consequences as appropriate sentencing considerations consistent with § 3553(a)'s directive that sentences reflect adequate deterrence and just punishment. *See United States v. Musgrave*, 761 F.3d 602 (6th Cir. 2014); *but see United States v. Pauley*, 511 F.3d 468 (4th Cir. 2007) (holding that the loss of a defendant's teaching certificate and his state pension as a result of his conviction was an appropriate sentencing consideration). For example, the Second Circuit has held that, because the conviction made it doubtful that the defendant could pursue his career as an academic or translator, the need for deterrence was lessened such that the defendant was properly sentenced to 20 months despite a guidelines range of 78 to 97 months. *See*

---

[58] The *Nesbeth* Court cited Harry J. Holzer, Steven Raphael & Michael A. Stoll, *Will Employers Hire Ex-Offenders? Employer Preferences, Background Checks, and Their Determinants*, www.irp.wisc.edu/publications/dps/pdfs/dp124302.pdf (using empirical data to conclude private "employers reveal considerable reluctance to hiring workers with criminal histories").

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). Additionally, in *United States v. Nesbeth*, the Court rendered a non-jail sentence to a woman with a drug trafficking conviction carrying a guidelines range of 33-41 months.[59] There, the district court incorporated the many statutory collateral consequences in the balancing of the 18 U.S.C. § 3553(a) in determining that "because the collateral consequences [the defendant] will suffer, and is likely to suffer—principally her likely inability to pursue a teaching career and her goal of becoming a principal—has compelled me to conclude that she has been sufficiently punished, and that jail is not necessary to render a punishment that is sufficient but not greater than necessary to meet the ends of sentencing." *Id.* at *14.

A sentence of incarceration is *not* necessary in this case to "reflect the seriousness of the offense" or "to promote respect for the law." The indictment and conviction have imposed substantial collateral consequences on Brian. These include the loss of his political career (felons are barred from running for office in Tennessee), the loss of his law license, the loss of his state health insurance, the likely loss of his state pension, the loss of his credit card and bank accounts (on account of the felony conviction), and other restrictions that he is discovering every day. Recently, his wife began the process of inquiring to obtain a nanny to help with their children only to find that the service refuses placements in households with a convicted felon. Brian now has a felony criminal record that will follow him for the rest of his life. This

---

[59] *See* No. 15-CR-18 (FB), 2016 WL 3022073, at *1 (E.D.N.Y. May 24, 2016).

means that he is now subject to hundreds, if not thousands, of statutorily mandated restrictions affecting their daily lives and hopes of future employment.

Together, these collateral consequences convey the seriousness of this offense and provide significant punishment for it. Courts have granted departures or variances in similar circumstances—where, for example, a defendant lost a prized job, his business, his good reputation, or even his marriage as a result of the criminal charges. *See United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (finding variance appropriate where defendant was already collaterally punished by loss of his position, loss of his reputation, and the widespread media coverage of his case); *United States v. Samaras*, 390 F.Supp.2d 805, 809 (E.D. Wis. 2005) (granting variance in part because defendant had lost good public sector job).

Moreover, recidivism is not a concern in this case. As detailed above, this case concerns an isolated event in Brian's otherwise law-abiding life. And the case itself is more than enough of a reminder to Brian of the penalties for breaking the law. *See, e.g.*, *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (upholding home detention sentence for defendant convicted of insider trading in light of reputational damage, "deterrent effect caused by proceedings," and loss of employment). More obviously, Brian *cannot* commit this crime in the future because (as a felon) he can never again run for elected office. In addition, Brian has been financially ruined by the charges against him and his conviction. To date, his family's defense of this matter has cost him over half a million dollars. And his reputation has

been irreparably harmed. There is no reason to believe incarceration is necessary to prevent him from repeating his conduct.

Moreover, this case has *already* resulted in the deterrent effect the government seeks. As a result of this case, every politician is on notice that the government will not hesitate to bring felony charges even in cases of campaign finance violations involving relatively small sums of campaign funds, regardless of their source. That message has already been sent loud and clear; incarcerating Brian is not necessary to amplify it. Before this case, Brian was a proud member and representative of his community. A prison term would only further estrange him from that community.

