# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA, )
)
)
v. )
) No. 3:21-cr-00264-1
BRIAN KELSEY, )
)
Defendant. )
)

---

## BRIAN KELSEY'S SUPPLEMENTAL SENTENCING MEMORANDUM
## IN RESPONSE TO THE GOVERNMENT'S SENTENCING MEMO

---

J. ALEX LITTLE
ZACHARY C. LAWSON
BURR & FORMAN LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3200
alex.little@burr.com
*Attorneys for Brian Kelsey*

August 8, 2023

Comes now Brian Kelsey, by and through counsel, and respectfully submits the following Supplemental Sentencing Memorandum, which responds to the factual and legal assertions and argument the government put forth in its Sentencing Memorandum, filed on August 4, 2023. (Doc. 136.)

Mr. Kelsey files this supplemental memorandum as soon as possible after receiving the government's filing to ensure that the Court has sufficient time to consider these matters, and to allow the sentencing hearing to proceed as efficiently as possible.

## ARGUMENT

The government's sentencing recommendation seeks a sentence that is far beyond what any district court has ever imposed in a similar case.

To make such an unusually harsh recommendation, the government's memo relies on four arguments, each of which are meritless, and in doing so egregiously misrepresents both the state of the law and the state of this case.

*First*, in the three sentences it devotes to sentencing disparities, the government claims that a 41-month jail sentence would be "would be commensurate with many sentences imposed on defendants convicted of crimes arising from campaign finance fraud schemes." (Doc. 136 at 11.) But this is flatly untrue, as even a brief examination of the cases it cites would show. The government does not do that work, however, leaving the court to guess how or if the few cases it cites are anything like the present one—falsely implying that they are. They are not. The cases the government cites involve instances of tax evasion, bank fraud, wire fraud, bribery,

and obstruction that happen to *also* involve political campaigns in one way or another. There is no good faith argument that they are anything like the present case.

*Second*, the government's memorandum misconstrues and fails to accurately represent what actually happened in this case, ignoring entirely the evidence that undermines its sentencing arguments. Contrary to the government's representations, this was not a case of a premeditated scheme on Mr. Kelsey's part. At best, the government's evidence (taken as a whole) reflects a "disorganized" set of independent actions resulting in a bungling effort, based on "implicit" wishes that were unclear and often not followed.

*Third*, perhaps recognizing that pure campaign election finances cases like this one rarely result in jail time, and certainly not the three-and-a-half years of punitive incarceration that the government wants, its memorandum attempts to cast the facts here as something that they are not. Although the government claims "[i]t is difficult to overstate the seriousness of the defendant's crimes," (*id.* at 7), overstate is exactly what it did. As reflected in the attached declaration of Lee Goodman, the former Chairman of the Federal Election Commission, "the conduct at issue in this case is similar to very common political activity that occurs in a vague and nuanced set of legal restrictions," and—critically—"place Mr. Kelsey's case at the margin in terms of severity or harm" as compared to other election finance cases.

Mr. Goodman's expert opinion is based on real-world experience with these cases in this very same context dealing with the very same issues. The government's

recommendation grapples with none of the difficult questions that inform how election laws are interpreted and enforced across the country.

*Fourth*, and finally, to make this case look more serious, the government relies on baseless accusations about "multiple, separate schemes" for which there is no evidence. (Doc. 136 at 5.) Rather than seek a sentence based on the guilty plea they managed to get, the government relies on its own self-serving description of its investigation to seek a sentence for crimes that Mr. Kelsey did not commit.

Why does the government want Mr. Kelsey in jail for 41 months? When it agreed to a plea, it believed that the appropriate sentencing range for his offense was 18-24 months. After he had a change of heart about the government's case (which this counsel believes was entirely justified based on the facts and the law), the government has decided that the same conduct deserves a sentence that is 70% longer.

As this supplemental memorandum shows, however, none of its stated reasons now stand up. Worse yet, the government's memo plainly misrepresents multiple matters. Accordingly, the Court should consider the government's memo and its request for lengthy incarceration in light of the facts presented here (which the government omitted). In this context, and particularly given the arguments in Mr. Kelsey's sentencing memorandum, a sentence of probation best reflects the considerations set out in the sentencing statute.

## ARGUMENT

**I.    The Government's Discussion of Disparities Plainly Misrepresents Other Cases in an Attempt to Justify What Would Be the Harshest Sentence Ever for this Crime.**

In a single sentence followed by a string cite, the government claims that its recommended 41-month sentence would be like other sentences "arising from campaign finance fraud schemes." (Doc. 136 at 11.) But the cases it cites involve far more serious crimes, like an $80 million Ponzi scheme and seven-figure tax evasion. Only two of the six are limited to campaign finance charges, and those two cases involved (in one) an explicit *quid pro quo* bribery scheme to kill legislation and (in the other) a former governor (and felon) who committed new campaign-related crimes (on behalf of another candidate) just after completing supervised release.

