IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITES STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               ) Case No.
      v.                       ) 3:21-cr-00264-1
                               )
BRIAN KELSEY,                  ) Chief Judge Crenshaw
                               )
                Defendant.     )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

CHIEF DISTRICT JUDGE WAVERLY D. CRENSHAW, JR.

TRANSCRIPT OF PROCEEDINGS

August 11, 2023

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES ON THE FOLLOWING PAGE

PREPARED BY:
                LISE S. MATTHEWS, RMR, CRR, CRC
                   Official Court Reporter
                719 Church Street, Suite 2300
                     Nashville, TN 37203
                lise_matthews@tnmd.uscourts.gov

```
 1      For the Plaintiff:   Amanda J. Klopf
                             U. S. Attorney's Office (Nashville)
 2                           Middle District of Tennessee
                             719 Church Street
 3                           Suite 3300
                             Nashville, Tennessee 37203
 4
                             David Pritchard
 5                           Assistant United States Attorney
                             167 North Main Street
 6                           Suite 800
                             Memphis, Tennessee 38103
 7
                             John P. Taddei
 8                           U.S. Department of Justice
                             Public Integrity Section
 9                           1301 New York Ave. NW
                             10th Floor
10                           Washington, D.C. 20530

11
        For the Defendant:   J. Alex Little
12                           Zachary C. Lawson
                             Burr & Forman, LLP (Nashville Office)
13                           222 Second Avenue South
                             Suite 2000
14                           Nashville, Tennessee 37201

15

16

17

18

19

20

21

22

23

24

25
```

1          I N D E X

2          Friday, August 11, 2023

3

4          INDEX OF WITNESSES

5
WITNESSES:                                          PAGE
6

7    JENNIFER MARTINEZ
          DIRECT EXAMINATION BY MR. LITTLE           24
8
     BETH WODARSKI
9         DIRECT EXAMINATION BY MR. LAWSON          32

10   JOHN DEBERRY
          DIRECT EXAMINATION BY MR. LITTLE           38
11
     DANIEL SUHR
12        DIRECT EXAMINATION BY MR. LITTLE           47

13

14

15

16

17                    EXHIBITS

18                    (None)

19

20

21

22

23

24

25

1          The above-styled cause came on to be heard on

2  August 11, 2023, before the Honorable Waverly D.

3  Crenshaw, Jr., Chief District Judge, when the following

4  proceedings were had, to-wit:

5          THE COURT:  All right.  Be seated.

6          All right.  We're here today on United States of

7  *America v. Brian Kelsey*, Case Number 21-264, and Mr. Kelsey's

8  in the courtroom.

9          If counsel can introduce yourselves on the record.

10          MS. KLOPF:  Good afternoon, Your Honor.  Amanda

11  Klopf on behalf of the Middle District of Tennessee.  I'm

12  present with my colleagues, John Taddei from the Public

13  Integrity Section and David Pritchard from the Western

14  District of Tennessee, and our Special Agent for the case.

15          Thank you, Your Honor.

16          MR. LITTLE:  Good afternoon, Your Honor.  Alex

17  Little and Zach Lawson on behalf of Mr. Kelsey.

18          THE COURT:  All right.  So, Mr. Kelsey, we're here

19  today for sentencing because on November 22nd you entered a

20  plea of guilty to Count One and Count Five of the five-count

21  indictment, pursuant to a plea agreement under Rule

22  11(c)(1)(B); although you later attempted to withdraw the

23  plea, I denied that request, and now proceed with sentencing.

24          The counts to which you knowingly and voluntarily

25  admitted are Count One:  Conspiracy to defraud the United

States, in violation of 18, U.S.C., Section 371.  That count

carries a maximum punishment up to five years' imprisonment,

probation up to five years, a $250,000 fine, and up to three

years of supervised release.

Count Five charges you with aiding and abetting

the acceptance of excessive contributions, in violation of

Section 3052, U.S.C., 30116(a)(1)(A) and 30116(a)(7)(B)(i),

and other related statues.  That count carries the same

possible penalty:  Up to five years' imprisonment, probation

from one to five years, a fine of $250,000, and supervised

release up to three years.

And each count carries the mandatory $100 special

assessment.

Do you understand you could be sentenced to the

statutory maximums today?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Okay.  In preparation for sentencing,

I've reviewed the indictment, the plea petition and

agreement, the filings in the motion to withdraw the plea, as

well as the transcripts from the plea hearing and the

evidentiary hearing on the motion to withdraw.

The record also reflects a large number of

letters, primarily from friends and family, legislative

colleagues, all of which I've read and reread.

Interestingly, your counsel has also filed -- and

I have reviewed -- the FBI's 302 statements regarding Jeremy

Durham, Langhofer, and a table of election fraud cases.

And, supplemental to that, your counsel has

provided me -- and I've read -- Document Number 148, which is

a supplemental brief, as well as a declaration from Lee

Goodman.

Attached to that are additional 302 statements

from Joshua Smith, Jeremy Durham, Jessica Durham, all in --

all in Documents 148-1 through -6.

I also have the grand jury testimony of Jeremy

Durham that was filed by your attorneys, and your notice of

intent to rely on mitigation evidence, which I've read,

attachments to that information, along with the declaration

of Kory Langhofer.

I've also received the United States's position on

the presentence report as well as your presentence report.

So, Mr. Kelsey, have you had a chance to review

all of that information?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Right.  And talk to your attorneys

about it?  You don't have to stand.

THE DEFENDANT:  I have, Your Honor.

THE COURT:  All right.  Have they been responsive

to any questions you had about that information?

THE DEFENDANT:  They have, Your Honor.

1          THE COURT:  All right.  Any complaints or

2   grievances you have about your attorneys' services to this

3   point in time?

4          THE DEFENDANT:  With my current counsel, no, sir,

5   Your Honor.

6          THE COURT:  Did you also receive the August 4th

7   revised presentence report?

8          THE DEFENDANT:  I did, Your Honor.

9          THE COURT:  And did you get your own copy of that

10  document?

11         THE DEFENDANT:  I did, Your Honor.

12         THE COURT:  And read -- did you read that

13  document?

14         THE DEFENDANT:  I did, Your Honor.

15         THE COURT:  Every page?

16         THE DEFENDANT:  I read every page, and then I

17  believe there were a couple of addenda to them.

18         THE COURT:  Right.

19         THE DEFENDANT:  And I think I've read two addenda,

20  Your Honor.

21         THE COURT:  And, again, did you get an opportunity

22  to talk to your current attorneys about any questions you had

23  about that document?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And, again, were they responsive to

1  any questions that you had?

2         THE DEFENDANT:  They were, Your Honor.

3         THE COURT:  Do you want any more time to review

4  any of this information before we proceed?

5         THE DEFENDANT:  Your Honor, I don't think I want

6  any more time.  I think it's -- I think I've taken up too

7  much of this Court's time already.  Thank you, Your Honor.

8         THE COURT:  Well, certainly if you want additional

9  time, I can have a short recess here today if you like.

10         THE DEFENDANT:  And I appreciate that offer, Your

11  Honor.  But, no, I've read everything and I've had all of my

12  questions answered up to this point, Your Honor.

13         THE COURT:  All right.  Does the government have

14  any objections to the presentence report?

15         MR. TADDEI:  No, Your Honor.

16         THE COURT:  All right.  Mr. Little, you filed some

17  objections.  I've read everything, but I'll certainly be glad

18  to hear you now.

19         MR. LITTLE:  Your Honor, we only have, I think,

20  one objection at which to provide an argument about.

21         Before I do, I did want to raise sort of a

22  non-guidelines issue of whether the Court was going to rely

23  upon uncharged conduct that the government argued about in

24  its memorandum.

25         They had put about two pages in their sentencing

memorandum about uncharged conduct that came from three
paragraphs in the PSR.  Those have been objected to for
months by original counsel as well.  The government doesn't
intend to put on any evidence about those.  And the case law
we have cited to you is pretty clear, that the Court can't
just rely on just the PSR in a situation of disputed evidence
such as that.

So it's not an objection about the guidelines
calculation, but it is an objection to how the government's
seeking to use those three paragraphs of the PSR in making
their sentencing argument today.

So I wanted to make sure the Court's aware of that
issue as well.

THE COURT:  Okay.  I'm sorry.  I was distracted by
the court officer.

For purposes of your objections and the concern
you raise now, I'm relying upon the facts that Mr. Kelsey
agreed to at his plea hearing.

MR. LITTLE:  Understand.  And as long as that -- I
think under rule 31, as long as the Court's made that
statement, it's not relying on this outside alleged conduct,
I don't think we have an issue, but I wanted to make that
clear on the record.

In terms of the PSR, the only objection I want to
spend any time here talking about is the two points for

1    obstruction of justice.

2              THE COURT:  Okay.

3              MR. LITTLE:  And the issue there is, generally the

4    PSR has not identified -- and we don't think there are --

5    statements that are specific perjury of the type -- it's

6    clear under the case law that to get a two-point obstruction

7    in this category for a withdrawal of a plea there has to be a

8    specific statement of fact that is determined to be perjury.

9    Perjury has specific definitions under the federal statues.

10             Here, we don't believe those are met because the

11   statement that the PSR points to that is perjured is that he

12   is not -- is that he is -- is that he was guilty.

13             So the PSR points to the November statement saying

14   "I was guilty" as the perjured statement.  Which doesn't make

15   a lot of sense, because, if that's perjury, then the PSR says

16   he should get two points for being innocent.

17             And, while there are circumstances where you can

18   have perjury by contradiction, those are fairly subscribed in

19   the U.S. Code to a very narrow set of circumstances that

20   aren't present here.

21             And so, under the case law, we don't think those

22   two points are appropriate.  That's the only objections we

23   have that we want to stand on in terms of argument here

24   today.

25             THE COURT:  All right.  As to the factual

1 objections, I guess those will just be noted for the record.
2 It doesn't change the calculation of the guidelines.
3         MR. LITTLE:  It does not, Your Honor.
4         THE COURT:  Okay.  Anything -- then you have the
5 second objection, the acceptance of responsibility point.
6 Any further comments --
7         MR. LITTLE:  Nothing more than prior counsel said.
8 Yeah.
9         THE COURT:  All right.  So let me hear from the
10 government.
11         MR. TADDEI:  Thank you, Your Honor.
12         With respect to the disputed facts in the PSR, I
13 believe Mr. Little is referring to paragraphs 39 through 41.
14         For purposes of a clear record, it doesn't sound
15 like the Court is planning on relying on those paragraphs in
16 determining its sentence anyway, but we would not object to
17 the Court's statement on the record that they will not impact
18 the defendant's sentence in moving forward.
19         THE COURT:  All right.  Anything you want to say
20 on the objection to the -- to the obstruction of justice?
21         MR. TADDEI:  Yes, Your Honor.
22         As the Court is, of course, aware, that
23 enhancement was not contemplated in the plea agreement
24 between the parties, which, of course, was entered into
25 before Mr. Kelsey moved to withdraw his plea.  Therefore, the

1  government defers to the Court on its application.

2        However, consistent with the terms of the plea

3  agreement, it appears the Probation Office and the Court is

4  inquiring with respect to the propriety of that two-level

5  enhancement.

6        We would note that in Application Note 4B of

7  Sentencing Guidelines Section 3C1.1, committing, suborning,

8  or attempting to suborn perjury, including during the course

9  of a proceeding, if it's conducted in front of the Court on

10 matters related to the conviction, that that two-level

11 enhancement can apply.

12        As, of course, this Court is aware, when

13 Mr. Kelsey testified before this Court at the hearing to

14 withdraw his plea, he repeatedly admitted that he lied at his

15 change of plea hearing when he said he was guilty.

16 Subsequent to that, while on the stand he also emphatically

17 and repeatedly stated that he did not commit the acts set

18 forth in the factual basis supporting his pleas, despite his

19 earlier sworn statement that he had.

20        As the Court ruled at the plea withdrawal hearing,

21 the Court can rely on the statement of facts that was entered

22 as true, and, therefore, the defendant's statements,

23 including, but not limited to, "I 100 percent did not commit

24 these things that I'm accused of," on page 119 of the

25 withdrawal transcript, were perjurious and support

1   application of the two-level enhancement.

2            THE COURT:  All right.

3            So, Mr. Little, I'm going to give you the last

4   word on your objection.

5            MR. LITTLE:  Your Honor, I think the government's

6   come pretty close to violating the plea agreement.  It sure

7   sounds like they're advocating for those two points, and they

8   can't do that.

9            THE COURT:  Well, I asked him what he thought.

10           MR. LITTLE:  I understand, Your Honor.  But if you

11  ask him to violate the plea agreement, it doesn't mean he

12  doesn't violate the plea agreement.

13           I think the end -- at the end of the day there are

14  statements that have been to be specifically found within the

15  Sixth Circuit precedent that are false.  A statement that "I

16  did not do something," generally an assertion of innocence,

17  is not found in the Sixth Circuit law to be a perjury without

18  a factual basis that those things had occurred.  And so the

19  general statements that you heard him say on the stand were

20  general denials "I didn't do this crime."

21           That sort of general denial, in most

22  circumstances, does not suffice under the case law to get the

23  two points.

24           Now, there can be times when -- and I think, Your

25  Honor, there may be specific cases where someone says, "Oh,

1  did you do this act, this transfer of funds?"

2       "No, I did not."

3       And the Court has a basis in the record to find

4  that transfer of funds happened, that might be a specific

5  circumstance.

6       What's unusual -- and I know you know this docket

7  very well.  None of the statements that Mr. Kelsey gave were

8  specific about those sorts of transactions.  The government

9  did not ask -- and the reason is because the plea agreement

10  is fairly vague on the particulars.

11       And so part of the problem that we have in talking

12  about all of these things, as you saw from our PSR, is that

13  the level of vagueness makes it difficult to determine

14  whether a statement is just a rebuttal of that vagueness or a

15  specific denial of fact.  To be perjury it's got to be a

16  specific denial of fact, and we don't think that's here in

17  this record.

18       THE COURT:  All right.  So I appreciate the

19  additional arguments, and I've read what's been filed before

20  today.

21       Under the guidelines, a two-level enhancement for

22  obstruction of justice applies when the defendant willfully

23  obstructed or impeded or attempted to obstruct or impede the

24  administration of justice with respect to the investigation,

25  prosecution, or sentencing of the instant offense of

conviction.  See Guideline Section 3C1.1.

This can include when a defendant lies in an effort to escape the consequences of his or her guilty plea. Each of these conditions is satisfied when a defendant intentionally lies under oath in an effort to scuttle a previously entered plea.

After all, an intentional lie in these circumstances is, by definition, an effort to impede the administration of justice with respect to the prosecution and sentencing of the case, seeking, as it does, to undo a conviction obtained pursuant to lawful procedures and to force the proceedings to begin anew.

And it necessarily relates directly to the defendant's offense of conviction, as it represents an effort to unring the bell on an already agreed-to conviction for that offense.

See *United States v. Soto*, 660 F.3d 1264 at 1268 through -69, Tenth Circuit, 2011, cited with approval in *United States v. Vargas-Gutierrez*, 464 F.App 492 at 498, Sixth Circuit, 2012.

Contrary to the defendant's suggestion, the refusal to grant him an acceptance of responsibility adjustment does not preclude the enhancement for obstruction of justice.  Nor is it double counting.  There may be extraordinary cases where only one or the other is

appropriate, but the Sixth Circuit has consistently granted district courts great leeway when making this determination.

See *United States v. Roberts*, 243 F.3d at 235, page 241, Sixth Circuit, 2001, collecting cases, and *United States v. Paull*, 551 F.3d 516 at 528, Sixth Circuit, 2009.

Also, the government does not have to move for the enhancement for it to be appropriate, nor should it, given that the parties agreed in their plea agreement that it intended to cover all adjustments and enhancements, and the agreement does not contemplate that a defendant will attempt to walk away from it.

Besides, and as the plea agreement recognized in this case, the final decision is for the Court to make, as it must.

See *United States v. Kimberly*, 412 F.App at 750, page 754, Sixth Circuit, 2011.

An enhancement can be appropriate even if neither the government nor the probation officer request it. The Court recognizes and agrees that the obstruction of justice guideline is not intended to punish a defendant for the exercise of a constitutional right.

See Guideline Section -- Sentencing Guideline Section 3C1.1, Comment Number 2.

Nor is the enhancement warranted if the defendant merely testified untruthfully due to mistake or confusion.

1          See *United States v. Dunnigan*, 507 U.S. 87 at page

2    94, 1993.

3          But nothing of the sort occurred here.  To assess

4    the enhancement -- to assess the enhancement for obstruction

5    of justice, the Court must, one, identify perjurious

6    statements the defendant made on the stand; two, find that

7    the defendant made these statements willfully; and, three,

8    find that the false statements were material.