IV.     **THE KINDS OF SENTENCES AVAILABLE**

### *Probation*

A sentence of probation is appropriate here. Notably, Brian has already served 22 months under similar conditions while he was released pending trial and sentencing. *See* PSR ¶ 11 ("Pretrial services records indicate the defendant has complied with all Court ordered conditions of release."). The terms of that release have operated, in effect, as a probationary sentence already. For example, for nearly two years, Brian has complied with many restrictions on his liberty, the violation of which would have placed them in additional jeopardy:

- He was prohibited from traveling outside Tennessee, Kentucky, or the metro D.C. area;

- He was required to report monthly to the U.S. Probation Office;

- He was prohibited from possessing a firearm;

- He prohibited from using alcohol excessively;

- He was forced to undergo drug testing; and

- He was subject to searches of his person and home at any time.

(Doc. 13 at 1-2.)

The severity of these conditions should not be underestimated and closely mirror what would be required of Brian on probation; the Supreme Court has described such conditions as "substantially restrict[ing a defendant's] liberty." *Gall v. United States*, 552 U.S. 37, 48 (2007). Specifically, the Supreme Court stated:

> Offenders on probation are . . . subject to several standard conditions that substantially restrict their liberty . . . Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excess drinking. Most probationers are also subject to individual "special conditions" imposed by the court.

*Id*. (footnote and citations omitted). Brian has proven the ability to comply with probation conditions. There is no reason to believe these restrictions on their liberty are insufficient to effectuate the purposes of sentencing.

### *Imprisonment*

Although the Sentencing Guidelines suggested by the Probation Office call for a sentence of imprisonment, they are advisory only. And Circuit Courts have upheld non-imprisonment sentences when the defendant faced a far more severe Guidelines range than Brian faces. For example, in *United States v. Stall*, the Sixth Circuit upheld a sentence of one day in prison, a lengthy term of supervised release, and the condition that the first year of that sentence be served in home confinement when the defendant faced a guidelines range of 57-71 months imprisonment. 581 F.3d 276, 277,

281 (6th Cir. 2009). And, perhaps more relevant here, the court imposed sentences of probation on two defendants in *Sorenson* even when their Guidelines Ranges suggested sentence of 41 to 51 months in prison.

These cases, and others like them, recognize that the sentencing analysis is individualized and permits large departures from the Guidelines range where, for example, the Guidelines recommended by the Probation Office are based on loss tables that bear no relation to harm and a defendant has an exemplary record of service to his community, which demonstrates the aberrant nature of the crime in the context of his character as a whole.

## V.      PERTINENT POLICY STATEMENTS

Although there are no pertinent policy statements, there is widespread criticism of the loss table in the Sentencing Guidelines, which "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013). Rather, the loss table is used as a clumsy proxy for the seriousness of the offense, even though it fails to account for any of the substantive aspects of the crime, including its means and the defendant's motivation. As a result, U.S. Sentencing Commission studies demonstrate that more than half of sentences that involve the loss table for economic crimes depart below the recommended guidelines range.[60] According to Mr. Allenbaugh, "[s]everal types of evidence indicate that a primary

---

[60]      *See, e.g.*, Mark Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent. R. 1, 19-27 (2013).

reason for judicial dissatisfaction with § 2B1.1, at least as it applies to fraud offenses, is that loss amount (in combination with the many other upward adjustments provided by the guideline) frequently inflates sentences far more than necessary to achieve the purposes of sentencing."

## **CONCLUSION**

As the Court considers what constitutes a reasonable sentence pursuant to § 3553(a), it should keep in mind the Supreme Court's admonition that "punishment should fit the offender and not merely the crime." *Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) (cleaned up). In *Koon v. United States*, 518 U.S. 81, 113 (1996), the Supreme Court observed, "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." In this context, a sentence of probation achieves the purposes of sentencing but is "not greater than necessary." Particularly because he is a lawyer and politician, Brian's felony conviction carries serious and life-altering consequences. On top of these punishments, a sentence of probation takes the crime seriously—and does so in a manner consistent with prior cases involving similarly situated defendants.

WHEREFORE, based upon the information contained in this memorandum and at the sentencing hearing, Brian respectfully requests that the Court order a sentence of probation.

Respectfully submitted,

J. Alex Little (TN #029858)
Zachary Lawson (TN # 036092)
BURR & FORMAN LLP
222 Second Avenue South, Suite 2000
Nashville, TN  37201
Telephone: (615) 724-3200
alex.little@burr.com
*Attorneys for Brian Kelsey*

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2023, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will serve it upon all counsel of record.

/s/ J. Alex Little
*Counsel for Brian Kelsey*