The government cites these cases without providing context, because if it had shown its work, the Court could easily see that these cases are night and day. Rather than point the Court to any semblance of factually or legally comparable case law, the government cites to some of the most egregious examples of criminal conduct that also happen to touch upon politics. When placed in the proper context, however, the government's cases prove the opposite of its point, and they demonstrate why Mr. Kelsey should be sentenced far differently than any of the defendants it lists.

### *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y.)

In its string cite, the government first relies on the case of Michael Cohen, providing the Court with no more information than that he received "36 months." But there is far more that the Court should know: Cohen pleaded guilty to significant and

willful tax evasion, making false statements to a financial institution, illegal campaign contributions, and making false statements to Congress. Specifically, Cohen pleaded guilty to avoiding more than $1.3 million in income tax payments between 2012 and 2016, making false statements to a federally insured financial institution to obtain a $500,000 loan, and infamously making approximately $280,000 in "hush money" payments to women who had allegedly had affairs with then presidential candidate Donald Trump.[1] As a result of his conduct, Cohen faced a total offense level of 24 with an advisory guideline range of 51 to 63 months' imprisonment. The district court varied downward and sentenced Cohen to 36 months' imprisonment, 3 years of supervised release, a $50,000 fine, and $1,393,858 in restitution.[2]

Clearly, the facts of Cohen's case bear no resemblance to those at issue here, and the amount at issue here is a fraction of what was at issue there. Cohen's criminal conduct encompassed years-long tax violations, bank fraud, and interference with a presidential campaign. Further, Cohen's conduct involved well over $1.5 million in losses and illegal transfers. Kelsey's conduct pales in comparison.

---

[1]    *See* Dep't of Justice Press Release, *Michael Cohen Sentenced To 3 Years In Prison*, (Dec. 12, 2018), available at https://www.justice.gov/usao-sdny/pr/michael-cohen-sentenced-3-years-prison.

[2]    *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y.) at Doc 29.

**_United States v. Stockman_, No. 4:17-cr-116 (S.D. Tex.)**

The second case the government cites, _Stockman_, likewise bears virtually no similarity to this case. The only similar aspect is that both the defendant in _Stockman_ and Mr. Kelsey held political office; however, that is where the similarities end. To make it look otherwise, however, the government simply notes in its parenthetical that Mr. Stockman received "60 months" for his campaign finance violations.

Unlike Kelsey, Stockman faced a wide range of criminal charges and elected to proceed to a three-week long trial. At the conclusion of the trial, Stockman was convicted of "twenty-three felony counts . . . [including], _inter alia_, of defrauding philanthropists and using their money to finance his personal life and political career."[3] Specifically, according to the government, "Stockman orchestrated a sophisticated fraudulent scheme to steal over $1.2 million from charitable foundations and the individuals who ran them, then secretly diverted the funds through a web of sham nonprofit organizations to finance his personal expenses and his campaigns for federal office."[4] He was ultimately sentenced to the max on all counts, but President Trump commuted Stockman's prison sentence to time served.[5]

At its heart, the case against Stockman was a wire fraud and mail fraud case against a politician who lined his own pockets. On top of the wire fraud and bank

---

[3]     _United States v. Stockman_, 947 F.3d 253, 255 (5th Cir. 2020).

[4]     Answering Brief for the United States, _United States v. Stockman_, No. 18-20780, 2019 WL 3072060, at *4 (5th Cir. Jul. 9, 2019).

[5]     Notice of Commutation, _United States v. Stockman_, No. 4:17-cr-116 (S.D. Tex. Dec. 29, 2020) at Doc. 485.

6

fraud, Stockman engaged in a scheme to lie to a donor to extract $450,000, which he again used in nefarious ways, including by instructing a co-conspirator to use any remaining amounts of that donation "to flee to Egypt" to avoid investigators.[6] Nothing in the same universe happened here.

### *United States v. Rowland*, No. 3:14-cr-79 (D. Conn.)

The facts and circumstances of the third case in the government's string cite are likewise readily distinguishable. First, unlike here, the defendant in *Rowland* had a significant and recent criminal history. Rowland had previously pled guilty to a conspiracy to defraud the United States in 2005.[7] In that case, he labored under countless conflicts of interest as the then-governor of Connecticut (i.e., accepted significant payments and lavish trips in exchange for support on various issues from private companies and individuals).[8] As a result, Rowland was originally sentenced to 12 months and 1 day imprisonment, 3 years of supervised release, 300 hours of community service, and an $82,000 fine.[9]

The case cited by the government here began shortly after Rowland completed his term of supervised release. In the new case, like in *Stockman*, Rowland proceeded

---

[6]     *Stockman*, 947 F.3d at 258.