9          *United States v. Sassanelli*, 118 F.3d 495 at page

10   501, Sixth Circuit, 1997.

11          Perjury, however, does not require specific intent

12   to obstruct justice.  Rather, it requires only that a

13   defendant give false testimony with the willful intent to

14   provide false testimony, rather than as a result of

15   confusion, mistake, or faulty memory.

16          See *Dunnigan*, 507 U.S. at 94.

17          In this regard, the Sixth Circuit has upheld the

18   enhancement where the district court referred back to its

19   earlier well-supported findings that Defendant was untruthful

20   during essentially all of his testimony with respect to the

21   circumstances of his guilty plea and his participation in the

22   crime at issue.

23          See *Vargas-Gutierrez* at 464 F.App at page 497.

24   See also *United States v. Graulich*, 524, F.App 802 at page

25   807, Third Circuit, 2013.

1    Obstruction enhancement warranted where defendant
2  either lied at his change of plea hearing or at his motion to
3  withdraw plea when he said that no one pressured him into
4  pleading guilty.
5    See also *United States v. Ardolf*, 683 F.3d at
6  89- -- 894, page 901, Eighth Circuit, 2012.
7    Obstruction of justice enhancement justified when
8  Defendant admitted guilt under oath but later attempted to
9  withdraw that guilty plea claiming innocence.
10    See also *United States v. Adam*, 296 F.3d 327 at
11  pages 334 through -35, Fifth Circuit, 2002.
12    Obstruction of justice enhancement appropriate
13  when Defendant admitted that he lied about the circumstances
14  surrounding his guilty plea.
15    During the evidentiary hearing on his motion to
16  withdraw his plea, Mr. Kelsey admitted to the Court that he
17  was not truthful to the Court, that he misled the Court, and
18  that the behavior he said under oath he engaged in was not
19  truthful.  The specific perjurious statements Mr. Kelsey made
20  to the Court were at least two.  One, he was not truthful
21  when he told the Court that he was, in fact, guilty of Counts
22  One and Five; and, two, he was not truthful when he told the
23  Court that he, in fact, engaged in the behavior set forth in
24  the factual basis section of his plea agreement.
25    Mr. Kelsey confessed at the hearing on his motion

to withdraw his guilty plea that he willfully told the Court
he was guilty of Counts One and Five when that information in
the fact- -- and that the information in the factual basis
was true when, in fact, in his mind he knew neither was true.

He did this because of personal pressure of his
then dying father and the stress of twin infant sons, as well
as his three-year-old.  He didn't share his personal pressure
with anyone, including his then lawyers or the Court.  As he
put it, he thought at the plea hearing that it was the right
thing to do.  He realized later that it was not and that he
had done the wrong thing.

His perjurious statements were material.  The
defendant's acknowledgment of guilt at the plea hearing is
legally required and without it the defendant remains
presumed innocent.

Had Mr. Kelsey told the truth, the Court would not
have found him guilty of Counts One and Five.  Likewise,
without truthful facts supporting his pleas, the Court could
not accept his plea.

See Federal Rule of Criminal Procedure 11(b)(3).

Mr. Kelsey also objects to the failure to decrease
his acceptance of responsibility.  Section 3E1.1 of the
guidelines permits a district court to reduce the guideline
range by two levels if the defendant clearly demonstrates
acceptance of responsibility for the offense.

1          See Guideline 3E1.1(a).

2          An additional one-point reduction is permissible

3 if a defendant timely notifies authorities of his intention

4 to enter a plea of guilty and the government so moves.

5          See Section 3E1.1(b).

6          It is Defendant's burden to show that he or she

7 accepted responsibility.

8          *United States v. Trevino*, 7 F.4th 414 at page 431,

9 Sixth Circuit, 2021.

10          And this is a factual determination to be made by

11 the district court subject to a clearly erroneous standard of

12 review.

13          See *United States v. Surratt*, 87 F.3d 814 at 821,

14 Sixth Circuit, 1996.

15          Pleading guilty does not automatically entitle a

16 defendant to an acceptance of responsibility adjustment.

17          See *United States v. Thomas*, 933 F.3d at 605, page

18 612, Sixth Circuit, 2019.

19          This is because, even though a guilty plea

20 constitutes significant evidence of acceptance of

21 responsibility, it can be outweighed by conduct of the

22 defendant that is inconsistent with such acceptance of

23 responsibility.

24          See Guideline Section 3E1.1, Comment 3.

25          The Sixth Circuit has repeatedly affirmed a

1  district court's denial of acceptance of responsibility

2  adjustment when a defendant has pled guilty and then

3  attempted to withdraw his plea.

4           See *United States v. Maxey*, 2021 Westlaw 5567269,

5  at *2, Sixth Circuit, November 29, 2021, citing *United States*

6  *v. Williams*, 396 F.App 212 at page 219, Sixth Circuit, 2010,

7  collecting cases.

8           In *Williams*, for example, denial of acceptance of

9  responsibility was appropriate where the defendant entered a

10  plea, tried unsuccessfully to withdraw the plea, and denied

11  that the answers he gave the district court under oath at the

12  guilty plea hearing were truthful.

13          The same is true here.  More than that, Defendant

14  continues to insist that he's not done what he admitted under

15  oath he did, in fact, do.  The declarations of Lee E. Goodman

16  and Cory Langenhofer filed as mitigation evidence at

17  sentencing actually advance Mr. Kelsey's belief that he is

18  innocent, notwithstanding his admission of guilt at the plea

19  hearing and in the plea agreement and in the plea petition.

20          Indeed, some of the friends and family letters

21  that this Court has read and reread, filed in support of a

22  probationary sentence, speak in terms of him being railroaded

23  and persecuted.  The sentencing memorandum filed on his

24  behalf references government -- the quote, Government's

25  telling, end quote of events, as if that version is not true,

1 even though it is based, in part, on the factual basis

2 Mr. Kelsey said were true.

3        Not only does the Court find an acceptance of

4 responsibility adjustment is not warranted, it finds to

5 conclude otherwise on this record would likely be clearly

6 erroneous. So that objection is overruled.

7        So, with those rulings and the Court's statement,

8 the presentence report will be accepted and the facts

9 contained in there, and especially the facts contained in the

10 plea agreement "Factual Basis" section will be relied upon.

11        So now the Court turns to calculation of the

12 advisory -- advisory -- guideline range, which, of course, is

13 no longer mandatory.

14        Here the offense level starts with Counts One and

15 Count Five are grouped pursuant to Section 3D1.2(b) because

16 they form a part of the common objective or scheme. The base

17 level is set at 8 pursuant to Section 2C1.8.

18        Six points are added because the defendant

19 transferred $91,000 in funds.

20        Two points are added because he was the organizer,

21 manager or leader.

22        An additional two points are added because he

23 abused a position of trust.

24        Two additional points are added because he

25 willfully obstructed justice in seeking to withdraw his plea.

1            That gives him a total of 20 points.

2            There are zero criminal history points, so that

3    sets him at Category I.

4            So the guidelines suggest or recommend to the

5    Court a sentencing range of 33 to 41 months' imprisonment.

6            Probation is not authorized under the guidelines.

7            The guideline range for supervised release is one

8    to three years per count.

9            The guideline range for a fine is 15,000 to

10   $150,000, and a special assessment of $100 per count.

11           Does the government have any objections to the

12   calculation of the guideline?

13           MR. TADDEI:  No, Your Honor.

14           THE COURT:  Any additional objections, Mr. Little?

15           MR. LITTLE:  Nothing additional, Your Honor.

16           THE COURT:  So that turns us to the application of

17   the 3553(a) factors.

18           I am told, Mr. Little, you -- you have witnesses?

19           MR. LITTLE:  Yes, Your Honor.  We have four

20   character witnesses --

21           THE COURT:  All right.

22           MR. LITTLE:  -- we would like to put on before we

23   get to argument, if that's okay with the Court.

24           THE COURT:  That would be good.

25           MR. LITTLE:  Your Honor, the first of those will

1  be Jennifer Martinez.

2          THE COURT:  All right.  If you'll come to the

3  podium, we'll swear you in.

4          COURT DEPUTY:  Please raise your right hand.

5

6                    JENNIFER MARTINEZ,

7          called as a witness by Defendant, was duly sworn

8  and testified as follows:

9

10         COURT DEPUTY:  Please state your full name for the

11 record.

12         THE WITNESS:  Jennifer Martinez.

13         COURT DEPUTY:  And spell your last name.

14         THE WITNESS:  M-a-r-t-i-n-e-z.

15         COURT DEPUTY:  Have a seat in the witness stand.

16

17                   DIRECT EXAMINATION

18 BY MR. LITTLE:

19 Q.   Good afternoon, Ms. Martinez.

20 A.   Hey.

21 Q.   If you can speak into the mic, that will be perfect.

22         Now, do you know the defendant, Brian Kelsey?

23 A.   I do.

24 Q.   And how do you know him?

25 A.   We've known each other I guess over probably 20 years --

1  21 years maybe.  We met originally teaching Sunday school
2  together.  We were both teaching five-year-old Sunday school.
3  I actually had a five-year-old in Sunday school and felt
4  obligated to volunteer to teach.  And inexplicably he also
5  had volunteered as a single, you know, twenty-something, to
6  teach.  And so we taught two years together at church.
7  Q.    So, in addition to knowing Mr. Kelsey in church, part of
8  the same church community, did you know him in any other
9  capacities?
10  A.    I -- yes, I did.  For -- we -- gosh, I would consider
11  myself one of his closest friends.  We've known each other
12  for years socially and in church.  But we also worked
13  together advocating for school choice, but then I also went
14  to work with him as his district representative in 2017.
15  Q.    So how many years did you work with him in total?
16  A.    Seven years, I think.  Seven -- '17 to '22.
17  Q.    So you've known him in church?
18  A.    Uh-huh.
19  Q.    You've worked with him.  And you've worked alongside of
20  him on social issues.
21         Has that got it?
22  A.    I mean, that's scratching the surface.  We -- we --
23  after we taught Sunday school together, we -- we had a blast
24  doing that.  Like, I don't know why he would ever agree to do
25  that.  But he was an amazing Sunday school teacher.  So he

1  kind of -- he, like, taught the class; I wrangled the kids.
2  And we had a blast doing that.  So we signed up for one more
3  year to do that.
4          And then my five-year-old was moved -- you know,
5  had moved on, advanced.  And so I threw in the towel.  I was
6  done.  So I thought that we -- that was it.  We had worked
7  together those two years and that was it.
8          But we crossed paths numerous times over the next
9  few years.  I -- every -- I think probably every time I
10 volunteered for something, he was already there doing
11 something.  Without fanfare, not for political reasons, not
12 in his district.  He was just always there working for the
13 City.
14 Q.   Could you give an example of the sort of volunteering
15 that you did with Mr. Kelsey?
16 A.   I mean, we -- and it wasn't even like we did it
17 together.  I would show up -- I showed up to a warehouse out
18 in the middle of nowhere to pack food baskets for the
19 homeless, and he was also there packing food baskets.
20         And then I signed up to tutor after school at an
21 inner-city community center, Lester Community Center in
22 Memphis.  And I signed up to tutor kids.  And when I showed
23 up he was also signed up for the same days.  He was reading
24 to kids in the class.
25         One year -- one year I signed up to help make

over -- there's -- there's a -- Kingsbury, it's the most
diverse inner-city school in Memphis. And I signed up to
help make over the teacher's lounge. We painted and fixed it
up. And when I -- when I got there, I found out he had been
tutoring middle school students there for a long time.

He was always -- he -- I showed up to an event one
time and he was singing in an urban choir. I didn't even --
I didn't even know he sang.

So he was -- it seemed to be he was everywhere.
And it was never -- it was never a publicity stunt. I
admired that he was always just silently serving as a 20- and
30-year-old, just every -- every chance -- you know, it
seemed every chance he got.

Q.   And just to be clear, about how many years did you see
Mr. Kelsey engage in this sort of public service?

A.   Oh, gosh. So that was -- at least over ten years. It
kind of switched. Like, as my kids got older, they were -- I
had three kids. And they were zoned for failing schools. So
I was desperate, as a single mom, for some sort of option for
them, some sort of decent school option, and couldn't afford
to put them all in private school.

So I started desperately working on school -- as
an advocate for school choice. And, not surprising, when I
showed up to start getting involved in policy and -- and
advocating with the legislators and in the community, he was

1   already there.  He had already been working on this issue for
2   probably three years before I got involved.
3           And I got involved because I was desperate and I
4   was panicked as a parent.  He didn't even have kids.  He was
5   just committed to -- he had gone to school on scholarship.
6   He had gone to private school on scholarship.  And he was
7   committed to making sure every other child in Memphis --
8   every other child in the state had the same opportunities he
9   had.
10          And so he had been working on this for about three
11  years.  And then I got really involved and spent years
12  working.  And we wouldn't -- we never worked together --
13  Q.   Is that how you all ended up eventually working -- how
14  you ended eventually working for him in the district?
15  A.   We did.  I didn't work with him on those issues, but we
16  were always on the same side at the same -- the same events.
17          So, eventually, in 2017 he was looking for a
18  district representative.  And I started working with him in
19  February, I think, of 2017.  And worked with him just helping
20  to make his schedule, representing him in the district when
21  he was in session.
22  Q.   And so in the course of that job, as well as the times
23  before, did you get to see Mr. Kelsey interact with the
24  public on a regular basis?
25  A.   I did.  I was -- I accompanied him to most speaking

1  engagements, events, constituent services.

2  Q.   And how would you describe for the Court sort of what

3  you saw in terms of his character and his intent in doing the

4  things that he was doing?

5  A.   He's one of the hardest-working, justice-focused

6  individuals I've ever met.  He deeply cares about not just

7  his constituents but the city -- our whole city and the

8  state.  He worked tirelessly.

9           And I was privy to a lot.  I worked in his law

10 office.  I was the one he would bounce ideas off of.  We

11 traveled to events together.  We -- I had a key to his house.

12 When he switched computers, I copied all the files from one

13 computer to the other computer.  I had access to all his

14 passwords.  I had read his -- and answered his emails.

15 Q.   So it's fair to say you had a pretty intimate look at

16 his day-to-day life?

17 A.   I started out by saying I don't think anybody knows him

18 better.  Like, we've spent so much time together --

19 Q.   You know that he's here because he's pled guilty?

20 Right?

21 A.   I do.

22 Q.   Does that change your view about what a good man he is?

23 A.   Not at all.  He's -- over the last few years, he's

24 mentored my three kids that are now grown.  He's had an

25 incredible impact on their lives and on mine.

In fact, he's had an impact on kids across the state. When -- when -- one evening stands out to me. After we had worked -- you know, before we worked together and then when we worked together to pass ESAs and offer scholarships for children zoned to failing schools, that night that it passed, we had to meet at a McDonald's parking lot at 108, which is halfway between Memphis and Nashville, to take care of business, sign paperwork, like take care of law business.

And so we had met at that parking lot, and I said, "I can't believe -- I can't believe it."

And he said that night, he said, "If I die tonight, it would be okay, because I believe I've done what I was put on Earth to do."

And he said, "I might be done." Like, this is it. This is all we've worked for.

I said, "What are we going to work on next?"

Q.    Let me be clear --

A.    Like, I was on fire.

Q.    -- he's referring to the fact that he was able to pass the Educational Scholarships Act?

A.    After 13 years of working on this issue and fighting for kids.

And when I said, "We're not done. What are we going to tackle next?"

And he was like, "That was it."

1            And, you know, it wasn't it.

2            Like, when the -- when the -- there was a lawsuit

3 filed that shut the ESA program down. And there were parents

4 that were I know as desperate as I was when, you know, I was

5 in that fight. And there were schools that these -- not the

6 big schools with million-dollar facility funds. These small

7 urban schools that were on the front lines doing the work,

8 these private schools that I saw offer full scholarships to

9 homeless families that let the entire family eat there for

10 free, they were desperate for some sort of help through this

11 legal process.

12            He took off his legislator hat and put on his

13 attorney hat and went to work for those families and those

14 schools pro bono to help them navigate through that legal

15 fight.

16            It's never done with him. Like, he might say,

17 "That's it," like, but he never ceases to stop working for

18 and fighting for those that are less fortunate, that -- that

19 he feels like have been dealt with unjustly.

20            MR. LITTLE: Ms. Martinez, I appreciate your time.

21            The government may have questions for you. The

22 Court may as well.

23            THE WITNESS: Sure.

24            MR. LITTLE: Thank you.

25            MR. TADDEI: No questions for this witness, Your

1  Honor.

2         THE COURT:  All right.  You can step down.

3         THE WITNESS:  Thank you.

4         THE COURT:  Thank you.

5                  (Witness excused.)