[7]     Judgment, *United States v. Rowland*, No. 3:04-cr-00367-PCD (D. Conn. Mar. 18, 2005) at Doc. 17.

[8]     *See* Gov't's Sentencing Memo., *United States v. Rowland*, No. 3:04-cr-00367-PCD (D. Conn. Mar. 18, 2005) at Doc. 14.

[9]     Judgment, *United States v. Rowland*, No. 3:04-cr-00367-PCD (D. Conn. Mar. 18, 2005) at Doc. 17.

to a three-week trial, at the conclusion of which he was convicted of all seven counts against him, including falsification of records, conspiracy to commit an offense against or to defraud the United States, causing false statements, and illegal campaign contributions.[10] Specifically, Rowland entered sham contracts with two congressional candidates, pursuant to which the candidates would pay him several hundred thousand dollars over the course of the contracts to act as an "advisor," but they did so through third-parties to conceal the disgraced felon's involvement with their campaigns.[11] Despite the agreements to pay significantly more, Rowland only actually received $35,000, which the district court used as the "loss" figure in determining his sentence and calculated his guideline range at 24 to 30 months' imprisonment.[12] Based in large part on his prior criminal history, however, the district court sentenced Rowland to the very highest limit of his calculated Guidelines Range and imposed 30 months of imprisonment.[13]

Here, again, the case is quite distinguishable. Rowland committed a second crime shortly after his first, while he was a felon, and even then the court sentenced him to 11 months less than the government seeks here.

---

[10]     *See United States v. Rowland*, No. 3:14-cr-79 (D. Conn.) at Doc. 244.

[11]     *United States v. Rowland*, 826 F.3d 100, 105-06 (2d Cir. 2016).

[12]     *Id.* at 116.

[13]     *Id.*

## *United States v. Braddock*, No. 3:12-cr-157 (D. Conn.)

Braddock was a campaign finance director for a state legislator running for re-election.[14] Unlike Kelsey, Braddock engaged in actual corruption of the worst kind. Braddock conspired with owners and employees of "Roll Your Own" smoke shops to accept $27,500 in bribes in exchange for killing legislation detrimental to the smoke shops.[15] The defendants hid their corruption by paying the bribes in the form of conduit contributions, meaning they would recruit people to write checks for contributions and the smoke shop owners would reimburse them in cash and then deliver the check to the campaign.[16] Following a jury verdict of guilty on three counts, the Court determined Braddock's Guidelines Range to be 41 to 51 months and ultimately sentenced him below that range to 38 months.[17]

Here, of course, there was no corrupt bargain. Mr. Kelsey was not offering to sell his vote in Congress or in the General Assembly, and the source (and transfer) of his state campaign funds were all documented. Nonetheless, the government somehow believes that Mr. Kelsey deserves an even more punitive sentence that what the court imposed on Braddock—without grappling with any of these distinctions or explaining to the Court why they should be ignored.

---

[14]    *United States v. Braddock*, No. 3:12-cr-157 (D. Conn.) at Doc. 21.

[15]    *Id*.

[16]    *Id*.

[17]    *United States v. Braddock*, No. 3:12-cr-157 (D. Conn.) at Doc. 419 at 26, 48-49.

**United States v. Bigica, No. 2:12-cr-318 (D.N.J.)**

The defendant in the next case the government cites, *Bigica*, pleaded guilty to a two-count information. The conduct that mattered most at sentencing, however, was not campaign finance violations but rather his massive tax fraud and, after his plea, his continued deception during the sentencing phase. The government says nothing about this, merely telling the court that Bigica's sentence was "60 months," again implying that this was a sentence imposed for a campaign finance case "commensurate" with this one.

But, again, the cases are not at all analogous. In *Bigica*, the first count related to a multi-year scheme to obstruct and impede the IRS's ability to ascertain and collect $2,198,836 in taxes.[18] When the IRS eventually ascertained his huge tax liability, Bigica claimed he could not pay. All the while, he was spending seven figures on personal expenses through corporate bank accounts and an employee's credit card to pay for vacations, multiple residences, and sports cars.[19] The other count related to a campaign finance violation. For four years, Bigica contacted and recruited straw contributors to issue checks totaling about $100,000 to a federal candidate's campaign, which Bigica then reimbursed.[20]

---

[18]     *United States v. Bigica*, No. 2:12-cr-318 (D.N.J.), Doc. 1 at 7.

[19]     *Id.*

[20]     *United States v. Bigica*, No. 2:12-cr-318 (D.N.J.), Doc. 1 at 7.