6         MR. LITTLE:  Your Honor, our next witness is Beth

7  Wodarski, and my colleague Zach Lawson is going to question

8  her.

9         THE COURT:  All right.

10         COURT DEPUTY:  Please come to the podium.  Raise

11  your right hand, please.

12

13                  BETH WODARSKI,

14         called as a witness by Defendant, was duly sworn

15  and testified as follows:

16

17         COURT DEPUTY:  Please state your full name for the

18  record.

19         THE WITNESS:  Beth Wodarski.

20         COURT DEPUTY:  And spell your last name.

21         THE WITNESS:  W-o-d-a-r-s-k-i.

22         COURT DEPUTY:  Have a seat in the witness stand.

23  ///

24  ///

25                  DIRECT EXAMINATION

1  BY MR. LAWSON:

2  Q.    Hello, can you please state your full name and spell

3  your last name?

4  A.    Beth Wodarski.  It's W-o-d-a-r-s-k-i.

5  Q.    And, Ms. Wodarski, you're aware that Brian Kelsey is the

6  defendant in this case and he's being sentenced today?

7  A.    Correct.

8  Q.    Okay.  I'm want to talk to you -- just a few questions

9  about Brian Kelsey.

10          How long have you known him?

11 A.    I've known Brian since about early 2017.

12 Q.    Okay.  How did you meet him?

13 A.    When he first started dating my friend Amanda.  So

14 that's how I got to know him.

15 Q.    Have you gotten to know him more since then?

16 A.    Yeah.  Absolutely.  So I've become friends with him over

17 the last, you know, handful of years.  I was really part of

18 getting to know him while they were dating and through their

19 engagement and their wedding, which, unfortunately, I didn't

20 make because there was a terrible snowstorm in Kentucky for

21 everyone that was there.

22          And I was honestly devastated because I was so

23 thankful that Amanda and Brian had met each other, and they

24 just were such a great fit, and I wanted to be there to

25 support them.  So. . .

Q.   Now, you've spent time with their family --

A.   Absolutely.

Q.   -- since 2017?

A.   Yeah.  So in the last few years I've gotten to see them become parents, and I get to spend time at the house with the family.  We live, you know, super close to each other.  And, you know, we have dinner at the house.  We've attended church together.  We go to Reagan's [phonetic] soccer games.  She's their four-year-old.  And, more than anything, we just spend a lot of quality time at the house, as you can imagine, with Reagan being four and extremely active and the twins now being 11 months and getting more active by the day.

        So we just spend a lot of time at the house together in quality time.  And, you know, Amanda and Brian are from very strong family backgrounds, and that's something that they -- I think really brought them together.  And I'm thankful to be part of that extended family, and I truly feel like I get to be part of that and witness them raising their kids.

Q.   And so through that time you've had the opportunity to see Mr. Kelsey parent his children?

A.   Absolutely.

Q.   And talk about that briefly.

A.   Yeah.  Absolutely.  So spent, you know, time with him.  And Brian is truly a very loving dad.  He is super hands-on

with these kids.  And, you know, he instills the character in them, and faith is so important to him.  And it's something that he really tries to embody and share with his kids, you know.

And education is something that is paramount to Brian.  And, you know, recently I was over at the house and I was helping Amanda with the twins, you know, during the day on the weekend, and Brian, you know, spends time researching activities that he can do with Reagan that are both educational and fun and exciting for her.  Right?

She's extremely active.  She's hands-down the smartest four-year-old I've ever met in my entire life.  She's truly amazing.  And, you know, he loves to spend and find things that invigorate that learning for her.

And he couldn't wait to get back and tell us and ask Reagan, you know, "What did you see and what did you learn?  And tell Ms. Beth."  And he was just so proud of that, you know?

And Reagan is getting to the age where she's going to be going to preschool, and they've been applying to different schools in the area.  And, you know, she's -- she's truly gifted in that area.

And, you know, I got to witness and watch Brian participate with the different activities she's going to be, you know, showing the school when she was going through that

process. And just seeing the pride in his face and knowing

how much, you know, he's done to help -- you know, help her

grow and help her educate in this area and just see the

phenomenal little girl that she's turned into.

Q. Have you had the chance -- since you've been close with

him since 2017 to now -- to see how the impact of this case

and of his plea has impacted the family, and, if so, can you

just say a few words about that?

A. Absolutely. I mean it -- you know, there's no question

that it's been a very hard time. And it's something that,

you know, I've been aware of. But to be honest, their

marriage has been stronger than ever through this. Watching

their partnership, they have a true, loving partnership, and

that's really amazing to see.

        And I know it's been extremely hard on them. And

they continue to show up for each other and continue to, you

know, become stronger through that and really just focus on,

you know, what's really important in life and family and

faith and really draw on their extended family for that

support.

Q. And you said that you -- you know, you understand why

you're here and why Brian's here today.

        Is there anything else about Mr. Kelsey you want

the Court to consider when its rendering its sentence today?

A. Yeah, I just -- I truly ask that the Court gives mercy

on Brian today.  I just can't imagine him not being there for

his children and that Amanda will be raising her children

without him.  It's just truly unfathomable to me.

MR. LAWSON:  That's all the questions I have.  The

government may have a few and the Court may have one or two.

THE WITNESS:  Sure.

MR. TADDEI:  No questions, Your Honor.

THE COURT:  All right.  You can step down.  Thanks

for being here.

(Witness excused.)

MR. LITTLE:  Your Honor, at this time the defense

calls Representative John DeBerry.

COURT DEPUTY:  Please raise your right hand.


JOHN DEBERRY,

called as a witness by Defendant, was duly sworn

and testified as follows:


COURT DEPUTY:  Please state your full name for the

record.

THE WITNESS:  John J. DeBerry, Jr.

COURT DEPUTY:  And please spell your last name.

THE WITNESS:  D-e-B-e-r-r-y.

COURT DEPUTY:  If you can take the witness stand.

THE WITNESS:  Thank you.  Your Honor.

```
 1                    DIRECT EXAMINATION
 2   BY MR. LITTLE:
 3   Q.   Good afternoon, sir.
 4   A.   How are you?
 5   Q.   Speak in that microphone the best you can.
 6   A.   Okay.
 7   Q.   If you don't understand me, let me know.
 8   A.   All right.
 9   Q.   Now, Representative DeBerry, how do you know Brian
10   Kelsey?
11   A.   Well, I've known Brian since he took the oath of office
12   in the House of Representatives.  He came in as a young man,
13   very vibrant, very smart, energetic.  As a matter of fact, he
14   served on my committee when I chaired Children and Family in
15   the House of Representatives.  He was a very valuable member
16   of that committee, a very trusted member of that committee.
17   Q.   And approximately how many years did you work with him
18   in the General Assembly in one capacity or another?
19   A.   I worked with him his entire career, the majority of his
20   career.  I worked with him in the House the entire time that
21   he was in the House.  He and I sponsored bills together.  We
22   worked together on a lot of difficult legislation, a lot of
23   times legislation that didn't make either of us popular, but
24   it was legislation that had to be fought for, especially
25   considering the demographics that we dealt with the majority
```

1  of the time.

2          Brian was the type of individual that I could call

3  upon him if I had a difficult bill, and I would always warn

4  him, as an older legislator, that this is not necessarily

5  going to make you popular on -- on either side of the aisle,

6  but it is something that has to be done.

7          He never hesitated to -- to stand beside me, to

8  pick up the mantle and work hard for legislation that was

9  good for the children and the people of the state of

10 Tennessee.

11 Q.   Now, some people in the courtroom may know this, but the

12 Court may not, and the record reflects not.  At the time

13 you're talking about, you were a Democrat; correct?

14 A.   Yes.  I was in the House.

15 Q.   And Mr. Kelsey was a Republican during this time.

16 A.   He was Republican.

17 Q.   You were on opposite sides of the aisle?

18 A.   Yes.

19 Q.   In interacting with him, how did you view as a

20 legislator, in terms of his character or the way that he

21 cared about others?

22 A.   Well, I haven't been in the House for 26 years.  I had

23 an opportunity to see a lot of different people come through

24 the House and Senate, a lot of different characters and

25 personalities, people who came for different reasons, who

1   were seeking many -- seeking popularity, seeking power, or

2   whatever -- whatever their intention was, it's not mine to

3   judge.

4           But I can say that when -- when the -- as my dad

5   used to say, when the rubber meets the road, you know who you

6   can depend upon.  You know who the people are that have the

7   courage and the stamina and the passion and integrity to

8   fight for something that really had to be fought for that

9   nobody else was going to do.

10          One of the things about Brian that I appreciated

11  was that he was always there for the call.  When he served on

12  the Children and Family Committee -- we had a lot of gut-

13  wrenching issues, issues that had to do with child support

14  and custody, that had to do with abuse and neglect.  All of

15  those issues came through our committee.

16          And so there were a lot of times that, you know,

17  we would walk out of that committee feeling like we had been

18  driving a John Deere all day.  But the fact is that Brian was

19  one of those people that would stick.  If he gave his word,

20  he kept his word.  If he said he would fight for it, he would

21  fight for it.

22          A lot of times, as I said, it wasn't popular.  He

23  took a beating for some of the bills that we fought for and

24  stood for.  But I could always depend upon him to keep his

25  word, and that's one of the things that I appreciated about

1  him.

2  Q.   What do you think in your interactions -- what do you

3  think drove him to do what he did?  What could you see about

4  his motivation, if anything?

5  A.   As far as why we're here today?

6  Q.   Well -- no.  Just in terms of his legislative work

7  first.

8  A.   His legislative work.  Well, I think what drove him was

9  a passion to serve.  I remember very well one of my

10  colleagues years ago, we were at an event, and at that event

11  he looked me in the eyes, literally with tears in his eyes,

12  and he said to me, he said, "I wish I could be like you."

13          I said, "What do you mean?"

14          He says, "I'm already compromised.  I'm too far

15  gone.  I can't change."

16          And what he was saying was, when I came, I came

17  with a purpose and I came for a reason.  I came to serve the

18  people of the state of Tennessee.  My father was alive at the

19  time, and Lord knows that he would get in my face and tell

20  me -- and I told -- I tell the folks at church all the time,

21  if you don't know who you are when you get here, someone will

22  define you.

23          Brian was one of those individuals that I believe

24  for -- as far as why he was there, he knew why he was there.

25  He understood that he was there at the will of the people and

1 that he had to conduct that -- himself in such a way that he

2 would be able to pass bills and garner support from the

3 house, both Democrats, Republicans, Black and white, and

4 Brian was one of the few people who were able to do that.

5 Q.    Now, you know that we're here today because Brian has

6 been convicted of a campaign finance crime.

7              You're aware of that?

8 A.    Yes.

9 Q.    Do you think Brian is the sort of individual in your

10 experience with him who can learn that lesson and really

11 internalize it and lead him to better things in the future?

12 A.    I -- I do not pretend to know the law as well as Your

13 Honor and esteemed counsel on both sides.  I don't pretend to

14 understand the charges that I heard the Judge read, and very

15 complicated, very technical, and very legal.

16              All I can do is say as a old legislator and an old

17 country preacher that sometimes you meet people, you know who

18 they are, and you learn who they are by the fruit that they

19 bear.  I can't read his mind, and God looks at our hearts in

20 spite of what we do.  And all I can say is that sometimes we

21 lose ourselves.

22              And there have been so many occasions that I have

23 worked with young people and -- and families and men who have

24 made some -- some terrible decisions, decisions that would

25 impact their lives for the rest of their lives.  And I have

1    sat with them.  I have cried with them.  I have prayed with
2    them.  And what I have seen on so many occasions is that was
3    that definitive moment that they finally got it, that life
4    has consequences.  The decisions you make have consequences.
5           And I have watched folks turn their lives around.
6    I have watched them come from the depths, as low as a person
7    can go, and rise as high as they can go.  I -- I honestly
8    believe with all of my heart -- and I say this with all
9    sincerity, sir -- that I'm -- I know this man.  And I -- I
10   believe within my heart that there is a lesson that he has
11   learned that is going to stay with him the rest of his life.
12   It's going to burn in his heart the rest of his life.  It's
13   going to buffet him the rest of his life.
14          Every time he looks at his wife, who has stood
15   beside him, every time he looks at his family, his in-laws
16   who have fought for him.  He's going to realize how blessed
17   he was.  And all I can say is I have watched him give the
18   State his best.  And I ask that he be granted mercy and grace
19   at his worst.
20          And that -- you know, I preach redemption.  And I
21   know this is a court of law and not church.  But I can ask
22   that, you know, you look at this man and the totality of what
23   he has done in his life.  A lot of people make mistakes.
24   They have no -- they have no remorse, no sorrow.  And they go
25   right back out again and commit the same crimes, make the

1   same mistakes.

2          I just can't see this happening ever again in this

3   man's life.

4          MR. LITTLE:  Thank you, Representative DeBerry.  I

5   don't have any more questions.  The Court or the government

6   will maybe.

7          MR. TADDEI:  No questions, Your Honor.

8          THE COURT:  So you just said, you know -- and you

9   said it quite eloquently, you know, he's learned a lesson he

10  has learned it for the rest -- what's that lesson he's

11  learned for the rest of his life?  As best as you understand

12  it.

13         THE WITNESS:  I think he has learned -- first of

14  all, that, as I said earlier, that -- that life is about

15  decisions and the consequences of those decisions.  We get a

16  chance to make our choices, but we don't get a chance to

17  choose our consequences.

18         And I think sometimes when we lose ourselves in

19  the daily battle, the daily endeavors, when we're trying to

20  get somewhere and we're trying to do some things, we forget

21  that you've got to get there the right way.  And you might --

22  we might be blinded momentarily to the fact that you've got

23  to -- you've got to do it the right way, and you've got to do

24  it the right way every time.

25         When we make those mistakes that -- for just a

moment, those mistakes in judgment, I think that is sort of
like a brick upside your head, so to speak, that it wakes you
up.  And I think that if there is ever an individual who gets
it at this point, I think it's Brian Kelsey.

And I honestly believe, Your Honor, that if --
if -- I know you have to make a decision by the law.  And you
have to be fair and just.  But I think that this is a person
who deserves a second chance.  And I think if you give it,
that I think you'll be proud of what you see five, ten, 15
years from now when you look at this man's life.

THE COURT:  So what have you seen him do?  What
have you heard him say that makes you think -- and you're the
first one to use this word today, that he's remorseful?

THE WITNESS:  He and I have talked on several
occasions, sir.  And it's -- it's all I can do, once talking
to him, is not be in tears myself.  Because he talks about
his children and the fear of what's going to happen with
his -- if he's absent, the fear of his family.  He's
concerned, as either of us would be, about what will happen
to his family.

I don't think for one second that he is trying to
say that he does not deserve consequences for this.  But I
think that he's saying that, perhaps because this is one of
those occasions where he has not done this before, that he
has followed the law the majority of his life, and served the

1  people the majority of his life, I can say from talking to

2  him that I honestly believe that he gets it.

3            If I saw arrogance and defiance in someone that

4  thought they deserved to be treated different than everybody

5  else, I wouldn't be sitting here today.  I would not.  This

6  is the first time I've done this in my 30-year career.  And,

7  if I detected that at all, I would not be sitting here.

8            THE COURT:  Anything else other than the

9  repercussions on his family and friends that has led you to

10 believe that, as you put it, he's remorseful or sorry?

11            THE WITNESS:  I think -- he and I have prayed

12 together.  And -- and -- and, you know, when a person has

13 worked as hard as Brian has -- and I know the legal

14 profession.  I took the LSAT back in 1970, and I'm not a

15 lawyer today.  So I know how hard it is to be a lawyer, what

16 it takes to do what you do.  And so to lose that, to have

17 worked so hard, and to have lost it, it's -- there are so

18 many different reasons why he's remorseful right now.

19            THE COURT:  Okay.  Thank you.  No other questions.

20            Anyone else have questions?

21            MR. LITTLE:  Nothing further from the defense.

22            THE COURT:  The government?

23            MR. TADDEI:  No, Your Honor.

24            THE COURT:  All right.  Thanks for being here.

25            THE WITNESS:  Thank you, sir.  Thanks for letting

1    me talk.

2                    (Witness excused.)

3              MR. LITTLE:  Your Honor, our next witness I

4    believe is in the witness room, Daniel Suhr.  Let me step

5    out.

6              THE COURT:  Okay.

7              All right.  Sir, if you'll come forward to the

8    podium, we'll swear you in.

9              COURT DEPUTY:  Please raise your right hand.

10

11                    DANIEL SUHR,

12             called as a witness by Defendant, was duly sworn

13   and testified as follows.

14             COURT DEPUTY:  Please state your full name for the

15   record.