Even then, much of what drove his sentence was what he did *after* his plea, which the court held was "the same sort of deceptive behavior that resulted in the conviction on both counts."[21] The court found that Bigica continuously lied to the Probation Department—an arm of the Court—about his financial status to avoid paying restitution.[22] For example, Bigica claimed to have a net worth of merely $13,910 "in an absurd and dishonest way" by claiming that his wife owned nearly all of his assets, including his $3.5 million home, even though he listed his $19,563 monthly mortgage payments as his expense.[23] He also had failed to pay any restitution despite earning more than $1 million between his plea and sentencing.[24] His guidelines range was 51 to 63 months.[25] Based in large part on his post-plea lies to Probation, and his intentional evasion of restitution, Bigica received the statutory maximum for both convictions—36 months on Count 1 and 60 months on count 2, to be served concurrently. [26]

---

[21]     *Id.*, Doc. 15 at 19.

[22]     *Id.* at 16.

[23]     *Id.* at 20.

[24]     *Id.* at 14-16.

[25]     *Id.* at 24.

[26]     *Id.* at 19, 24.

### *United States v. Danielcyzk*, No. 1:11-cr-85 (E.D. Va.)

Here, defendants Danielcyzk and Biagi funneled $186,000 from a corporate treasury through at least thirty-five (35) straw donors to two federal political campaigns spanning two election cycles.[27] After the scheme was discovered, defendant Danielczyk tried to cover it up by creating back-dated phony letters, submitting false letters to the FEC, issuing bonus checks for work that never took place, and hiding his laptop from the FBI. This conduct earned him a Guidelines range of 63 to 78 months.[28] He was sentenced to 28 months, which was 56 months below the top of the range. His co-conspirator, Biagi, had a Guidelines range of 27 to 33 months, which will be the same or close to Mr. Kelsey's in this case. He was sentenced to two years of probation—a sentence entirely consistent with what we have advocated here. But the government ignores his case and cites to the other (much more culpable) defendant to justify their 41-month demand.

### *United States v. Hsu*, No. 1:07-cr-01066 (S.D.N.Y.)

The final case the government cites, *Hsu*, drives home the absurdity of its highly selective attempt to claim that a 41-month sentence would not be disparate, when all the facts show otherwise.

This is the case of notorious fraudster and political fundraiser Norman Hsu. Hsu pleaded guilty to ten counts of mail and wire fraud stemming from his $80 million Ponzi scheme where he defrauded hundreds of investors. (Doc. 70 at 3.) A few

---

[27]    *See United States v. Danielcyzk*, No. 1:11-cr-85 (E.D. Va.) at Doc. 243.

[28]    *Id.* at Doc. 255 at 6-8.

days after his plea, he went to trial on the remaining four counts in his case, which related to campaign finance violations, and he was ultimately convicted of those charges as well. (*Id*.) His campaign finance violations furthered his fraud scheme by raising his profile to gain access to more investors. (*Id*. at 14.) To do this, he illegally directed people to make political donations in their own names while using Hsu's money. (*Id*. at 14.) He became a top fundraiser for pre-eminent politicians, allowing him to cultivate connections with the likes of Hillary Clinton, Bill Clinton, and Barack Obama. (*Id*.) This gave Hsu more credibility with investors. (*Id*.) He was sentenced to 292 months—240 for mail and wire fraud and 52 for campaign finance violations.

This case is nothing like Mr. Kelsey's case. Nor does the government even attempt to show that it is. Rather, like all the cases above, the government simply throws out the case names and sentence numbers, hoping the Court won't notice. But the government—and especially its Public Integrity Section, which issues an annual report on the cases it prosecutes around the country—knows that the cases it has cited are very, very different from this one. Instead of honestly confronting the disparity its requested sentence would create, the government has tried to hide that a disparity exists. The Court should not reward this approach by imposing a sentence on Mr. Kelsey that is greater than truly analogous cases suggest is appropriate.

## II.    The Government's Sentencing Memorandum Fails to Accurately Represent the Facts of this Case.

Perhaps recognizing that pure campaign election finances cases rarely result in jail time, and certainly not the three-and-a-half years of punitive incarceration that the government wants, its memorandum attempts to cast the facts here as something that they are not.

Specifically, the government says that Kelsey has "admitted" that he "carefully orchestrated the concealed movement of $91,000—$67,000 of which came from Kelsey's state Senate campaign committee . . . for the coordinated purpose of funding advertisements to support the defendant in the looming August 4 Republican primary."[29] But he has never admitted to "carefully orchestrat[ing]" anything or that any movement of money was "concealed."