16             THE WITNESS:  Daniel Robert Suhr, S-u-h-r.

17

18                  DIRECT EXAMINATION

19   BY MR. LITTLE:

20   Q.   Good afternoon.

21   A.   Good afternoon.

22   Q.   Now, Mr. Suhr, how do you know Mr. Kelsey?

23   A.   For starters, professionally, and now as a friend.

24   Q.   How long have you known him?

25   A.   Brian and I joined the same law firm at about the same

time in February of 2019.  I had been working for the
Governor of Wisconsin, and my boss lost his reelection, so I
found a new job working at the firm, and it was about the
same time that Brian joined the firm.

Q.    And what sort of firm was this?  Was it a private firm?
Pro bono?  Maybe explain that.

A.    Yeah.  So Brian and I were colleagues at the Liberty
Justice Center.  It's a nonprofit, nonpartisan law firm that
focuses on free speech, free markets, and children's and
parents's rights in education.  It's about ten attorneys, and
we all work remotely.

         So I'm from Milwaukee.  Brian obviously is from
here in Tennessee, and we had colleagues across the country
that worked on our cases.

Q.    And you said you know him both professionally and as a
friend.

         How did that develop?

A.    Yeah.  So when Brian and I started at the firm, we both
were new and about the same level of experience and seniority
at the firm.  But we quickly found that we were more than
just colleagues and became friends.

         That stems from the fact that we are both men of
deep faith, that we are both interested in politics, that
we're both a little nerdy, we had both young marriages at the
time.  And so, on a number of different ways, we really just

1  found a lot of reasons to be friends.

2  Q.   And so have you had an opportunity in both the

3  professional and personal capacities to watch Brian, watch

4  him interact with others, and just see how he sort of exists

5  in the world?

6  A.   Yeah.  So Brian and I were colleagues for about four

7  years, and during that time we had a number of cases where we

8  were co-counsel.  Eventually, within the firm Brian and I

9  rose to be co-managing partners of the firm.  And I think

10 that reflected the confidence that the board had in both

11 Brian and I individually, but really us as a team, that we

12 did cases together, that we complemented each other well.

13         And so, as is often the case in litigation, you

14 get to know somebody in the heat of the moment as you're

15 fighting those tough cases.  So we spent a lot of time

16 working together professionally.  And then personally, as we

17 became friends, I've also had a chance to spend time with

18 Amanda, to spend time with Reagan and the twins and really

19 get to know the family as a whole.

20 Q.   Now, could you give us some examples of the work you saw

21 him do as a lawyer?

22 A.   Yeah.  So Brian is an outstanding attorney.  We had the

23 privilege of working on really interesting cases.  One of the

24 great things about being in public interest law is that you

25 can be passionate about the cases you're on, that they are

1   causes you believe in.

2          One of the things I think set Brian apart in our

3   industry is that for Brian it was never just about the case.

4   He also cared about our clients.  Right?  When you're in a

5   private firm setting, obviously you're caring about your

6   clients because they're paying your bills.  When you're in a

7   public interest setting, you're really there because of the

8   issue that you're trying to advance, and the clients are a

9   necessary part of that.  And obviously you have ethical

10  obligations to your clients, but a lot of attorneys in my

11  industry really focus on the case.

12         Brian was unique because he focused on people.

13  Brian really cared about our clients as individuals.  Some of

14  our clients, honestly, were high-demand clients.  They were

15  people who were low income.

16         One of the fights Brian and I did together was on

17  behalf of a state scholarship program.  And, in order to

18  qualify for the scholarship program, you had to be low

19  income.  And those were challenging clients to deal with.

20  One of them was illiterate, homeless, and it would have been

21  easy to just hand that over to a paralegal or somebody else

22  and say, "You deal with it, I'll just write the briefs."

23         But that's not Brian.  Brian cares about people as

24  individuals.  And so he would consistently talk to our

25  clients.  He would walk them through in very simple,

1    accessible language what was happening in their case.  In

2    that particular instance, we ended up winning.  It went all

3    the way to the Tennessee Supreme Court, won the case, got

4    this great precedent.

5            The case gets remanded down, and the state agency

6    that we sued said, "Well, that's fine moving forward, but

7    your clients we're not going to grandfather in."  And it

8    would have been really easy at that point just to drop the

9    matter and to take the big win for the statewide precedent.

10           And Brian was the one who really within our team

11   pushed and said, "No, these are our clients.  We owe them

12   more than this."  And so, rather than just taking the

13   quick -- and getting attorneys' fees on remand, we are still

14   slugging it out on their behalf because Brian insisted that

15   we do our best for them as people.

16   Q.   Did -- in your experience, what you saw, did Brian enjoy

17   being a lawyer?

18   A.   Brian loved being a lawyer.  Brian was a great lawyer.

19   He was passionate about our cases.  Our cases mattered.  They

20   were part of advancing the things that Brian believed in.

21           One of our cases, actually, was a case I was

22   working on on the flight over here, writing the brief.

23   They're also, like, really interesting and important.  Right?

24   Like, one of the cases I was working on today, the *Wall*

25   *Street Journal* recently said is headed to the U.S. Supreme

1    Court.  And Brian won't be part of the team when we get

2    there, if we get there.

3    Q.    Let me ask about that.

4              As a result of this conviction, when he pled

5    guilty, he lost his job at the law firm?

6    A.    Yeah.  So the day that Brian entered his guilty plea, we

7    all got an email, out of the blue, from the head of the firm

8    saying please get on conference call, and it was to notify us

9    that that was going to be Brian's last day.  It was actually

10   before even his bar license was suspended.  The firm made a

11   decision not to continue employing him.

12             And that was actually a point where I had a

13   decision to make, too.  It would have been easy just to say,

14   "Goodbye, good luck.  This is going to be a mess.  I don't

15   want to be a part of it."  And I -- honestly, I prayed about

16   it, I talked to my wife about it, and just decided, like,

17   Brian was more than a work friend.  He was going to be a real

18   friend, and I was going to stick with him for the next year.

19             And so we still talk on the phone every week.  I

20   still see him every time I visit Washington.  I spend time

21   with his family at their home.  Yeah, we've stuck together

22   even after he left the firm.

23   Q.    Has the loss of his law license, do you think, affected

24   Brian?

25   A.    Yeah.  Absolutely.  I mean, for starters, it's just the

1   simple reality of losing your source of income when you've
2   got three little kids at home.  I've got two little kids at
3   home, and that's a big deal, just for starters.

4            But, beyond that, obviously being a lawyer is --
5   it's a source of identity.  Right?  It's something that is
6   core to who we are.  And it's core to who Brian is.  I think
7   that's one of the great sadnesses of this whole experience,
8   is that we as lawyers obviously have this responsibility to
9   model the law.  But losing that -- that identity, losing that
10  opportunity, it was more than just losing a job.  It was --
11  it was being barred from continuing to live into a core part
12  of who Brian is.
13  Q.   You talked about seeing him with his family.
14           What was your experience with that?
15  A.   Yeah.  Actually, I was just at the Kelsey home two weeks
16  ago.  I was at a conference in Washington.  Wasn't my first
17  time visiting their little townhouse in Alexandria.  But
18  whenever I travel to D.C., I make a point of seeing Brian.
19  Usually we go to a restaurant and get buffalo burgers by the
20  airport.  But this time it just worked out, it was in the
21  afternoon after my conference.  So I went over to their home.
22           And, as I say, it's a cute little townhouse in
23  Alexandria.  And one of the -- I guess the good -- unexpected
24  good things to come out of this, it was a real joy to see
25  Brian as a dad.  That when you go from 100 miles an hour,

being a high-power -- you know, high-profile attorney and a
state senator to zero miles an hour, in, like, an instant, I
think a lot of men would have wilted under that.

And Brian I think made a choice to say, "I'm going
to be here for my family.  I'm going to be here for my wife.
I'm going to be here for my kids."  And, like, I saw that
when I was at their house.  That he was ready to get on the
floor and roll around and play with the twins.  He was ready
to change diapers.  He was ready to unpack groceries.

It would have been easy to say, "Oh, I've got a
friend over.  Like, let's go out on the back porch and have a
beer."  He did give me a beer, but he was still unpacking
groceries while I was out playing with the kids in the yard.
Q.   Do you think if the Court gave Brian a not -- a sentence
that didn't include incarceration he would take the most
advantage of it in rebuilding his life and sort of all pieces
of what he's done already?
A.   Yeah.  Absolutely.  I have complete confidence in Brian.
I think God's still got a plan for his future.

As somebody who employs people in my industry, I
would have no hesitation about hiring Brian in the future.
If his law license is not reinstated right away, I would
think he could bring great value with a number of other
skills that he has to still work on and advance the causes
that he believes in and to serve -- serve people.

1        Like, that's one of the things that just motivates
2   Brian.  And I have every reason to think that he will find
3   other ways to contribute to society and make a difference in
4   people's lives.
5        MR. LITTLE:  I've got no further questions, unless
6   the Court or the government do.
7        MR. TADDEI:  No questions, Your Honor.
8        THE COURT:  All right.  Thanks for being here.
9   You can step down.
10       THE WITNESS:  Thank you, Your Honor.
11                    (Witness excused.)
12       MR. LITTLE:  Your Honor, we have no further
13  witnesses.
14       THE COURT:  All right.  Does the government have
15  any witnesses?
16       MR. TADDEI:  No witnesses for the government, Your
17  Honor.
18       THE COURT:  Okay.  So, Mr. Little, we can proceed
19  however you like.  You could start first on the 3553 factors,
20  hear from the government, but you and Mr. Kelsey will get the
21  last word no matter how we start.
22       MR. LITTLE:  I appreciate that.  Is there a
23  possibility to take a five-minute recess?
24       THE COURT:  Sure.
25       MR. LITTLE:  Thank you.  And I think we'll take

1  that opportunity to go first, second, and rebut.

2            THE COURT:  Okay.

3            (Recess.)

4            THE COURT:  All right.  So, Mr. Little, you're

5  going to start us off?

6            MR. LITTLE:  Your Honor, I know that the Court the

7  treats sentencing as the serious deliberative process that it

8  is.  And I think you've seen through -- I apologize for doing

9  so -- but through the 70 pages that we threw at you in the

10 last week that this case is unlike probably any other case

11 you've ever had the opportunity to sentence a defendant in.

12 It's unusual both because of how you got here procedurally.

13 It's unusual because of the type of case it is.  And it's

14 unusual because of the sentence that the government is asking

15 for here.  And so I want to break down sort of each of those

16 pieces.

17            Under Section 3553 you're asked to look at the

18 crime, the nature and circumstances of the crime, the nature

19 and circumstances of the defendant.  You're told to avoid

20 sentencing disparities and make sure that the resulting

21 sentence is the least but is sufficient to serve the purposes

22 of the statute.

23            And so to do that we have to look at each of these

24 factors.  And the first thing we've pointed you to is the

25 crime itself.  This is a regulatory crime.  It is not a crime

of corruption, like many other campaign finance cases.  We
know that because, by its very facts in the sentencing plea
agreement, this is a series of money flows from the candidate
of funds that were legally given in donors' names under state
law through a series of PACs to eventually be used for that
same individual.

THE COURT:  So, as I read your brief -- and I'm
glad you started there.

MR. LITTLE:  Yeah.

THE COURT:  You just tell me, what is the crime
you think we're here for.

MR. LITTLE:  The crime is -- what Count Five is.

THE COURT:  Okay.

MR. LITTLE:  Is the excess contribution.

And so this is complicated.  And, Your Honor, I
had to learn it in two weeks.

THE COURT:  What about Count One?

MR. LITTLE:  Count One is the conspiracy to
commit --

THE COURT:  Well, I know that, but you didn't be
reference it in your brief at all.  So I'm trying --

MR. LITTLE:  Well, Your Honor, I think, let's be
honest.  Count One is a -- it's a throwaway.  It's a
conspiracy.  It means other people have done it.  You're
participating with them.  It doesn't drive the guidelines.

```
 1  It doesn't require any additional facts, except for other
 2  people's involvement.
 3              And so when you've got, for example, a drug
 4  distribution case and a conspiracy to distribute, it is the
 5  conspiracy to do the act you were ultimately charged of
 6  doing.  There's a conspiracy and then there's a substantive
 7  act.
 8              The substantive act here is Count Five.  So the
 9  Court -- without Count Five you don't have a Count One.  But
10  an excessive contribution case can come in all sorts of
11  flavors.  And I think it's important for this Court to have a
12  good sense of what flavor this is.
13              The classic excess contribution case is I take
14  $500,000 under the table, nobody knows who it's come from,
15  and it ends up in my campaign's coffers and we spend it.
16  Maybe we spend it without noting that we've ever gotten the
17  donation, or maybe we spend it by lying about where it came
18  from.
19              The reason that is criminalized is because
20  Congress has decided that we want to know who that candidate
21  is beholden to ultimately for the money they spent.  Because
22  the whole purpose, the only purpose that the Supreme Court
23  has said these serve is to stop bribery and that sort of quid
24  pro quo corruption.
25              THE COURT:  So you gave me a lot of information,
```

which I appreciate, which I've read, reread several times.
And among the things you gave me, which I do want to ask you,
you cite from Mr. Durham's many statements and his grand jury
when it supports your brief, but you would agree, now that
you've given it to me and I've read it --

MR. LITTLE:  Sure.

THE COURT:  -- there's some things that Mr. Durham
says that if they're completely true or even if they're half
true --

MR. LITTLE:  100 percent.

THE COURT:  -- it's problematic for your client?

MR. LITTLE:  Well, he's here to be sentenced, Your
Honor.  They must be problematic.

THE COURT:  Okay.

MR. LITTLE:  And I think -- we did that because we
don't want -- and I think one of the things that happened
early in this case is -- we got the sense the government was
given a very different view of the facts than what the facts
actually showed.  I mean, they've done that in a couple of
ways.  And that's kind of my third point I'll get to.

But, realistically, this was not Brian Kelsey with
some plan on day 1 to come and spend these funds in this way.

I mean, if you believe, for example, Jeremy
Durham --

THE COURT:  But Mr. Durham tries to suggest that

1  was it from the very moment -- the whole dinner was
2  planned --
3          MR. LITTLE:  Well, he says it three different
4  ways.  Right?  He says one time, "Well" -- you know -- and
5  the quote that -- the specific quote, "Well, he told me not
6  to talk to 'em."  And then I had -- the quote I think is
7  interesting, the second 302, is he says, "Look, I can't tell
8  you what to do, Jeremy."
9          Now, does that mean ultimately there's not some
10  implicit piece of this where here's what I hope you do?  And
11  that's why we gave you the Lee Goodman affidavit.  Because
12  that is Politics 101.  It happens every single day.
13         THE COURT:  Right.  But when Mr. -- in this case,
14  and with the information you've given me, when Mr. -- when
15  Mr. Kelsey told Mr. Durham or Mr. Smith, "I can't tell you
16  what to do with it," when he was talking to Mr. Durham, he
17  wasn't talking to a stranger.
18         MR. LITTLE:  No, of course.  But, Your Honor,
19  that's -- I think that's the point of the Goodman affidavit,
20  which is -- in these circumstances -- I mean, we have a
21  presidential candidate who has raised more money than anybody
22  in the country, who is handed $98 million or $89 million from
23  his state campaign to his federal campaign.
24         And his basis, and the only reason he's allowed to
25  do it is he says, "I don't have anything to do with it.  I

don't know what they're going to do with it." Now, that's fairly implausible, but, for purposes of the law, that's how the FEC treats that transfer.

And so the line we're talking about here is very small. And he's being sentenced because he has pled to crossing it. And if you ask what the actual crime is, it's not the transfers of money. And that's one of the things we've tried to sort of show in our memos. Because PACs can transfer money to one another. They can do all sorts of things. If ACU had taken that money and said, "Thank you, we're going to pay our rent with this," not a problem. It only becomes a problem when that money is spent on a candidate with a specific message. And that's the coordination piece.

And the FEC has defined coordination very narrowly to be do you coordinate the message, the means, and even the medium, as in TV, print, radio.

And here the crime is Jeremy Durham having a conversation with Dan Schneider about, "You've got this money, Dan. You need to run a radio ad around this time, around these topics, and this is what I want you to say generally." That is the only thing that's a crime.