Rather, what the Plea Agreement admits was a "disorganized" set of independent actions resulting in a bungling effort, based on "implicit" wishes that were unclear and often not followed. The actual evidence (rather than the government's sanitized and self-serving summary of it) shows that Mr. Kelsey intended to follow the law and was at least initially "careful" to do so. Further, the evidence shows that the co-conspirators repeatedly and expressly did *not* follow Mr. Kelsey's hopes but instead made "rogue" decisions.

---

[29]    Doc. 136 at 4.

### A.    There was no premeditated or orchestrated illegal conduct.

The government's narrative that the transfer of funds was some carefully orchestrated scheme to conceal unlawful conduct has no foundation. These facts do not appear in the Plea Agreement or the government's other evidence.

To the contrary, the very idea to transfer funds to another state PAC emanated from a casual conversation with another state Senator. When confronted with this information and before taking any action on it, Mr. Kelsey did what we encourage everyone to do: he consulted and received the advice of counsel. According to Mr. Kelsey's campaign finance counsel, he "inquired whether and how such a transfer would be legally permissible." (Doc. 131-2 at 2.) He was told he could "transfer [his state Senate] funds to a state committee that is completely independent from [him]." (*Id.* at 6.) He was further told "the precise words or ideas that might be permissibly exchanged between a federal candidate and an independent expenditure campaign." (*Id.* at 2.) Mr. Kelsey's campaign counsel "recommended that Mr. Kelsey contemporaneously memorialize the content of the exchange." (*Id.* at 3.)

Mr. Kelsey followed this legal advice. He transferred his state Senate reelection funds to a state political action committee over which he had no control, the Standard Club PAC (SCPAC). When he did so, he expressly told co-defendant Joshua Smith, who did control the PAC, "You can spend [these funds] however you want." (*Id.* at 10.) And he promptly left to ensure that no further conversation regarding the funds could take place. (*Id.*) In fact, he intentionally never spoke to Smith again until *after* the election was over. The government's toll records verify

this.[30] He also followed his counsel's advice by contemporaneously memorializing the words that he used when giving the funds to Smith.

The other three people present when the funds were transferred all verify this version of the facts, which stands in contrast to the government's narrative. For example, Smith told investigators that he "remembered KELSEY emphatically telling SMITH that he could do whatever he wanted to do with the money. KELSEY specifically told SMITH he wanted nothing to do with the money once it was donated."[31] Durham likewise said that Mr. Kelsey told Smith that he could use the money "however he wanted."[32] Durham told the government that Mr. Kelsey "left shortly after handing over the check, maybe within a minute."[33] Durham's wife, Jessica, agrees: "At the end of the dinner, while everyone was still seated at the table, [I] observed Kelsey hand a check to Josh Smith."[34] She "further recalled that Kelsey planned to drive back to Memphis that night so Kelsey was the first to leave the restaurant." So regarding the initial transfer of funds, all four witnesses agree that Mr. Kelsey followed the advice of his counsel and acted appropriately and legally.

Because the co-conspirators were not receiving direction from Mr. Kelsey, what happened next was rightfully described by Durham as a "disorganized" "cluster" and

---

[30] Ex. I to Doc. 119 at 31-34.

[31] Ex. 2: Smith 302 dated 11/5/18 302 at 2.

[32] Doc. 141 at 28.

[33] *Id.* at 29.

[34] Ex. 3: Jessica Durham 302 dated 3/23/21 at 3.

"mayhem."[35] Durham's description and the actions that took place belie the government's repeated assertions that Mr. Kelsey "carefully orchestrated" a "scheme" that was "calculated, multifaceted, and complex," or was an "intricate scheme that the defendant carefully planned" because he was "rational, cool, and calculated." (Doc. 136 at 4, 5, 6, 10.)

Notwithstanding the language in the Plea Agreement, the government's evidence showed that Smith made the first decision—to transfer money to Andrew Miller's PAC—on his own without any direction from anyone. He "stated the money started to 'burn a hole in his pocket' so he decided he wanted to make a large donation to boost his reputation in the political arena."[36] He "then asked around the club about where or to whom he should donate PAC money."[37] Finally, he decided to give the money to one of the Standard Club's wealthiest and most politically involved members, Andrew Miller: "SMITH initially decided to make a large donation to MILLER with CITIZENS FOR ETHICS IN GOVERNMENT. However, MILLER returned the check to SMITH and told him he was getting out of politics."[38] It is uncontroverted that this initial contribution and return took place without Mr.

---

[35]   Doc. 141 at 29, 30.

[36]   Ex. 2: Smith 302 dated 11/5/18 at 2.

[37]   Ex. 4: Smith 302 dated 2/8/18 at 1.

[38]   Ex. 2: Smith 302 dated 11/5/18 at 2.