Now, it's a coordination crime. And it's an excess contribution because the way the statute works is we treat that as a contribution. But back up into why that's

 1  illegal, is because we don't have that prophylactic rule, you
 2  will -- those people who have the secret money can go spend
 3  that secret money and corrupt politicians.
 4          THE COURT:  And I appreciate the argument, and you
 5  do it persuasively.  But, as you know, I'm in no position to
 6  overrule what Congress said.
 7          MR. LITTLE:  No.  But, Your Honor --
 8          THE COURT:  So we accept that as true, and now --
 9          MR. LITTLE:  100 percent.  But there are far
10  different crimes.  I mean, a heat of passion murder is very
11  different than a premeditated murder.  They're both murder.
12  They're both going to end up in a conviction.  But the Court
13  cannot -- the reason that we have the laws on the books and
14  the purpose that it serves should absolutely motivate the
15  sentence that's involved.
16          Because, as we've laid out, there were 1,016 FEC
17  cases investigating campaign finance cases that resulted in
18  no fines.  And so what that means, essentially, is the FEC
19  has said, "We can't regulate this.  We don't know what we're
20  doing."  And so we leave it to these folks to do that.
21          And the problem when we take regulatory crimes and
22  we leave it to prosecutors in 93 districts across the United
23  States is you're not going to get the same result in every
24  district.  Some folks are going to see things like this and
25  see, boom, felony, four years in jail.  Some folks are going

to say non-prosecution agreement.  And the only place that we can find a normalization of that is at the sentencing process, when a Court looks at the other sentences.

And so the crime here is not like any of the crimes the government has talked about.  It's not like the crime the statute was passed to protect us against, the corruption of unknown individuals.

And so then we have to turn to the character of Brian Kelsey.  Not a repeat offender.  We gave you all of those documents to show what a bumbling mess it was, not to show you that it was some very clear, orchestrated thing. Jeremy Durham is saying 16 different things.  And, in fact, he admits at one point he's going to take the money and spend it himself on attack ads.

So it's not this very -- it was a mess.  But it's not what they say it was.  And we have an individual who has never committed of any -- never committed a crime in his life, unlike the other folks here, who were testifying against him, or otherwise providing evidence.  Not only that but --

THE COURT:  Doesn't that -- I thought you made a good argument when you compared Mr. Kelsey to Mr. Durham, Mr. Miller, Mr. Smith, but then it dawned on me -- at least I think -- one of the differentiators is, well, for whatever it's worth, Mr. Durham, Mr. Miller, Mr. Smith all cooperated

and accepted responsibility --

MR. LITTLE:  After Mr. Durham got a non-prosecution agreement.  I'm sure that -- anybody on the planet that's got a decent lawyer is told "you got immunity, go talk."  Jeremy Durham didn't prosecute until he got a -- I mean, we'll walk through that in a minute.  I was going to talk about that in --

THE COURT:  Well, I think the reason -- I don't know why he got it.  The government did that.  I don't even know if it's at issue here.  But at least part of the reason is he cooperated with the government.

MR. LITTLE:  But I think it was the reverse.  I think that -- if you look at the timeline, they gave him immunity; he goes in the grand jury.  And -- we can talk -- I'll leave this part now.  But he's a witness that they are so concerned about his truthfulness that they have to give him a written statement to read to the grand jury.  He can't even actually testify to answer questions.  If you read that -- we didn't point this out too much, but it literally is a written statement that he worked out with his lawyer.  I have never in my 16 years --

THE COURT:  Although it was consistent with his 302.

MR. LITTLE:  In some points.  I mean, it kind of distilled --

1          THE COURT:  In material points.

2          MR. LITTLE:  And included saying things like,

3   "Yeah, I thought Brian" -- you know -- I mean, "I thought he

4   at this point was telling me I shouldn't coordinate."  In the

5   beginning it's pretty clear that he thought that he was

6   trying to abide by that thin line.

7          So you have an individual who dedicates years to

8   public service, who I think you heard great testimony

9   today did so for the right reasons.  There are some people

10  who don't do so for the right reasons, like Jeremy Durham,

11  who, as we put into our memorandum, took a lot of money in

12  campaign finance, spent it on himself, did all sorts of other

13  things for improper reasons.

14         That's not Brian Kelsey.  He's a great father.  He

15  was a great lawyer to his clients.  And now he's going to

16  face the severe consequence of never being able to practice

17  law, of having all this press here to report all the things

18  that he's done.  It's going to live on the internet forever.

19  Everybody's going to know he's a felon.  They're all going to

20  see the, you know, headlines about campaign finance.  And

21  he's never going to ever be able to be a politician, which is

22  what he had done and cared about doing for more than a

23  decade.

24         THE COURT:  And I'm sure the government is going

25  to say when you sit down, those are the collateral

consequences that everybody faces when they commit a crime.

MR. LITTLE: Well, Your Honor, I think it's different. No. Is your courtroom always like this on a sentencing?

THE COURT: Oh, no, I'm not talking about the people here. I'm talking about the consequences of --

MR. LITTLE: Well, but, Your Honor, I do think that matters. Right? I mean, the fact there's going to be six news stories about Brian Kelsey that will live on, that is a consequence because of his conviction, that isn't always shared by people who have felonies. A consequence -- because he works in a regulated profession, of losing the ability to practice, is a consequence specific to Mr. Kelsey.

And it is true, and courts have upheld this, the Sixth Circuit has certainly in many circumstances, that a Court can say, in the particular circumstances of this case, with that defendant, the collateral consequences are more than sufficient to serve the purposes of a deterrence.

For example, Brian Kelsey can never run for office again. He will be forever deterred, because he is a felon. You don't need a separate jail sentence to stop him from running for office.

And -- so I'll move, I guess, to the third piece, which is the sentencing disparity piece. And, you know, we looked through the cases. And, frankly, I was surprised.

What we did -- and we showed our work in doing it -- is you
can go to the sentencing guideline website, and you can put
in 2.1C(8) -- or 2.18(c), the guideline here, which is
specific to these election crimes.  And that database will
give you every case where that is the primary and lead
guideline level, and show you all the resulting sentences.

And we did that.  We didn't cherry-pick them.  We
gave you every single one.

What those tell is a story of below $100,000,
nobody has ever been sentenced to probation -- to jail except
for one person who went to trial, and after trial they were
given three months.

Above that, there were six people, I guess, or
about 12 people, who got jail sentences.  The average
sentence was seven months.  The median sentence was eight
months.  And so, when the government filed at the same time
we did a sentencing memorandum telling you that 41 months was
an appropriate and commensurate sentence, it was not in the
right universe of being accurate.

And so we provided you -- again, showed our work,
and for each of those cases gave you a full page, or two
pages, of discussion about what they were.  I mean, they said
one guy who had a 1.8- -- you know, multi-million-dollar
Ponzi scheme to enrich himself, told co-conspirators to flee
to Egypt, and got ultimately sentenced to 40 months or 50

months, was somehow the same defendant as Mr. Kelsey?  It's not in the same universe.

And I'm fascinated to hear how they're going to defend it, Your Honor, because it's not defensible.  They're upset because Brian Kelsey moved to withdraw his plea.  They're upset that he put them through this effort back and forth and did not seem to show enough remorse.

So let me talk about that piece.  This is a case, at the outer limits of the statute, with conduct that is not very unlike what happens in politics every day.  I think when you have a client -- particularly one who is sophisticated -- and you throw at them the ambiguity of this sort of situation and the stress of losing a father and having infant twins -- I have twins myself.  I don't remember a single thing from the first year of their life, and that's not an exaggeration.  Because of sleep depravation.  I don't remember a single thing.

And I raise that because you have a very complicated legal question.  You have factual circumstances here where your main person testifying against you has said lots of different things and you're relying solely on the lawyers you have to give you good advice.

Now, whether or not those lawyers gave the best advice will be a question potentially for another day.  But I can tell you in working with Brian for the past few weeks

1    that he's not here trying to play games with the Court.  I

2    think last time we were here, you said, "What can you promise

3    me?  We want to get this done."

4            Well, two weeks, we got this done.  We're here.

5    And we've given you what I think is a fulsome view of why

6    Mr. Kelsey should get probation.

7            But in that conversation -- you're going to hear

8    his allocution.  He recognizes that in doing the things that

9    he did, he took risks.  And he dealt with people who he knew

10   were going to potentially do wrong.  And I think ultimately,

11   if you ask him on his deathbed, did he know these folks were

12   going to do that, he may have hoped they would.  And those

13   are risks that he took and he shouldn't have taken, and

14   they've all led them here.

15          And that, I think, is a particular -- if this

16   were, I'm going to go rob a bank, I'm going to commit fraud,

17   where I know where the line is -- I think plenty of people

18   would struggle where the line is not particularly clear and

19   you've got a whole set of facts around it that aren't great.

20   Then maybe you don't get the best legal advice about what

21   your options are.  Some folks may not like how that comes

22   out.  And I think that's what you have here.

23          But, at the end of the day, if this Court's

24   looking at the objective facts, this case is nothing like the

25   ones the government cited, and it falls squarely in the

1  category of cases we gave the Court.  This case should not be

2  41 months.  It shouldn't be anywhere near it.

3          I'll speak briefly about the guidelines.  You've

4  said a calculation of 33 to 41.  That guideline is similar to

5  or lower than all the individuals who where sentenced to

6  probation that we gave you.  We've included their guidelines

7  calculations.

8          In fact, one of the cases the government cited as

9  the example that you should rely on --

10          THE COURT:  So go back to your second or third

11  argument.  He said he understands he took risks and perhaps

12  he shouldn't have.

13          MR. LITTLE:  Well, right so --

14          THE COURT:  What does that mean in terms of

15  remorse, which is where you started --

16          MR. LITTLE:  Oh, I think that he never should have

17  given the money to the Standard.  I think he'll tell you

18  that.  He knows that he shouldn't have worked with Jeremy

19  Durham or trusted anybody to do this -- or to work with him

20  in these ways.  And that's how the crime was committed.  I

21  mean, he knows in those transfers, that was not where he

22  should have been.

23          THE COURT:  And, as a result of that, what?

24          MR. LITTLE:  He committed a crime.  That's why

25  we're here.

```
 1              THE COURT:  Okay.
 2              MR. LITTLE:  And --
 3              THE COURT:  I thought that was going to be your
 4    lead up to Mr. -- Mr. Kelsey is remorseful.
 5              MR. LITTLE:  Oh -- and he is.
 6              THE COURT:  Okay.  Well, that's only the second
 7    time that word has been used here.
 8              MR. LITTLE:  Well, Your Honor, I think --
 9              THE COURT:  Mr. DeBerry used it and you used it.
10              MR. LITTLE:  I think the issue about remorse here,
11    he clearly doesn't want to be here.  He knows how he got
12    here.  And I think the difficulty of --
13              THE COURT:  But that's the whole purpose of
14    remorse.  You are here, so as a consequence of that, what
15    have you learned to this point in time?
16              MR. LITTLE:  Well, I think he's going to tell you
17    all that in his allocution.
18              THE COURT:  Okay.
19              MR. LITTLE:  I mean -- you know -- and I can tell
20    you, in dealing with him he's certainly remorseful.  And part
21    of my job too, though, Your Honor, is --
22              THE COURT:  And what objective evidence do I have
23    of that?
24              MR. LITTLE:  Well -- what I've seen?  Or what
25    you've seen?
```

1          THE COURT:  No.  What evidence does the Court
2    have?  I can't see what you've seen.  What's before me in
3    this record that says, yeah, you do say you're remorseful and
4    I can look at A, B, and C and say, you're right, those are
5    remorseful behavior.
6          MR. LITTLE:  Your Honor, I think, one -- you know,
7    we're here today and we presented to you -- let me say -- let
8    me say it a different way.
9          Any time you have a plea, the only ways that you
10   know the defendant is remorseful is they've entered a plea
11   and they come in here and they say they're sorry.
12         THE COURT:  Uh-huh.  But then I'm able to look
13   back and count the plea and the things said at the plea as
14   indicators of that remorse.
15         MR. LITTLE:  Sure.
16         THE COURT:  Sure.
17         MR. LITTLE:  And I think -- the question, though,
18   is also -- Your Honor, the remorse serves the purpose, I
19   think, two ways.
20         THE COURT:  Well, just to finish.  But in your
21   case, as you've already noted, this is sort of an interesting
22   procedure because he's renounced all the things he said at
23   the plea -- and I've already ruled on that.  So I don't have
24   the plea to say he's remorseful.
25         MR. LITTLE:  No.  And I think you're going to have

1  to rely on what he's says here today.

2          THE COURT:  Okay.  So there's not objective

3  evidence that I've not read yet, before he talks?

4          MR. LITTLE:  Well, Your Honor, I think everybody

5  who talked about this has affected him and being sorry for

6  putting people in the situation, all of that --

7          THE COURT:  I agree.  And that's the reason I took

8  notes.

9          (Overlapping speech.)

10          THE COURT:  Ms. Martinez made no mentions of

11 remorse.  Ms. Wodarski made no reference to remorse.

12 Mr. DeBerry did.  And I didn't hear that from -- they're all

13 good people, all friends and supportive of him.  But, by my

14 notes, Mr. DeBerry was the first one to use that word.

15          MR. LITTLE:  And, Your Honor, I recognize that.

16          THE COURT:  Okay.

17          MR. LITTLE:  And I think -- you have also -- this

18 goes back to the nature of the crime that was committed and

19 the way it was committed.

20          THE COURT:  Remorse?

21          MR. LITTLE:  Yes.

22          THE COURT:  Goes to the nature of the crime?

23          MR. LITTLE:  It does.

24          THE COURT:  How so?

25          MR. LITTLE:  Because, Your Honor, I think --

again, when I know if I walk into a bank and I give the
teller a note that says, "Give me all your money," I know in
that moment what I have done is wrong.

When I create a regulatory crime -- and, Your
Honor, I have lots of clients who commit regulatory crimes.
That's -- a lot of white collar work.  The law is not so
clear.  Because here, for example, is there a moral
culpability of taking supporters' money that was given to you
to be used as campaign funds and then transferred somewhere
else to be used in a way that is improper under the law?

There absolutely is a legal responsibility, but
the moral question is very different.  And I think -- and,
Your Honor, it's -- I mean, there are all sorts of
circumstances where we have moral -- we have laws that have a
legal component that don't carry necessarily the same moral
prohibition or same level of moral severity.

THE COURT:  So, as we gather here for sentencing,
legally he was wrong, but morally he was --

MR. LITTLE:  I'm not saying morally he's right,
but I --

THE COURT:  Okay.  Well, good.  That's what I
thought you were saying.

MR. LITTLE:  But, Your Honor, I do think the
distinction is important.  Because you're going to see in a
case that's got moral culpability a very different series of

```
 1  remorse, because it's much more clear from the beginning.
 2          I believe -- if you have a regulatory crime -- I
 3  mean, there's regulatory crimes with executives who commit,
 4  you know, some sort of fraud through a scheme that they've
 5  done, but they've done it through policies and procedures.
 6          THE COURT:  Well, depending on how much you
 7  believe of what Mr. Durham says, I don't know if we -- if
 8  that supports his moral innocence.
 9          MR. LITTLE:  Well, Your Honor, I guess what I'm
10  saying is there's a difference between the transfer of funds
11  and the hiding of that transfer.
12          THE COURT:  Sure.
13          MR. LITTLE:  And I think that's sort of the point
14  you're driving at.
15          THE COURT:  Well, I'm just talking about what's in
16  the record.
17          MR. LITTLE:  Right.  But the transfers are a
18  different -- of a different moral nature, because you're
19  hiding them.  And so the moral culpability is any sort of
20  hiding.  And I think that's different than, you know, a
21  concealment crime than an active crime.
22          And what I'm trying to explain is that, over time,
23  particularly if you get this indictment, you've been told
24  these things are wrong, you say, "You know, I went to my
25  lawyer; I thought I was on a line, and I thought I could do
```

1    these things."  Then you have to trust those lawyers to
2    communicate to you the way in which you've committed that
3    crime.
4              THE COURT:  Right.  Which is a great argument, but
5    now I've got to apply it to Mr. Kelsey, a Georgetown law
6    student, graduated and practicing lawyer.  He is not your
7    average criminal defendant.
8              MR. LITTLE:  Sure.
9              THE COURT:  And when he's talking to his lawyers,
10   you know, he's speaking and with insight that few have.
11             MR. LITTLE:  If we were talking about a criminal
12   statute that was explainable.  And what I -- I think --
13             THE COURT:  -- when he's talking to his lawyers
14   and it's not explainable, then you make the calculated
15   decision, do I go to trial, do I file a motion, or do I plead
16   guilty?
17             MR. LITTLE:  And he made the decision in that
18   moment to plead guilty.  And I think upon reflection, having,
19   you know, realized very quickly that was not a decision that
20   he -- ultimately his heart felt safe with, changed his mind,
21   and came before you.
22             And so I think trying to look into his mind and
23   say, "Are you really, really -- do you really feel guilty for
24   this," I think is somewhat of a difficult question.
25             THE COURT:  I'm not trying to do that.  I am

1  trying to see some behavior, or some words, that give me some
2  indication of that.
3          MR. LITTLE:  And all he can do today is allocute.
4          THE COURT:  I think you're right.
5          MR. LITTLE:  But I can also tell you -- I don't
6  want for a moment for this Court to think for a moment that
7  our advocating on his behalf is anything other than trying to
8  advocate for legal arguments and not any sort of excuse.
9          THE COURT:  All right.
10          MR. LITTLE:  The government's -- which takes me to
11  the third piece.  Everything the Court has said, I
12  understand.  But I can't help but be -- Your Honor, the
13  disparities argument I started with in our first motion
14  points out it's always important to not sentence defendants
15  who are similarly situated in a different manner.  It's
16  essential to justice.  We try to make sentences as similar as
17  possible.
18          It is particularly important in political cases
19  for that to be true.  We have press here.  This is a
20  different level of scrutiny than other cases.  And the reason
21  that matters is that those disparities have to be explained
22  by objective measures.
23          And so when the government comes in here and
24  presents to you an argument that is far afield from anything
25  they can actually point to in a similar case, I think it's

1  important to take note of that.