Kelsey's input or knowledge and without Durham's: "DURHAM was unaware that MILLER had not accepted a $60k check from SMITH."[39]

On July 14, 2016, three days after dinner at the Standard Club, Durham abruptly suspended his reelection campaign due to the Tennessee Attorney General's report that he had sexually harassed more than 22 women.[40] All of a sudden, he had time on his hands, and he began calling Mr. Kelsey more frequently. He often sought Mr. Kelsey's advice on his own dire situation: "KELSEY acted as a sounding board for DURHAM during DURHAM's public relations crisis, and would offer DURHAM advice on how to proceed through the public relations issues."[41]

With time on his hands, Durham also began to assert himself more aggressively into Smith's funds in the Standard Club PAC: "On July 15, 2016, DURHAM met with SMITH. It was a short meeting to discuss how the funds were to be used."[42] Durham encouraged Smith to donate funds to the American Conservative Union (ACU), but "at that time [Durham] did not know how much money was transferred to SMITH."[43] When Durham later found out, in his words to the grand

---

[39]      Ex. 5: Durham 302 dated 5/26/21 at 1.

[40]      *See* Joel Ebert and Dave Boucher, *Rep. Jeremy Durham suspends his campaign, doesn't resign*, The Tennessean (July 14, 2016), *available at* https://www.tennessean.com/story/news/politics/2016/07/14/rep-jeremy-durham-holds-afternoon-news-conference/87097678/.

[41]      Doc. 141 at 25.

[42]      *Id.* at 29.

[43]      *Id.* at 28-29.

jury, "I told Brian he was a fucking idiot for placing that much trust in Smith." Durham decided that he, and not Smith, should be in charge of helping Mr. Kelsey. But Smith and Durham were not friends, and Smith was aware of Durham's very public indiscretions, so Smith sought independent advice on what to do with the funds: "SMITH sought advice from Andrew 'Andy' Miller (MILLER) about giving to the ACU, and MILLER agreed it was a good PAC."[44] Smith decided to donate $30,000 to ACU.

At this time, Durham is clear that Mr. Kelsey was not directing him: "KELSEY was careful with his words and tried to be careful not to direct him."[45] He even told Durham, at one point, "not to contact him."[46]

The third movement of money also occurred without Mr. Kelsey's direction, quite the opposite of the government's telling. Durham testified that "Smith decided" to donate an additional $30,000 to Miller's PAC, Citizens 4 Ethics in Government.[47] After this transfer, Durham describes his and Miller's actions as "going rogue."[48] Durham and Miller "talk[ed] about using some of the money to create attack ads . . . ."[49] This plan also occurred without Mr. Kelsey's direction, according to Durham's

---

[44]    Ex. 6: Smith 302 dated 2/5/21 302 at 2.

[45]    Ex. 5: Durham 302 dated 5/26/21 302 at 2.

[46]    Ex. 7: Durham Grand Jury testimony at 17.

[47]    *Id.* at 21.

[48]    Ex. 5 at 4.

[49]    *Id.*

grand jury testimony: "Initially, I did not tell Kelsey about my alternative plan to use the money for the attack ads . . . ." When Durham later informed Mr. Kelsey of this plan, Mr. Kelsey was "not happy."[50] Durham told the grand jury that Mr. Kelsey directed him to "scrap the [attack] ads and send the month to the ACU."[51]

But according to the Plea Agreement, Mr. Kelsey gave only "implicit" directions and never "explicit" directions to Durham.[52] For example, when Miller emailed Durham to tell him he had received another $7,000 from Smith's PAC and asked Durham what to do with this final movement of funds that came from Mr. Kelsey's state campaign account, Durham equivocated, saying "I dunno . . . maybe send that to ACU too."[53]

Far from the "carefully orchestrated" scheme described by the government, Durham described a series of donations that were "disorganized," initially not directed by Mr. Kelsey, and culminated in Durham's unsure decision "[to] maybe send that to ACU too." Because Mr. Kelsey is being sentenced for stumbling over the line

---

[50]     *Id.*

[51]     Ex. 7: Durham Grand Jury testimony at 26.

[52]     Doc. 73 at 7-8.

[53]     Doc. 98-5 at 52. A separate movement of funds involved a donation of $25,000 from the Judicial Crisis Network to ACU by Jonathan Bunch. Bunch described that this donation took place as a result of Kelsey providing contact information in the manner that Mr. Kelsey's counsel advises is legal: "In his conversation with KELSEY, BUNCH told KELSEY he needed to speak with someone independent of KELSEY's campaign. Essentially, BUNCH needed an independent person to speak to in order to avoid any coordinated contributions. A follow-up text message from KELSEY to BUNCH was likely KELSEY providing the contact information for DURHAM." Ex. _: Bunch 302 dated 6/4/21 302 at 2.

of what's permissible in the complex arena of campaign finance and backing into a violation through the bumbling efforts of others to divine his "implicit" instructions, this is hardly a violation worthy incarceration, especially not for 41 months.