2          And so the arguments that we're bringing forth

3  aren't just that we think Mr. Kelsey should get probation,

4  but that's what the objective circumstances show in this

5  case.

6          Your Honor, if you don't think that Mr. Kelsey's

7  remorseful enough, that certainly doesn't move the bar to --

8  anywhere near where the cases the government has shown.  And

9  so I think that -- I'll leave that as my last point.

10         THE COURT:  All right.  Well, you'll get another

11  chance, as well as Mr. Kelsey.

12         MR. LITTLE:  Thank you.

13         THE COURT:  Okay.  Let's hear from the government.

14         So I guess -- I know you -- I want you to get to

15  your speech.  But help me -- I think -- I think Mr. Little

16  does raise a good point of discussion.  How do you all see --

17  he points to this difference between how Mr. Kelsey is being

18  treated and Mr. Durham, Mr. Miller, Mr. Smith.

19         MR. TADDEI:  I think there's two responses to

20  that, Your Honor.  I think the first response is a legal one,

21  and then there's also a factual one.

22         THE COURT:  Okay.

23         MR. TADDEI:  Under the 3553(a) factors, there's a

24  need to avoid unwarranted sentencing disparities between

25  similarly situated defendants.

1      Those individuals that you mentioned are not
2 defendants in a criminal case.
3      THE COURT:  Oh, yeah, but they're part -- I mean,
4 I read everything.  I don't know why you all gave me
5 everything, but I've now read everything.  And Mr. Durham was
6 part of the conspiracy.  Mr. Smith has already pled guilty
7 and is going to be in here at 3:00 for his actions.  And
8 Mr. Miller was also part of the conspiracy.
9      MR. TADDEI:  The position, Your Honor -- I think
10 legally, that would be our position, that it's improper to
11 compare those.
12      But, moving on to the factual aspect of this,
13 Mr. Kelsey was the candidate.  And, as you indicated in
14 several of your questions to Mr. Little, he's a sophisticated
15 one at that.  He had specific legal guidance, as we now know
16 from the affidavit submitted by Mr. Langhofer, that he was
17 not allowed to direct this money, he was not allowed to
18 coordinate with these individuals and make these
19 expenditures.  He asked for that.  He knew exactly where the
20 line was.  And then he intentionally crossed it.
21      Mr. Miller, Mr. Smith, Mr. Durham are not
22 individuals who are nearly as sophisticated as Mr. Kelsey,
23 when it came to the advice that he received and that was
24 provided to him, nor were they the candidate.
25      And this gets to something I think Mr. Little said

several times, is that this was a regulatory crime.  There's a continual effort to downplay the seriousness of this offense and Mr. Kelsey's conduct again and again and again.

Your Honor, these are felonies.  They've been on the books for decades.  The Supreme Court has repeatedly affirmed them again and again and again.  And the reason why the Supreme Court has affirmed them in the face of First Amendment challenges and other attacks that have been made on the Federal Election Campaign Act is that the Supreme Court has recognized, as Congress has, that transparency is critical and elemental to the proper functioning of our democratic institutions.  And, in fact, the most sacred democratic institution, perhaps, the proper functioning of elections.

Mr. Little is not incorrect that the possibility of quid pro quo corruption and quid pro quo corruption itself are the chief reasons for these laws.  What Mr. Kelsey did by directing the movement of these funds and the coordination of this expenditure by an outside entity is deprive the voters and the people of their ability to truly know who is funding these elections, where the money was going.  And that's another thing that Mr. Little glosses over.

There are two counts that Mr. Kelsey was charged with and pled guilty to, Your Honor.  He did plead guilty to the contribution count, Count Five.  But there was also

another count, conspiracy to defraud the FEC or a Klein conspiracy, and they gloss over this. They gloss over the fact that Mr. Kelsey's actions caused the political organization to make false filings with the FEC that deprived the people of their ability to engage in fair and honest understanding of who their candidates were being supported by and their involvement in the spending of this money.

So, coming back around to Mr. Durham and Mr. Miller and Mr. Smith, not the same level of sophistication, not the same position as the candidate himself. And, quite frankly, only one of them is a defendant in this case.

THE COURT: Okay.

MR. TADDEI: Your Honor, moving on to some other points about the nature and circumstances of the offense. Obviously the 3553(a) factors must guide the Court's determination of a proper sentence in this case. It's the government's position that the nature and circumstances of the offense, the characteristics of the defendant, and the need to promote the respect for the law, and specific and general deterrence are particularly weighty.

As Your Honor's noted several times, the defendant is a lawyer and 18-year legislator. He intentionally ignored the clear legal advice that he had received, and he immediately thereafter crossed obvious lines that he knew

1  existed to do everything he could possibly do to win a
2  political campaign in the final days before his election.

3          In more than 70 pages of briefing, not once does
4  Mr. Kelsey accept responsibility for his crimes, acknowledge
5  that he has repeatedly lied to the public and the Court, or
6  shown any remorse for his actions other than, as
7  Representative DeBerry said, the effect of this case on his
8  family.

9          When he testified under oath before this Court
10 several weeks ago, he pointedly stated, "I 100 percent did
11 not commit the things that I am accused of."  That's not
12 saying I crossed a gray line or I tiptoed past some arbitrary
13 standard.  That's a wholesale rejection of the basic facts of
14 this case, Your Honor.  Things like who he spoke to, the
15 purpose of those conversations, the money he was involved in
16 moving, and his knowledge, perhaps most critically, that what
17 he was doing was illegal.  These are facts that he swore to
18 before this Court when he pleaded guilty.

19         Now, for a lawyer of the defendant's background
20 and sophistication, his defiance now shows a remarkable lack
21 of respect for the law.  And, rather than acknowledge his
22 participation in this illegal contribution scheme and a
23 conspiracy to defraud the FEC, the defendant downplays the
24 seriousness of the offense and he attacks other witnesses and
25 individuals associated with this case.

1    And that's a consistent tack that the defendant
2 has taken.  He's previously used --
3    THE COURT:  What other witnesses are you saying he
4 attacked?
5    MR. TADDEI:  Well, in his sentencing memorandum,
6 Your Honor, he repeatedly attacks personal aspects of the
7 lives of Mr. Durham --
8    THE COURT:  Oh.
9    MR. TADDEI:  -- of Mr. Miller, of Mr. Smith, of
10 several different individuals.
11    THE COURT:  Well, I guess for good reason, because
12 they were all engaged in a conspiracy and all are equally
13 culpable of the object of the conspiracy --
14    MR. TADDEI:  Well, Your Honor --
15    THE COURT:  Well, if I could finish?
16    MR. TADDEI:  Of course, Your Honor.
17    THE COURT:  Okay.  It's up to you.
18    He, like I -- Mr. Kelsey, like I, sort of
19 scratching our head about -- Mr. Smith was -- has pled
20 guilty.  But isn't there some -- doesn't the Court need to
21 look at all the people who are involved in the conspiracy as
22 we -- as I determine what's -- what's a sufficient but not
23 harsh sentence for Mr. Kelsey?
24    MR. TADDEI:  With respect to Mr. Smith, yes, Your
25 Honor.  But, again, our position is that, under the 3553(a)

1  factors, the other two individuals who are uncharged are not

2  a relevant point of comparison.

3          THE COURT:  Even though they were part of the

4  conspiracy?

5          MR. TADDEI:  Well, they're uncharged, but --

6          THE COURT:  All right.  But, again -- everybody's

7  given me information.  Clearly Mr. Durham was part of the

8  conspiracy.  Clearly Mr. Smith -- perhaps unknowingly -- but

9  eventually knew he was.  And Mr. Miller.

10         MR. TADDEI:  Your Honor, the other thing I would

11  say about that --

12         THE COURT:  Did you all enter a non-prosecution

13  agreement with Mr. Miller?

14         MR. TADDEI:  I believe there were materials turned

15  over in discovery.  I'm not sure if it would be proper for

16  the government to say on the open record regarding potential

17  non-prosecution agreements or immunity.

18         THE COURT:  Mr. Little, didn't I read that in the

19  materials?

20         MR. LITTLE:  Yes.  I believe he was given

21  immunity.

22         THE COURT:  Yeah, that's what I thought I read.

23         MR. TADDEI:  Just because Mr. Little put it in a

24  filing, including references to secret grand jury transcripts --

25         MR. LITTLE:  It's not secret.  The guy's been

1  charged.

2         THE COURT:  All right, Mr. Little.  We'll -- hold

3  on.

4         So you know the statute allows a district court

5  judge to consider -- there is no limitation.

6         MR. TADDEI:  Of course, Your Honor.

7         THE COURT:  So, I need you to answer my question.

8         Does Mr. Miller have a non-prosecution agreement?

9         MR. TADDEI:  Yes, Your Honor.  Now --

10        THE COURT:  Okay.  Well, he must have done

11  something then.

12        MR. TADDEI:  One other fact, Your Honor, in terms

13  of your questions about their relative culpability and their

14  backgrounds and their history, is these are individuals that

15  Mr. Kelsey chose to rely on and associate with.  So his

16  attacks on their character and their history and their

17  actions are also reflective of Mr. Kelsey's personal

18  characteristics and nature and his history.

19        These weren't random people that he pulled into

20  this conspiracy.  He pulled in somebody who he served as best

21  friend -- as -- excuse me -- as best man at his wedding, who

22  he knew was struggling, both through, apparently, addiction,

23  as he put in his sentencing memorandum, as well as another

24  public scandal that required him to be forced out of the

25  statehouse.

1    And he chose that moment in time to pick these

2 individuals as the ones that he would involve in this

3 particular scheme.  And you do also have to ask why he would

4 do that.  Because they were vulnerable?  Because they were

5 people that he could use to execute these schemes?

6    There's a wide variety of reasons why you could

7 reach a reasonable conclusion Mr. Kelsey relied on these

8 people to engage in this scheme.

9    And that's also a factor that supports

10 culpability.  The degree to which Mr. Kelsey orchestrated

11 this entire thing after receiving legal advice, knowing where

12 the lines were, and intentionally overstepping them, and then

13 the people that he pulled into it to try to pull it off.

14    THE COURT:  All right.

15    MR. TADDEI:  Another factor this Court should

16 consider, Your Honor, as I mentioned, was Mr. Kelsey's

17 repeated efforts to try to undermine the facts that he has

18 admitted to, to lie to this Court, to lie to the public.

19 It's a theme that's also reflected in the letters submitted

20 in his support.  A sentiment he apparently continues to agree

21 with, given he included them in his sentencing submission.

22    And that sentiment is that he's continued to

23 attack the grand jury's decision to indict him as a partisan

24 political exercise, and that this is somehow not a serious

25 offense.

1          THE COURT:  Yeah.  I only read in one letter.

2     That wasn't an overarching theme in the, what, 50 or so

3     letters that I read.

4          MR. TADDEI:  I understand that, Your Honor, but it

5     was an overarching theme --

6          THE COURT:  And I think it was actually in his

7     mother's letter, and one would expect.

8          MR. TADDEI:  Um-hmm.  I believe that was also a

9     feature of several other letters, Your Honor, but I

10    understand that.

11         But I think, more critically, it was an

12    overarching theme in his public relations campaign

13    immediately after being indicted.  And that's also a factor

14    that should be considered with respect to the nature and

15    circumstances of his offense and his characteristics as a

16    person.

17         THE COURT:  All right.  Now, that's not in the

18    plea agreement factual basis.

19         MR. TADDEI:  Well, we included a reference to it

20    in our sentencing memorandum --

21         THE COURT:  Right.

22         MR. TADDEI:  -- in a public video that could

23    support a finding by a preponderance of the evidence that

24    this was something that had occurred --

25         THE COURT:  Right.  But I've calculated the

1  guideline.  I'm not going to start over.

2           MR. TADDEI:  I understand, Your Honor --

3           THE COURT:  But I hear your argument --

4           MR. TADDEI:  Yes, it is something --

5           THE COURT:  -- consider.

6           MR. TADDEI:  Yeah, it is something that we believe

7  is relevant to his nature and characteristics.

8           Furthermore, Your Honor, the defendant's refusal

9  to accept responsibility and his unwillingness to recognize

10 his crimes as serious show a need for specific and general

11 deterrence, and a substantial risk of recidivism.

12          As the PSR reflects in paragraph 12, the defendant

13 continues to be involved in the political and lobbying

14 spaces.  He doesn't appear to show any remorse for his

15 crimes.  And it's our position, therefore, that he continues

16 to represent a risk of recidivism.

17          THE COURT:  But, obviously, under law, he's not

18 going to ever be -- as the law currently stands, he'll never

19 be in a position that he was in when the offenses of

20 conviction occurred.

21          MR. TADDEI:  Well, he wouldn't be able to run for

22 certain offices.

23          THE COURT:  Right.

24          MR. TADDEI:  He wouldn't be able to be a lawyer.

25 But he could still be very engaged in campaign finance.

1    THE COURT:  And, given the record here, it's
2  highly unlikely that anyone's going to give him that
3  opportunity.
4    MR. TADDEI:  Well, you would think that, Your
5  Honor.  And this isn't specifically cited in our briefing,
6  but there is a case, *United States v. Benton*, in which a
7  defendant was convicted of a campaign finance scheme.  He was
8  pardoned.  And then recently in district court in D.C. was
9  convicted of almost the exact same offense once again.
10    So recidivism is something that does occur with
11  respect to campaign finance offenses.
12    THE COURT:  But that sort of shows the problem of
13  looking at one-off cases.  It's hard to extrapolate because
14  every case has its own facts.
15    MR. TADDEI:  Yes, Your Honor.  And let's move on
16  to that point, which is the disparity argument that
17  Mr. Little spent a great amount of time on.
18    The statutory term "unwarranted", in particular, I
19  think important in this case.  As even the defendant appears
20  to acknowledge elected officials and powerful political
21  actors convicted of felony campaign finance offenses
22  frequently receive substantial terms of imprisonment.
23    And just a few examples that are cited, just in
24  their table alone, the Lundergan case, which is a case out of
25  the Eastern District of Kentucky, so within the Sixth

Circuit.  That was a private citizen who arranged about a

$2,000 -- a corporate contribution to his daughter.  He

received 21 months in prison following trial.

Sorensen was a state senator, like Mr. Kelsey, who

arranged about $130,000 worth of illegal contributions.  He

pled guilty and cooperated and received 15 months pursuant to

a plea agreement.

And the Wetmore case, another private citizen,

$145,000 in illegal contributions, received 24 months after

trial.

Now, the defendant points to several of these

cases and says, they're different because these people were

sentenced after trial, and, therefore, he should receive a

more lenient sentence.  But what's particularly notable that

makes these cases different is, in these cases there was no

indication that the defendants perjured themselves before the

courts, much less did so in such a defiant and sweeping

manner as Mr. Kelsey did.

THE COURT:  And even the cases you cite don't

support your 41 months.