### B. The transfers were not "hidden" or "secret."

In describing Mr. Kelsey's conduct as intended for the "concealment of contributions from publicly filed reports,"[54] the government omits the fact that every single transfer of funds between PACs was publicly disclosed on the internet. The government's narrative of Mr. Kelsey's plan to "hide" transactions and keep them "hidden" through the "concealed movement" of funds is fantastical.[55] Doubling down—and tripling down—on its description of transactions publicly available on the internet, the government on three different occasions, says the so-called conspirators were "secretly" transferring funds.[56]

In fact, every transfer of funds was publicly reported in 2016 and is still available for viewing today, including Mr. Kelsey's donation to Standard Club PAC,[57] SCPAC's receipt of those funds,[58] SCPAC's donation to Citizens 4 Ethics in

---

[54]     Doc. 136 at 6.

[55]     *Id.* at 6, 3, 4.

[56]     *Id.* at 4, 7.

[57]     *Available at* https://apps.tn.gov/tncamp/search/pub/report_full.htm?reportId=70530.

[58]     *Available at* https://apps.tn.gov/tncamp/search/pub/report_full.htm?reportId=70277.

Government PAC,[59] CEG's receipt of those funds,[60] CEG's donation to ACU,[61] SCPAC's donation to ACU,[62] and ACU's expenditure on ads supporting Kelsey.[63]

### C. Mr. Kelsey did not decide the medium, message, or amount.

Nor is there any evidence in the record that Mr. Kelsey told anyone what medium ACU should advertise on, what message to use, when to run ads, how much to spend, or any of the classic ways in which candidates coordinate communications. Despite this knowledge, the government falsely claims that Kelsey was "directing Political Organization 1's decisions regarding the content of the ads (Kelsey's legislative accomplishments that had polled well), their audience (residents of West Tennessee), the medium (radio and online), and the timing (the days leading up to the August 4 primary)." (Doc. 136 at 4.) In fact, Kelsey's campaign team found radio ads to be an "antiquated" medium for campaigning and internally mocked ACU's poor choice of medium. (Doc. 141 at 37.) Regarding the audience and the timing, surely no direction would have been necessary, as the ACU knew that Mr. Kelsey was running in West Tennessee, and election day was only a couple of weeks away. Most

---

[59] *Id.*

[60] *Available at* https://docquery.fec.gov/pdf/125/201610139032411125/201610139032411125.pdf.

[61] *Id.*

[62] *Available at* https://apps.tn.gov/tncamp/search/pub/report_full.htm?reportId=70277.

[63] *Available at* https://docquery.fec.gov/pdf/046/201610139032405046/201610139032405046.pdf.

importantly, the government fails to cite any evidence that Mr. Kelsey communicated to anyone what the content of the ads should be. Durham did not claim that. Instead, he claimed that *he* provided some input for the content of one of the ads, and then he oddly remarked that Mr. Kelsey did not actively stop him from doing so: "Kelsey allowed it to happen."[64] The government's characterization to this Court of Mr. Kelsey's *inaction* as an *action* of direction is dubious.

And this mischaracterization is consistent with the entirety of the government's memorandum, which repeatedly attempts to convince this Court that Mr. Kelsey is some sort of con man, rather than an elected official who (at worse) crossed a very gray line.

### III. The Conduct Here Closely Resembles Legal Conduct, and the Harm It Caused Was Marginal.

The facts above demonstrate why this case is not one of the more severe campaign finance cases. As the attached declaration of former FEC Commissioner Lee Goodman explains, this case is "at the margin" of the statute's reach and one that does not involve the types of conduct or danger to election integrity present in most FEC violations that are criminally prosecuted.[65] This is not a case about corruption. Mr. Kelsey was not bribed, he did not recruit straw donors, and he didn't swindle anyone. And he did not do anything to try to cover up his actions. Moreover, the PAC-

---

[64]     Doc. 141 at 32.

[65]     Ex. 1: Goodman Decl. at ¶¶ 8, 24-30.

to-PAC transfers, even assuming Mr. Kelsey's implicit involvement with them, do not constitute illegal coordination.

Mr. Kelsey is being sentenced because, under the plea agreement, Jeremy Durham was acting as Kelsey's agent when he offered his opinion about the content of ACU's advertisements. This is not a morally culpable crime; it is a regulatory one. While it is important for regulations, especially ones related to our elections, to be followed to the letter, the Court should take into account the particulars of the case. As Mr. Goodman explains, the line between lawful facilitation and unlawful coordination is a blurry one; there is very little difference between the two.[66] Moreover, because most of the funds at issue came from individual donors to Mr. Kelsey's state races, the corruption or appearance of corruption that is typically present in campaign finance cases is not present here.