MR. TADDEI:  Well, not specifically with respect

to the sentence, but the difference between the -- these

individuals' conduct and Mr. Kelsey's post-plea conduct and

perjury support that sentence, Your Honor.  That is our

position.

```
1          THE COURT:  So I think what Mr. Kelsey argued in
2   his brief is, one, the guideline -- neither -- the top of the
3   guideline, which is where you -- what you want, doesn't take
4   into account his many good deeds --
5          MR. TADDEI:  Um-hmm.
6          THE COURT:  -- that are outlined -- we've heard
7   some here.  That's not considered in the guidelines.
8   Correct?
9          MR. TADDEI:  It shouldn't be considered in the
10  guidelines.
11         THE COURT:  Well, I didn't ask you if should.  But
12  I think -- well --
13         MR. TADDEI:  Well, it's not considered.
14         THE COURT:  But it is, though, something the Court
15  can consider as a variance.
16         MR. TADDEI:  Well, so the Sixth Circuit --
17         THE COURT:  Yes or no?
18         MR. TADDEI:  No, Your Honor.  The Sixth Circuit's
19  addressed this issue in *United States v. Musgrave*.  And
20  that's at 761 F.3d 602.  It's a case they actually cite in
21  their brief.  And in that case the Sixth Circuit reversed a
22  district court decision to depart downward to one day on a
23  guidelines range of 57 to 71 months in a wire fraud scheme.
24         And, in reversing that district court decision the
25  Sixth Circuit said, the fact that the defendant had already
```

1   been punished extraordinarily -- which is what the district
2   court said in justifying its departure.
3           THE COURT:  So we're talking about two different
4   things.  You're talking about the collateral consequences
5   from -- I'm talking about the good deeds that have been
6   outlined in the 70 or so letters and the testimony we had
7   here.  That is not something that's in the guideline.  And I
8   think that is something I can consider at sentencing.
9           MR. TADDEI:  Yes, Your Honor.
10          So, of course, the government acknowledges the
11  many letters that have been submitted by Mr. Kelsey's friends
12  and family, the testimony of his character witnesses, and his
13  history of public and community service.  And the government,
14  of course, does not question the defendant's love for his
15  family and friends and their love and support for him.
16          But that also does not distinguish Mr. Kelsey from
17  many defendants who appear before Your Honor.  And our
18  position is that it should not be a basis for a guidelines --
19  a sentence outside of the guidelines range.
20          Same thing for community service, Your Honor.
21  Several courts of appeals have recognized that using
22  community service, essentially, to escape later punishment
23  changes that service into some sort of, you know, cynical,
24  social indulgence that a person can redeem at a later date.
25  And it's by virtue of Mr. Kelsey's privilege and the

1   opportunities he has had that he seeks to cash that in now.
2   And that puts him --
3            THE COURT:  Well, I don't think in 2018, when he
4   got the Pro Bono Award for the year he could have possibly --
5   I'm sorry -- 2008 -- 2008, when he got the Pro Bono Award of
6   the year in the Memphis Bar, he could have possibly thought
7   he was doing all that work to get leniency --
8            MR. TADDEI:  No.  And we're not alleging that,
9   Your Honor.  We're just saying that -- I'm sorry.  We're
10  saying that the privileges that he has been able to enjoy and
11  experience place him in a different category of other
12  defendants that often appear before Your Honor, that, quite
13  simply, wouldn't be able to make those kinds of arguments.
14           THE COURT:  So, in the government's mind there's
15  just nothing in this record that the government thinks the
16  Court should consider to vary one month down from 41, the top
17  of the guideline?
18           MR. TADDEI:  No, Your Honor.  I mean, I think -- I
19  think those things -- the government's position is that they
20  should not carry particularly significant weight.  And that
21  it would be unfair to other defendants, because it would
22  result in an unfair sentencing disparity between people who
23  don't have those sorts of opportunities and someone like
24  Mr. Kelsey who does.  That's our position.
25           THE COURT:  Okay.

1          MR. TADDEI:  But it's not legally prohibited, Your

2    Honor, for the Court to consider it with respect to a

3    variance.  As Your Honor said, of course, the Court can weigh

4    the 3553(a) factors in any way that it so chooses.

5          But on that latter point, Your Honor, setting

6    aside the community service arguments, the Musgrave points

7    that I was making previously with respect to collateral

8    consequences, the loss of his Senate position, the loss of

9    his law license, future earnings, those sorts of things, what

10   the Musgrave court said is that the district court's reliance

11   on the fact that the defendant had already been punished

12   extraordinarily by four years of legal proceedings, legal

13   fees, and the likely loss of his CPA license in that case,

14   and his felony convictions would follow him for the rest of

15   his life, the Sixth Circuit said that that was not a proper

16   consideration for a variance.

17          It said, and I quote, None of these things are his

18   sentence.  Nor are they consequences of his sentence.  A

19   diminished sentence based on these considerations does not

20   reflect the seriousness of his offense or effect just

21   punishment.

22          The same is true here.  The guidelines were

23   created, Your Honor, in part to help address concerns that

24   white collar offenders receive special treatment and, quote,

25   frequently do not receive sentences that reflect the

seriousness of their conduct. That's from a 1983 Senate
report, 98-225. And a sentence outside the guidelines range
here, Your Honor, would create disparities with other types
of less privileged offenders. It would simply reinforce the
perception of special treatment, and would thus undermine
deterrence and respect for the law.

The defendant was not a drug dealer on the streets
in desperate search of cash. He has a strong family and
community. That's very clear. Look at this courtroom.

The defendant, nonetheless, despite that strong
family and community and his opportunities, still committed a
crime of selfishness. Born from an opportunity he had to try
to promote his career solely due to his previous professional
success and the ability to raise money as a state senator and
connections to powerful political actors.

He should not be treated less harshly than a
corner dealer because he was fortunate enough to have the
support and talent to become a lawyer, state Senator, and a
candidate for the U.S. House of Representatives. And
unless --

THE COURT: Yeah. So we'll end on where I
started.

Do you agree or disagree that the differentiator
between Mr. Kelsey and his co-conspirators, Mr. Durham,
Mr. Miller, Mr. Smith, is that Mr. Durham, Mr. Miller, and

1  Mr. Smith cooperated with the government, and Mr. Durham,

2  Mr. Smith, and Mr. Miller accepted responsibility for their

3  activity in the conspiracy?

4          MR. TADDEI:  I think that is a very significant

5  differentiating factor, Your Honor, as well as Mr. Kelsey's

6  role as the candidate himself of the source of the funds and

7  the ultimate beneficiary of this scheme.

8          THE COURT:  All right.  Well, that's a good

9  place -- I'm not cutting you off.

10          MR. TADDEI:  No, Your Honor.

11          THE COURT:  I think that's a good place to let

12  Mr. Little have the final word here.

13          MR. TADDEI:  Thank you, Your Honor.

14          MR. LITTLE:  Your Honor, I'll start where you

15  ended.  Which is Mr. Durham never had to accept

16  responsibility.  He just had to say what he did.  But there

17  was no sort of formal acceptance of responsibility.  No

18  saying that he committed a crime.  He just went in and said

19  what he did.  But it's a minor point, but it is a point.

20          A couple of these things.  They said these people

21  are all different.  Jeremy Durham was also a state Rep.  He

22  was also an elected official.  He is also a lawyer.  He is

23  still a lawyer.  And he will still be a lawyer until somebody

24  does something about it.

25          I don't know if any of those cases have gone

anywhere, but maybe they've done something about it.

They made a reference that somehow specific deterrence was needed here because maybe Mr. Kelsey will be a lobbyist. And I think they referred somewhere in their pleadings to, well, he had registered as a lobbyist somewhere.

But to make sure the Court's aware. That had to do with what Mr. Suhr said, that when they were doing public interest litigation, when they did pro bono work, depending on the type of work, in some circumstances they had to registered in one case.

THE COURT: Yeah, I thought what he was really referring to was in his current lobbying business -- I know it's in the file somewhere -- he's now lobbying for the -- the Kentucky Horses Association.

MR. LITTLE: Yeah, it wasn't lobbying. It was the litigation work they were doing. And that was pro bono. They had to register, but it was pro bono capacity. And he can answer any questions about that.

THE COURT: No. I think the -- I think -- one of the conditions of his pretrial release, he needed to report his work. And he started The Kelsey Company. And one of the clients of The Kelsey Company is the Horse Breeders Association, and he did some work for them.

MR. LITTLE: Oh, that -- yeah. I can't speak to

1  that.

2          THE COURT:  Yeah, that's in the record.

3          MR. LITTLE:  Your Honor, I think what was most

4  interesting to me in hearing the government talk about these

5  things, one -- I think we put this quote -- but to me it's

6  really important:

7          That if ever a man is to receive credit for the

8  good he has done and its immediate misconduct assessed in the

9  context of his overall life here hitherto it should be at the

10  most of his sentencing when his very future hangs in the

11  balance.

12          And I think the government wants you to not

13  consider that factor.  But clearly this is not a depraved

14  criminal who stands before you.  It's someone who made a

15  mistake in the context of an otherwise very virtuous life.

16          But perhaps what was most notable about the

17  government's presentation is, we have given you multiple

18  charts, multiple cases.  We've analyzed their cases.  They

19  can't point you to an analogous case.

20          Oh, and, Your Honor, that lobbyist contract is

21  also pro bono.  Not making any money for it but --

22          THE COURT:  Okay.

23          MR. LITTLE:  I knew that there was some pro bono

24  aspect to this.

25          They can't point you to a single case that is

```
 1   analogous.  And the ones they sort of -- they try to find
 2   one --
 3               THE COURT:  And I didn't see one in your brief
 4   supporting a probationary sentence.
 5               MR. LITTLE:  Well, Your Honor, there's a whole
 6   host of them on --
 7               THE COURT:  Like this case.  Similar to this case.
 8               MR. LITTLE:  Yeah, I think this case -- so maybe
 9   this is the best example.  James Tannenbaum, he was a wealthy
10   businessman.  He funneled $323,000 of illegal contributions,
11   24 separate federal candidates in three years.  He was
12   sentenced to two years of probation.
13               THE COURT:  And how did he plea?
14               MR. LITTLE:  He pled guilty, but the man before
15   him, Dale Edmonds, had a --
16               THE COURT:  See, there's the differentiator.  See,
17   I'm required to take into consideration all the facts.  And
18   one of the differentiators between Mr. Kelsey and Mr. James
19   Tannenbaum is Mr. Kelsey pled guilty and then attempted to
20   withdraw.
21               MR. LITTLE:  Then I think the three that are most
22   analogous, Your Honor, are Dale Emmons, who had a five-week
23   jury trial.  Certainly didn't show remorse.  Went to trial.
24   On a $200,000 multiyear scheme to funnel money to his
25   daughter.  He got three years' probation.  After a five-week
```

1  trial, no acceptance of responsibility.  $200,000 for his

2  daughter.  Very similar, sending money to yourself from one

3  campaign to another.  It was his money to his daughter,

4  $200,000.

5          The government has not provided any reason that

6  Mr. Emmons' case is any different than this case.  None

7  whatsoever.

8          Mr. Kasari, who was involved in an explicit

9  purchase of endorsement scheme -- this is the case in Iowa

10  where members of Ron Paul's campaign purchased from a state

11  Senator his endorsement for $73,000.  They all went to trial.

12  Mr. Kasari was given three months of prison.  Three months.

13  And he engaged in actual corruption.

14          And so, in terms of where this sits, it sits

15  somewhere in that world.

16          Mr. Sorensen, the man who actually sold -- again,

17  went to trial, no remorse -- sold his endorsement, got 15

18  months of prison.

19          I don't think the Court can set anything higher

20  than that.  And we think certainly Mr. Kesari and

21  Mr. Dannenbaum's cases are much closer to where this is.

22          If the Court is inclined to sentence Mr. Kelsey to

23  any period of incarceration, we would ask that it would be in

24  the form of home confinement.  You know, I often --

25  especially since I've taken off my prosecutor hat -- I think

a lot about what the point of prison is.  Why prison versus

something else?  And the prosecutors haven't talked about

that.  We kind of just presume when we're in that office that

prison is this thing that we do, and it's useful for some

purpose.

Nothing about prison that serves any of the

purposes here, Your Honor.  It certainly isn't going to be

disparate if you sentence Mr. Kelsey to probation.  What it's

going to do is it's going to take him away from his family,

and it's going to punish him.  And the question is, does he

need a punishment that includes incarceration within a

federal facility?

If the Court thinks he needs a restriction on his

liberty, we would ask that you make that home confinement,

which the Court can certainly do for a period of at least a

year.

THE COURT:  All right.  So, Mr. Kelsey, if you

want to join Mr. Little at the podium, the Court welcomes

anything you would like to say.

THE DEFENDANT:  Thank you.

Good afternoon, Your Honor.

THE COURT:  Good afternoon.

THE DEFENDANT:  As you know, Your Honor, I'm Brian

Kelsey, and I'm a felon.  I am -- I'm also a former elected

official.  I'm a former officer of the Court.  But I'm no

1  longer an officer of the Court because of the actions that I
2  have taken.

3           And I'm truly sorry for the actions that I have
4  taken that have brought me here to be before you today.  I --
5  I knew -- clearly -- you've read the record -- I knew that
6  when I gave the money that I gave to the Standard Club PAC, I
7  knew that I was taking a risk and that that was at the line
8  of what was legal and illegal.  And I knew the people that I
9  was associating with did not have the most reputable
10 reputations, and yet I did it anyway, Your Honor.  And in
11 doing so, I broke the law.  And it's a decision that I'm
12 going to regret for the rest of my life.  And it's one that I
13 can only hope, as Representative DeBerry said, that will help
14 shape my life in some way, shape, or form, that I can't see
15 today, in a positive way.  Because I have always, my whole
16 life, felt a calling to service, and I don't know what that's
17 going to look like in the future, but that calling is still
18 there.  And -- and I, Lord willing, hope to follow it.

19          As a -- as a man of faith, I believe in the
20 natural depravity of men.  I believe that -- I know that I
21 have a sinful and selfish heart and that I make sinful and
22 selfish decisions every day that are wrong.  And I --
23 certainly, if I could go back in time, there's no doubt in my
24 mind I never would have given any donation to the Standard
25 Club and never would have even run for Congress.

1        But that's irrelevant because we can't go back in

2  time.  We can't change the past.  All I can really do before

3  you today, Your Honor, is say I'm sorry.  And I'm sorry.

4        I am -- I would like to apologize to the other

5  people in the room, if that's all right --

6        THE COURT:  Sure.

7        THE DEFENDANT:  -- if I can take a quick minute,

8  Your Honor.

9        I'm sorry for the things that I have done that

10  have let down all my friends and supporters, especially those

11  of you who traveled a great distance for being here.  I -- I

12  can't tell you how much that Amanda and I truly appreciate

13  the love and support that we have felt from so many people

14  throughout this long process.  And we appreciated your

15  prayers and -- and your acts of service.

16        But, most of all, Your Honor, I'm sorry for what

17  I've put my family through.  And I'm sorry that my wife has

18  been drug into this mess.  She doesn't deserve that.  She is

19  a -- she's the most -- she's the most straightforward, honest

20  person that I know.  She is -- she is a woman of utmost honor

21  and respect.  And I would like, Your Honor, for the record to

22  reflect that.

23        She is -- she's also -- she's a strong and a loyal

24  and a steadfast wife, and she has been nothing but supportive

25  of me throughout this entire process.  And I can't thank you

enough for that action.  It's been six years.  And not many
spouses could get through that.  But she has, and she's done
it with dignity and with grace.

        I -- I also want to give credit to her for being a
great mom.  She's done a lot throughout this process.  She's
carried two twin babies until they were 7 pounds when they
were born.  And, as my lawyer indicated, raising twins is a
blessing, and doing it with -- same situation -- doing it
with an older daughter is a blessing as well.  But it's also
exhausting.  And she has been there every single day and has
endured it.  There's constantly a mouth to feed, a diaper to
change, a crying baby to comfort.  And there are many, many,
many sleepless nights.  Last night, the night before, two of
them.  And I just -- I truly cannot imagine her having to
raise those children without -- without my support.

        I know that you have to punish me, though.  I do
understand that.  And -- and I know that I'm responsible for
my actions; you're not responsible for my actions.  But I
nonetheless do pray that you will -- that you will take that
into consideration, as well.

        But, ultimately, Your Honor, this is -- as I say,
this is -- this is on me.  And it's my job, with God's help,
to take this experience and to turn it into something
positive in the long run, in a way to continue to do what
I've always felt called to do, and that is to serve the

community.  And I -- I -- I pray that you will give me that
opportunity, and I pray that you will show mercy on me today.
Thank you.

   THE COURT:  Well, Mr. Kelsey, I certainly
appreciate that, and I think it's genuine and well stated.

   So my responsibility is to impose a sentence
that's sufficient but not greater than necessary to
accomplish the purposes of the sentencing laws.  And I've
certainly considered the government's arguments toward 41
months, which is the top of the guideline, and your arguments
for probation, or otherwise as modified here today.

   In order to determine what is the appropriate
sentence, I need to follow -- and I do follow -- the factors
that Congress has laid out.  And we start with the nature and
circumstances of the offense.

   You pled guilty -- you pled guilty I think
knowingly, intelligently and voluntarily.  You pled guilty to
two counts:  Count One, conspired with Joshua Smith and
others to defraud the United States to impair and obstruct
the Federal Election Commission in the enforcement and
administration of the election laws; and Count Five, aiding
and abetting contributions to your congressional campaign in
excess of the limits set forth in the Election Act.

   At the time of the offense of conviction, you were
a practicing attorney, licensed in the State of Tennessee,

and a member of the Tennessee Senate.  The facts I rely upon
as I said in the beginning of the sentence, and I'll say it
again, are those that were agreed to by you at the plea
hearing, and I rely upon them because you told me those were
truthful.  And from those facts I discern that you did
orchestrate an illegal contribution to your federal
congressional campaign by using friends and at least one
other member of the Tennessee General Assembly.  I think your
actions were willful.  I think that it involved a significant
action in that it involved over -- approximately $91,000, and
it covered an eight-month period.  So the Court accepts that
as true, of what you told me when you admitted guilt to
Count One, the conspiracy count, and Count Five, the aiding
and abetting count, to violate the election law.