Mr. Kelsey is being sentenced for stepping his toe over a blurry line. The difference between his conduct and the government's cases that warrant incarceration make clear that a probationary sentence is appropriate here. This is particularly true when considering the collateral consequences that Mr. Kelsey has already suffered and will continue to suffer for his felony conviction, including the loss of his job, law license, employment prospects, and substantial legal fees.

## IV. The Court Cannot and Should Not Consider Unfounded Allegations of Other Crimes.

Because this case is not the "serious" case the government wants it to be to justify its lengthy jail request, the government also relies in its sentencing

---

[66] *Id.* at ¶¶ 8-23.

memorandum on baseless accusations about "multiple, separate schemes" for which there is no evidence.[67] Rather than seek a sentence based on the guilty plea they managed to get, the government relies on its own self-serving description of its investigation to seek a sentence for crimes that Mr. Kelsey did not commit.

This is legally and factually improper.

As a legal matter, and as the government surely knows, the Court cannot rely on these alleged but disputed facts at sentencing under Rule 32(i)(3)(B) without making an explicit finding of fact that they are true. And the only evidence that the government points to is three disputed paragraphs of the PSR, which prior defense counsel objected to, and for which the only response of the Probation Office was that the descriptions were taken (without any further verification) from some unnamed documents in the government's discovery.

Where (as here) certain facts are in dispute, the Court cannot merely rely on their inclusion in the PSR. *United States v. Treadway*, 328 F.3d 878, 886 (6th Cir. 2003). "Rather, the district court must actually find facts, and it must do so by a preponderance of the evidence." *United States v. White*, 492 F.3d 380, 416 (6th Cir. 2007). The government knew all of this when it told the Court via email on Friday, August 4, that it would not call any witnesses at sentencing, yet it made the argument anyway.

In other words, the government has told the Court that it should consider disputed conduct that it knows the Court should not—and legally *cannot*—consider

---

[67]     Doc. 136 at 5.

in these circumstances. This is nothing more than an attempt to poison the well. In response, the Court should determine at the beginning of the sentencing hearing "that a ruling [on the facts asserted in paragraphs 39-41 of the PSR] is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing."[68]

If, on the other hand, the government truly wants the Court to consider these allegations as a basis for meting out a 41-month prison term, Mr. Kelsey respectfully requests that the Court reset the sentencing hearing, require the government to provide notice of the evidence and witnesses it intends to rely upon at sentencing to support these claims, thereby providing Mr. Kelsey the proper opportunity to debunk all of them.

It is counsel's guess that the government has no intention of doing this. If that is the case, the prosecutor's inclusion of this information was improper, and the government should itself strike these paragraphs from its sentencing memo.

In any event, the vague but ominous sounding allegations are simply not true. The most obvious evidence of this is the fact that the government did not charge the conduct when it certainly could have—and it has shown no mercy to Mr. Kelsey in any other manner that suggests it would not have done so if it could. The implication is that the government (at least previously) recognized that these allegations were not as credible as those for which it chose to seek an indictment.

---

[68]     Fed. R. Crim. P. 32(i)(3)(B).

In addition, and finally, these claims suffer from the same problems that are discussed above; the government neither appreciates the technicalities of the crimes it has alleged nor acknowledges the evidence that exculpates Mr. Kelsey from committing them. For example, the government claims that Mr. Kelsey participated in a scheme to "funnel [soft money] through his legislative colleagues." The memo cites unnamed "state legislators[]" without naming them or describing the scheme at all. But the fact is that Mr. Kelsey received donations from roughly *sixty* fellow state legislators, and the overwhelming majority of them never received a dime from either Red State PAC or Mr. Kelsey's reelection committee.

None of this is a basis for a sentence of incarceration.

## CONCLUSION

WHEREFORE, based upon the information contained in this supplemental memorandum, his original memorandum, and discussed at the sentencing hearing, Brian respectfully requests that the Court order a sentence of probation.

Respectfully submitted,

J. Alex Little (TN #029858)
Zachary Lawson (TN # 036092)
BURR & FORMAN LLP
222 Second Avenue South, Suite 2000
Nashville, TN 37201
Telephone: (615) 724-3200
alex.little@burr.com
*Attorneys for Brian Kelsey*

27

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2023, I electronically filed this document with the Clerk of the Court using the CM/ECF system, which will serve it upon all counsel of record.

<u>/s/ J. Alex Little</u>
*Counsel for Brian Kelsey*