And from those facts the Court is imposing a
sentence because on or near July the 11th, 2016, you and your
co-conspirators con- -- began these illegal acts.  I'm going
to talk about the co-conspirators because I think in a
conspiracy you had to do this with one other person.  And
here there were several other persons.  One was Joshua Smith,
who is going to be sentenced later this afternoon, who owns
the Standard social club, and was at that dinner when the
check was passed.  You knew -- you had a -- more of a
business/social club relation.  I don't see anything in the
record that suggests you were long-term friends or anything

of that nature.  But I do think Mr. Smith -- I think for
Mr. Smith you were somebody important to him because you're a
member of the club and he wanted to make his club members
happy, and he participated.

        And then we go to Jeremy Durham.  Jeremy Durham
was indeed a very close friends of yours, since 2006 to 2007.
As someone alluded to, you were the best man at his wedding.
You all were roommates in Memphis as well as in Tennessee,
and he was a legislative colleague and your campaign manager
for your Tennessee State Senate.  So Mr. Durham's
participation in the conspiracy and his engagement clearly
grew out of that relationship that you all had.  And the
Court can make certain inferences from that.  Then Mr.
Durham's wife was there at the dinner at the Standard club.
These personal relationships between you and Durham and Smith
and -- are important because it helps the Court create a
context for the communications, both direct communications
and indirect communication.

        It doesn't take much of a logical -- or reasoning
to know that if you're closely related or have close
friendship or close relationship with somebody you can say
and do things to that person because they know you almost
better than you know yourself.  And obviously direct
communications speak for themselves.  But all of that was at
play when the transfer of money took place in the tune of

$106,341 from your Senate campaign votekelsey.com to the Standard Club PAC controlled by Smith. I accept as true that when that check was transferred, when you gave the check to Mr. Smith, you recited a rehearsed statement about using the money however you wanted and then thereafter you engaged in behavior and your other conspirators engaged in behavior to attain the object of the conspiracy, to accomplish its illegal purpose. That became clear in subsequent days. Specifically, on July the 15th of 2016, you -- I'm sorry -- Smith, at your implicit direction, or indirect communication, and supported by Mr. Durham's direct involvement, transferred $30,000 to provide funds for the Kelsey congressional campaign. Then Smith and Kelsey transferred more money on July the 20th in the amount of $7,000; then again on July the 21st in the amount of $36,000. And I say all that because the purpose of all these transfers, according to the facts that you told me were true at the plea, was to provide funds to the Kelsey congressional campaign. But even more, in the plea -- plea agreement, and the facts in the plea agreement, you admit as true that when the American Conservative Union made contributions to your campaign, the contributions were coordinated by you through your friends, through your colleagues. It was not independent. It was not legal. It was not a mistake. And it wasn't an accident. So that's what brings us here. And I think that reflects some

orchestrated -- an orchestrated conspiracy to subvert the Election Act.  I think it did harm to the public confidence and the safeguards in the Election Act.  And it was all done to really fuel your zeal to be elected to Congress.  So these actions are serious.  They were deliberate.  And are actions that deserve punishment.

Now, I do note -- and you'll -- and this is part of sentencing -- is I have to take into consideration all of the circumstances that bring -- that surround the offense of conviction.  And I have to note, because it's clear in the papers, your conspiracy took the help of others:  Joshua Smith, Jeremy Durham, and Andrew Miller.  And although the advisory guideline says that you were properly determined to be the organizer and the leader, the Court believes that Smith and Durham and Miller all had an important role in you accomplishing the transfer of the money.  And the Court is concerned, and I've considered the arguments, and I'll talk more about this, but as it pertains to Mr. Smith, Mr. Durham and Mr. Miller, the differentiator for me here at sentencing is that each of those three cooperated with the government and early accepted responsibility.  They may not have done it in a way satisfactory to your lawyer, but the essence of all that they did was to accept responsibility.

So now I turn -- and the Congress tells me I need to consider your history, your characteristics, and they

are -- and this is what I find.  You're 45 years old.  You

have a law degree from Georgetown, married with three

children, a former state senator.  But important to the

Court, and it's -- it's acknowledged in the guideline, but I

don't think the guideline gives it as much weight as it

should get, this is your first ever criminal behavior.  It is

true, as set forth in your brief, you've -- you -- to the

best of the Court's knowledge and the record I have, you've

been a model citizen for most of your life, and there's

certainly no substance abuse or mental health issues here for

consideration.

        But I do turn to the letters from your friends and

family.  And they reflect your devotion to your family and to

public service that we heard about here today.  I do

consider -- I will consider, and I have considered, the many

good deeds that you've engaged in.  Your friends and family

know you as a dedicated husband, father.  The word hands-on

is mentioned many times in the letters many times.  And even

today I think it was mentioned here.  You're a hands-on

father, a devoted son, and a devoted member of -- family

member to others.  You have a strong commitment, as

demonstrated by your actions and behavior, to both

non-secular and secular nonprofit organizations.  And your

activity in those nonprofit have caused an impact, a positive

impact on children, on adults in Memphis, throughout

1   Tennessee, and even internationally with your work in Somalia
2   and South America.  And that's important to the Court for the
3   reasons I said earlier.
4           I do not think that you could have possibly have
5   done those things merely for the fact that they be considered
6   by the Court for mitigation here today.  The good deeds are
7   also important because they give me a more well-rounded view
8   of you and determine what would be an appropriate sentence.
9   They also are important because they do demonstrate, as the
10  witness this morning said, sort of your silent servant
11  attitude, or as somebody else said, a passion to serve.  And
12  the Court is impressed that back in 2008 you received the pro
13  bono award of the year from the Memphis bar for legal
14  services to a nonprofit that would have otherwise failed,
15  would have otherwise been out of business but for your
16  action.  So that interest in public service is something that
17  is apparent and something that makes up part of who you are
18  that the Court has to consider.
19          Likewise, and not as much as I give weight to your
20  actions of good deed -- good deeds, I am going to consider
21  the collateral consequences.  I'm not giving them the same
22  weight that I would other things, but nevertheless, they're
23  part of what brings you to sentencing here today.  And the
24  fact of the matter is, you've lost your license, your law
25  license.  It is unlikely you'll ever be a licensed lawyer

again for the rest of your life.  You could not run for
reelection.  You lost your legal job and you have experienced
the shame and disappointment, to a greater extent I think
that other felon -- felony defendants have.  These collateral
consequences don't eliminate the need for punishment, but in
order to fulfill the responsibility that Congress has given
me, it's something that I've got to consider for the purpose
of sentencing.

        Now I turn to the fact of respect for the law.
And that's sort of changed today.  I'm glad to hear that the
first words out of your mouth were I am a felon.  I was glad
to hear that you said I broke the law.  I'm not sure what you
meant by risk involved, but it's better late than never to
express some respect for the law here.  And that's important.
I don't put weight on your argument in your brief that your
compliance with the conditions of pretrial release in some
way gets you consideration.  And that's because complying
with the conditions of pretrial release, that's just what's
expected.  You don't get points for doing what's -- the law
requires you to do.  You lose points when you don't do what
the law requires you to do.

        And again, it's better late than never that today
you're showing some remorse and today you're showing some
respect for the law.

        I do think there's a need to impose a sentence

that sends a message of general deterrence.  I don't think --
it's highly unlikely -- I can't even think of the facts of
you being in a position to violate the election law or -- and
I think the consequences of this plea have specifically
deterred you going forward.  But I do think there's a need to
have a message of general deterrence because the opportunity
to run for public office is one that's important to our
country and important to our state.  And we need to encourage
people to do that.  And at the same time we need to make sure
that they know when you seek that opportunity you do need to
comply with the law.  And I think the sentence I'm going to
impose will send that message here.

I've already talked about it's unlikely you'll
hold a position.  So I see less of a need that you're going
to be in a position to harm the public in the -- in the
future.

Now, let me turn to the guideline.  Because that's
also a factor in -- that the Congress has told me to
consider.  And here the guideline range I think is due
substantial weight.  The guideline range of 33 to 41 months
is properly calculated.  And it does account for a lot of
your behavior here.  It accounts for the fact you were the
organizer and leader of the conspiracy.  It accounts for the
$91,000 that was transferred.  It accounts for the fact you
abused a position of trust.  And it accounts for the fact

that you willfully obstructed justice when you lied under
oath before this Court.  And all of which was material.  But
at the same time, the guideline range don't -- does not
account for all of the conduct that makes up Brian Kelsey.

And then, finally, let me go to your argument
about sentence disparities.  Your presentence filings and
today urge that the Court should impose a probationary
sentence because, quote, no district court has ever sentenced
a defendant like Brian Kelsey to prison, and your brief
reasons that sending you to prison would create a sentencing
disparity.

Then you argue that you are the model defendant
for whom probation is appropriate and your conduct as -- your
conduct is far afield from the core illegality of the
campaign finance laws even if the conduct makes that a crime
at all.  The Court has considered that and will give them
weight, but I'm going to give them little weight.  And let me
tell you why.

First, the United States sentencing guideline,
advisory though it may be, makes Mr. Kelsey ineligible for
probation.  That's an objective measure if we're -- if
we're -- and that's advisory only.  But it's something the
Court has to consider.  And I do consider.

Next, a sentence within the guideline range is
presumptively, by the Sixth Circuit, determined to be

1  substantially reasonable.

2         And further, as Chief Judge Sutton explained in

3  *United States versus Swafford*, 639 F.3d 265 at 260, said, and

4  I quote:  The point of the guidelines is to decrease

5  sentencing disparities and objective further it by a within

6  guideline sentence, as opposed to a sentence that varies

7  above or below the advisory guideline, end quote, page 270.

8  And then to the extent that you're arguing for a noncustodial

9  probationary sentence because -- based upon some kind of

10 national averages -- average for federal sentences of

11 defendants like Mr. Kelsey convicted of campaign finance

12 criminal violations, the Court considers that but rejects it

13 because we just don't know enough about the details.  As one

14 Court put it, cooperation or not in those sentences,

15 objective behavior or not in those sentences, long

16 association with criminal activity or not.  All of these are

17 factors that are simply put together in one big pot sort of

18 liquified like some big pot of gumbo.  Nothing stands out to

19 provide the particular instruction for the Court.  See *U.S.*

20 *versus Reynolds* 813 F.App at 185, page 197, Sixth Circuit,

21 2020.  And then finally, facts matter.  Context matters.  And

22 Mr. Kelsey, I have not seen any case supporting a

23 probationary sentence that mirrors your conduct in all

24 material respects.  Significantly, the failure to -- the only

25 recent desire to accept responsibility, the untruthfulness to

the Court, and I have to sentence people according to their particular characteristics. And the Court finds that you are an above average criminal felon defendant. You have a BA, a JD, a practicing lawyer, and you served in the Senate, chairing two significant committees.

So for all those reasons and having balanced all those reasons here as best as I can, Mr. Kelsey, I'm going to commit you to the custody of the Attorney General for a total of 21 months. That will be followed by three years of supervised release. While you're on supervised release you'll be subject to following the directions of the probation officer with a reporting on where you live and where you work. You will furnish all financial records without limitations to the Probation Office, not incur any new debt or open any lines of credit without the approval of probation until all monetary sanctions have been paid. I'll impose all the standard and regular conditions of supervised release -- I'm sorry -- yeah, of supervised release, including one that shouldn't be a problem, but one that people have a problem, and that is you can't have possession directly or indirectly of any firearms or ammunitions as the law currently stands. All of the standard conditions of supervised release will be set forth in the judgment.

I will not impose a fine because I don't find that a fine is necessary, but I do have to impose the mandatory

special assessment; that's $100 per count for a total of
$200.

Restitution is not an issue here or forfeiture.

Any other special requests, Mr. Little?

MR. LITTLE:  Yes, Your Honor.  We request a
placement in Morgantown, West Virginia.

THE COURT:  I'll make that recommendation.  That
decision is made by the Bureau of Prisons.  But I will make
that recommendation.

The government have any objections to the
sentence?

MS. KLOPF:  No, Your Honor.

THE COURT:  Mr. Little?

MR. LITTLE:  The only additional objection is the
two points for obstruction, Your Honor.

THE COURT:  All right.  As already stated, for the
reasons I've already explained, overruled.

So Mr. Kelsey, the sentence is hereby imposed.

Now, you have the right to appeal, and your appeal
rights start 14 days from when I enter the judgment.  And
let's see -- so I'm not -- I probably won't get the judgment
entered today.  I probably won't be able to get the judgment
entered until about Monday or Tuesday.  And that's when your
14 days starts.  You can tell your lawyer you want to appeal.
You can tell the Clerk of Court you want to appeal.  And I'm

handing you right now a blank Notice of Appeal that you can

use however you wish, but, Mr. Kelsey, I strongly urge -- I

strongly urge you talk to a lawyer, and I strongly urge you

to read your plea agreement because in your plea agreement

you -- you waive certain appellate rights regarding your

sentence.

And do you have any questions about your appellate

rights?

THE DEFENDANT:  I do not, Your Honor.

THE COURT:  All right.  Does the government have a

motion?

MS. KLOPF:  Yes, Your Honor.  First I just want to

make sure that the record reflects that the Court has

accepted the plea agreement, and then pursuant to the plea

agreement we move to dismiss the remaining counts.

THE COURT:  All right.  That motion will be

granted.

Okay.  Anything --

MR. LITTLE:  Your Honor, we ask for 60 days to

report.

THE COURT:  Okay.  I think that's optimistic from

what I'm seeing.

MR. LITTLE:  I've seen dates kicked out a ways.

THE COURT:  They're taking some time.

MR. LITTLE:  Just no less than 60 days.

1          THE COURT:  Okay.  Why don't we -- why don't we

2  start with October the 20th.  But he'll get a communication

3  from the Bureau of Prisons, and Mr. Little know -- you can

4  make a motion if you've not received a communication --

5          MR. LITTLE:  Okay.

6          THE COURT:  -- from the Bureau.

7          MR. LITTLE:  Your Honor, you know, October 1st.

8  It can be earlier if it's better for the Court.  Any time

9  before October 1.

10         THE COURT:  If he doesn't get -- he just wants to

11  report anyway.

12         MR. LITTLE:  I mean, I guess he can report sooner

13  than that date.

14         THE COURT:  Oh, yeah.

15         MR. LITTLE:  That's fine.

16         THE COURT:  Okay.

17         MR. LITTLE:  It will be up to the BOP to do the

18  designation.  That may take them five weeks.

19         THE COURT:  That's right.  Okay.

20         All right.  Anything else, Mr. Little?

21         MR. LITTLE:  Not from the defense, Your Honor.

22         THE COURT:  Anything from the government?

23         MS. KLOPF:  I wanted to clarify, are these 21

24  months to run concurrent?  I don't think the Court had stated

25  if the 21 months was concurrent or consecutive, and I wanted

```
 1   to ensure the record is clear.
 2              THE COURT:  Concurrent with what?
 3              MS. KLOPF:  With each other.
 4              THE COURT:  Oh, yeah.  I'm sorry.  That will all
 5   run concurrent.
 6              MS. KLOPF:  Thank you, Your Honor.
 7              THE COURT:  Anything else?
 8              Mr. Kelsey, I think I've imposed a sentence that
 9   fulfills the purposes of the sentencing laws, and I know I've
10   imposed a sentence at age 45 that gives you plenty of
11   opportunity to continue the service that's been important --
12   perhaps in a different vein -- in a different route.  But
13   nevertheless, that opportunity's there for you to continue to
14   do the things you've done in the past.
15              Good luck.
16              MR. LITTLE:  Thank you, Your Honor.
17              (Court adjourned.)
18
19
20
21
22
23
24
25
```

1  REPORTER'S CERTIFICATE

2

3       I, Lise S. Matthews, Official Court Reporter for

4  the United States District Court for the Middle District of

5  Tennessee, with offices at Nashville, do hereby certify:

6       That I reported on the Stenograph machine the

7  proceedings held in open court on August 11, 2023, in the

8  matter of UNITED STATES OF AMERICA v. BRIAN KELSEY, Case No.

9  3:21-cr-00164-1; that said proceedings in connection with the

10 hearing were reduced to typewritten form by me; and that the

11 foregoing transcript (pages 1 through 120) is a true and

12 accurate record of said proceedings.

13       This the 21st day of August, 2023.

14

15                          /s/ Lise S. Matthews
                            LISE S. MATTHEWS, RMR, CRR, CRC
16                          Official Court Reporter

17

18

19

20

21

22

23

24

25