UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA,

       Plaintiff / Respondent,

v.

                                      No. 3:21-cr-00264-1

BRIAN KELSEY,

       Defendant / Movant.

---

**BRIAN KELSEY'S MEMORANDUM OF LAW IN SUPPORT OF
EMERGENCY MOTION FOR RELEASE PENDING DECISION ON HIS
MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255**

---

Joy Boyd Longnecker
Barnes & Thornburg, LLP
1600 West End Avenue
Suite 800
Nashville, TN 37203-3494

Kent Wicker
WICKER / BRAMMELL PLLC
323 West Main Street, 11th Floor
Louisville, Kentucky 40202
(*Admitted pro hac vice*)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

SUMMARY OF ARGUMENT .................................................................................... 1

INTRODUCTION ......................................................................................................... 1

BACKGROUND ........................................................................................................... 4

ARGUMENT ................................................................................................................. 6

I.  Mr. Kelsey raises substantial claims of law because of his counsel's ineffective assistance and the government's misconduct. ........................................ 7

    A.  Mr. Kelsey raises several substantial claims of law that he received ineffective assistance of counsel. ............................................................... 7

        1.  Mr. Kelsey received ineffective assistance of counsel when his counsel failed to object to the government's breach of the plea agreement. ................................................................................... 7

        2.  Mr. Kelsey received ineffective assistance of counsel when his counsel failed to appeal the Court's finding of no factual basis for his guilty plea. ............................................................................ 11

        3.  Mr. Kelsey received ineffective assistance of counsel at his withdrawal of plea hearing when his lawyer gave materially inaccurate testimony. ................................................................. 12

        4.  Mr. Kelsey received ineffective assistance of counsel when his counsel failed to file a motion to dismiss that the Sixth Circuit opined is likely to win at the Supreme Court. ............................. 14

    B.  Mr. Kelsey raises several substantial claims of law that the government committed misconduct. ............................................................. 15

        1.  The government committed misconduct by suppressing the Smith Recording and Durham's initial, exculpatory statements. ............ 15

        2.  It is a substantial claim of law that the government coerced false testimony from Durham to the grand jury. .................................. 18

II.  Mr. Kelsey's strong bases for vacating his conviction, in light of other compelling evidence disputing the charges, constitute "exceptional circumstances" warranting release pending a decision on the motion to vacate. ............................................ 21

A.  The Court of Appeals has largely decided the issue of ineffective assistance of counsel already. ............................................................... 21

B.  The Durham Recordings are exceptional. .................................................. 21

C.  The government can present little evidence to contradict its own witnesses who, it is now known, have proclaimed Mr. Kelsey's innocence. ........... 22

D.  This Court has found that Mr. Kelsey's statements that he was guilty are false. ............................................................................................................. 25

CONCLUSION ........................................................................................................... 25

CERTIFICATE OF SERVICE ................................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boyer v. City of Orlando*,
    402 F.2d 966 (5th Cir. 1968) ....................................................................................4

*Brady v. Maryland*,
    373 U.S. 83 (1963) ......................................................................................3, 15, 16, 17

*Bridges v. United States*,
    991 F.3d 793 (7th Cir. 2021) ...................................................................................14

*Burns v. Gammon*,
    260 F.3d 892 (8th Cir. 2001) ...................................................................................11

*Cagle v. Davis*,
    520 F. Supp. 297 (E.D. Tenn. 1980) ................................................................. 15-16

*Ceasor v. Ocwieja*,
    655 F. App'x 263 (6th Cir. 2016) ...........................................................................12

*Coe v. Bell*,
    161 F.3d 320 (6th Cir. 1998) ...................................................................................18

*Cowans v. Bagley*,
    639 F.3d 241 (6th Cir. 2011) ...................................................................................12

*Dando v. Yukins*,
    461 F.3d 791 (6th Cir. 2006) ...................................................................................14

*Davis v. Alaska*,
    415 U.S. 308 (1974) .................................................................................................14

*Dotson v. Clark*,
    900 F.2d 77 (6th Cir. 1990) ................................................................................7, 25

*Girts v. Yanai*,
    501 F.3d 743 (6th Cir. 2007) .....................................................................................8

*Goff v. Bagley*,
    601 F.3d 445 (6th Cir. 2010) ...................................................................................12

*Gravley v. Mills*,
    87 F.3d 779 (6th Cir. 1996) .......................................................................................8

*Higgins v. Renico,*
  470 F.3d 624 (6th Cir. 2006) ............................................................14

*Hodge v. Hurley,*
  426 F.3d 368 (6th Cir. 2005) ...........................................................8, 9

*House v. Bell,*
  547 U.S. 518 (2006).........................................................................22

*Jamison v. Collins,*
  291 F.3d 380 (6th Cir. 2002) ............................................................15

*Jells v. Mitchell,*
  538 F.3d 478 (6th Cir. 2008) ............................................................15

*Kyles v. Whitley,*
  514 U.S. 419 (1995).........................................................................22

*Lucas v. O'Dea,*
  179 F.3d 412 (6th Cir. 1999) ............................................................14

*McFarland v. Yukins,*
  356 F.3d 688 (6th Cir. 2004) ............................................................12

*McPhearson v. United States,*
  675 F.3d 553 (6th Cir. 2012) ......................................................7, 9, 10

*Napue v. Illinois,*
  360 U.S. 264 (1959)......................................................................3, 18

*Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n,*
  117 F.4th 389 (6th Cir. 2024) (*en banc*) ...................................... 14-15

*Nix v. Whiteside,*
  475 U.S. 157 (1986).........................................................................13

*Opper v. United States,*
  348 U.S. 84 (1954)...........................................................................15

*Santobello v. New York,*
  404 U.S. 257 (1971) (Douglas, J., concurring).....................................10

*Smith v. Cain,*
  565 U.S. 73 (2012)...........................................................................22

*Spalla v. Foltz,*
  762 F.2d 1011 (6th Cir. 1985) .......................................................4, 22

*Strickland v. Washington*,
    466 U.S. 668 (1984) ................................................................7, 9, 11, 13

*Strickler v. Greene*,
    527 U.S. 263 (1999) ................................................................................15

*Tate v. Wood*,
    963 F.2d 20 (2d Cir. 1992) .......................................................................17

*United States v. Al Mudarris*,
    695 F.2d 1182 (9th Cir. 1983), *cert. denied*, 461 U.S. 932 (1983) ........................................19

*United States v. Benny*,
    786 F.2d 1410 (9th Cir. 1986), *cert. denied*, 479 U.S. 1017 (1986) .................................. 18-19

*United States v. Bricker*,
    No. 24-3286, 2024 U.S. App. LEXIS 15572 (6th Cir. June 26, 2024) .....................................4

*United States v. Claiborne*,
    765 F.2d 784 (9th Cir. 1985), *cert. denied*, 475 U.S. 1120 (1986) ........................................19

*United States v. Fitch*,
    282 F.3d 364 (6th Cir. 2002) ..............................................................10, 21

*United States v. Mandell*,
    905 F.2d 970 (6th Cir. 1990) .....................................................................10

*United States v. McCreary-Redd*,
    475 F.3d 718 (6th Cir. 2007) .....................................................................12

*United States v. Nagra*,
    147 F.3d 875 (9th Cir. 1998) .....................................................................17

*United States v. O'Dell*,
    805 F.2d 637 (6th Cir. 1986), *cert. denied*, 484 U.S. 859 (1987) ........................................19

*United States v. Samango*,
    607 F.2d 877 (9th Cir. 1979) .....................................................................19

*United States v. Shakir*,
    No. 3:98-00038, 2006 U.S. Dist. LEXIS 117024 (M.D. Tenn. Dec. 27, 2006) .....................19

*United States v. Tunning*,
    69 F.3d 107 (6th Cir. 1995) .......................................................................12

*Washington v. Hofbauer*,
    228 F.3d 689 (6th Cir. 2000) .......................................................................8

**Statutes**

28 U.S.C. § 2255 ......................................................................................1, 6, 7, 11, 15, 25

**Rules**

Federal Rule of Criminal Procedure 11 ..........................................................................11

**Other Authorities**

*Criminal Justice Standards for the Defense Function* (American Bar Association, 4th Ed., 2017) ..........................................................................................................8, 12

Restatement 3d of Agency § 3.05 ..................................................................................16

## SUMMARY OF ARGUMENT

To grant release pending the resolution of a 28 U.S.C. § 2255 motion, the Court must find a substantial claim of law and an exceptional circumstance. The Court of Appeals held that Mr. Kelsey's counsel failed to object to the government's breach of the plea agreement and that the failure was fatal to his appeal; therefore, whether Mr. Kelsey received ineffective assistance of counsel is a substantial claim of law. The exceptional circumstance is the strength of this legal argument: it rests upon an appellate court decision that is binding on this Court. A second exceptional circumstance is two newly discovered recordings of "star witness" Jeremy Durham, containing statements against interest in which Durham recants his testimony and exonerates Mr. Kelsey. With both prongs met, the Court should grant release.

## INTRODUCTION

Defendant Brian Kelsey moves the Court to allow him to be and remain released on his present conditions until thirty days after the Court has ruled on his motion to vacate his sentence pursuant to 28 U.S.C. § 2255. As this Court already found, Mr. Kelsey poses no risk of flight nor danger to the community. (Order granting release pending appeal, Doc. 177, at 3.) The Court granted Mr. Kelsey release on his own recognizance at his arraignment in this matter, without incident. (Doc. 13-1.) The Court continued his release while his case was considered on appeal, also without incident. (Doc. 177 at 8.) And the Sixth Circuit continued his release while he petitioned the Supreme Court, also without incident. (COA Doc. 38.) There is no risk in his further release while the Court considers these grave issues of constitutional concern.

Mr. Kelsey raises two issues that constitute a substantial claim of law in his motion to vacate: (1) ineffective assistance of counsel and (2) prosecutorial misconduct. The most obvious ineffective assistance of counsel is the one the Sixth Circuit Court of Appeals already found: counsel failed to object adequately when the government breached the plea agreement at sentencing by advocating for an enhancement for which it was prohibited from advocating. The circuit court ruled that this failure cost Mr. Kelsey his appeal. It reviewed the breach under plain error and did not find the error to be plain. But

had counsel objected properly, it would have reviewed the breach *de novo*, and it stated that Mr. Kelsey likely had the better argument. Therefore, this ineffective assistance of counsel cost Mr. Kelsey his constitutional right to a jury trial. On this ground alone, the Court should grant this motion.

But further ineffective assistance abounds. Mr. Kelsey's counsel also failed to appeal an issue that likely would have gained him a reversal. This Court found that Mr. Kelsey's statements when he entered his guilty plea were false. That negates the factual basis for his guilty plea.

Mr. Kelsey also received ineffective assistance of counsel at his plea withdrawal hearing. His own lawyer testified inaccurately regarding when Mr. Kelsey had made him aware of his desire to withdraw his plea. He stated that it was months after the plea entry, but in reality, it was only five days later. He was not cross-examined with the emails that would have shown this testimony to be inaccurate. This Court relied on the testifying lawyer's incorrect testimony and ruled against Mr. Kelsey, finding he should have communicated his misgivings to his counsel sooner.

Finally, the Sixth Circuit recently opined that the Supreme Court is likely to rule that campaign coordination is protected political speech and cannot constitute a crime. Therefore, Mr. Kelsey's first attorney was also ineffective in not filing Mr. Kelsey's motion to dismiss and raising that argument.

Mr. Kelsey also raises substantial claims of law regarding prosecutorial misconduct. The government failed to promptly disclose to Mr. Kelsey exculpatory evidence from two of the three witnesses against him that would have prevented Mr. Kelsey from pleading guilty. First, his chief accuser, Durham, initially told prosecutors that Mr. Kelsey was "the poster child" of "a rule follower" who would not do anything he believed to be illegal. He told them that Mr. Kelsey never directed him what to do with the funds Mr. Kelsey had donated to Joshua Smith's political action committee and that Mr. Kelsey never told him to coordinate campaign expenditures with the American Conservative Union ("ACU"). But then Durham says the government began "threatening [him] like hard core" that they would take away his immunity and prosecute him unless he changed his story. Ultimately, Durham

relented, and he permitted the prosecutors to begin "feeding" him statements to read to the grand jury about Kelsey that were "not true." Because the government failed to promptly turn over Durham's initial, exculpatory statements to Mr. Kelsey and the statements it had drafted for Durham that he rejected, Mr. Kelsey entered guilty pleas unaware that the government's self-described "star witness" had actually said he was innocent. The government's suppression violated this Court's Local Rules and its constitutional obligations under *Brady v. Maryland*. (Local Crim. R. 16.01(a)(3).) Also, the government's coercion of Durham and indictment of Mr. Kelsey based on Durham's false grand jury testimony constitute gross misconduct in violation of *Napue v. Illinois*.

Second, the government also failed to promptly disclose Smith's recorded statement containing exculpatory information about Mr. Kelsey. Although Smith pleaded guilty and agreed to testify against Mr. Kelsey, he told an associate in a recorded conversation before his guilty plea that he was "under investigation . . . for something totally unrelated, that [he] had nothing to do with either." Thus, Mr. Kelsey's alleged agent asserted his innocence (and by extension, Mr. Kelsey's innocence), without Mr. Kelsey's knowledge. The government came into possession of the critical recording three months before Mr. Kelsey entered a guilty plea, but it suppressed the evidence in violation of this Court's Local Rules and its constitutional obligations under *Brady v. Maryland*.

Five circumstances make this case exceptional and, therefore, worthy of granting release pending consideration of the motion to vacate. First, Mr. Kelsey's argument for ineffective assistance of counsel in failing to object to the plea agreement breach is exceptionally strong because it rests upon an appellate court decision that is binding on this Court. Second, the existence of *three different recordings* pointing to Mr. Kelsey's innocence is truly exceptional. In two recordings, Durham says that he told the government Mr. Kelsey was innocent before he was coerced into changing his testimony and reading a false statement to the grand jury. In the third recording, Smith denied participating in any illegal conspiracy with Mr. Kelsey. The emergence of these three recordings after Mr. Kelsey pleaded guilty is

highly exceptional. Third, the government's case, with its witness testimony now impeached, is exceptionally weak. There is no direct documentary evidence that Mr. Kelsey directed anyone or coordinated anything related to the campaign funds at issue—only toll records with Durham, a friend whom he called regularly. And there is at least one email exchange showing that, even in the final donation, Smith, Durham, and accuser Andrew Miller were making decisions on their own, with no input from Mr. Kelsey. Fourth, this Court's ruling that Mr. Kelsey's statements that he was guilty were false is exceptional. That amounts to a ruling that Mr. Kelsey is innocent. The most essential duty of this Court or any other is to convict the guilty and free the innocent, and Brian Kelsey is innocent.

At the very least, Mr. Kelsey deserves to be released while this Court considers these very serious claims. Mr. Kelsey can show that his conviction resulted from the violation of his rights under the Fifth and Sixth Amendments to the Constitution. Unless the Court grants him release while it considers the motion, though, the relief will come too late. Without an immediate order from this Court, the U.S. Marshal's Service will order Mr. Kelsey to report to prison in thirty days. The Court cannot give careful consideration to the motion to vacate before then. Without release, Mr. Kelsey will have served a substantial amount of his 21-month sentence before his *habeas corpus* motion is ruled on; thus, release is necessary to safeguard his constitutional rights. *Boyer v. City of Orlando*, 402 F.2d 966, 968 (5th Cir. 1968); *see also United States v. Bricker*, No. 24-3286, 2024 U.S. App. LEXIS 15572, at *5 (6th Cir. June 26, 2024) (granting release with 23 months to be served). This represents a fifth "exceptional circumstance[] . . . which make[s] the grant of bail necessary to make the *habeas* remedy effective." *Spalla v. Foltz*, 762 F.2d 1011 (6th Cir. 1985). Therefore, Mr. Kelsey moves that the Court grant him release under his current conditions until thirty days after it rules on the motion to vacate.

## BACKGROUND

Mr. Kelsey is an attorney and former Tennessee state Senator who ran for Congress in the 2016 primary election. He sought expert legal advice on how to donate accumulated funds from his state

campaigns in a way that might be helpful to his federal election, and he followed the advice. (Langhofer Decl., attached as Ex. 1.) Five years later, immediately after a change of administrations, the government pursued and secured an indictment against him and Joshua Smith, the director of a state political action committee. The indictment alleged conspiracy and violations of federal election finance laws. (Indictment, Doc. 1.)

Mr. Kelsey always maintained he was not guilty of the charges, but pressures mounted on him to change his plea to guilty. He learned that one political associate, Durham, had testified against him to the grand jury. Then, his co-defendant, Smith, pleaded guilty and agreed to testify against him at trial. (Smith Plea Agreement, Doc. 65.) These events occurred at an especially stressful time for Mr. Kelsey – his wife had just given birth to twins, joining a three-year-old daughter in his home, and his father was dying from pancreatic cancer. (Tr. of Change of Plea Hr'g, Doc. 119, at 21-24.) With extreme reluctance, Mr. Kelsey entered a plea agreement with the government and pleaded guilty to two counts. (Plea Agreement, Doc. 73.)

He regretted the decision almost immediately. Within five days, Mr. Kelsey told his counsel Mr. Bruno, "I've been sick at my stomach ever since talking to Judge Crenshaw" and asked: "Is there anything you can do to withdraw my plea and file the motion to dismiss?" (Kelsey Decl., attached as Ex. 2, at 56.)[1] His requests were rebuffed, so he asked a different attorney to file the motion. At the hearing, Bruno failed Mr. Kelsey by testifying erroneously about when Mr. Kelsey first raised the issue of withdrawing the plea. (Doc. 119 at 174:8-11.) He was not cross-examined with the emails that would have proven Bruno's timing-related testimony was wrong. *Id*. at 175:20-21. The attorney errors were compounded at sentencing, when Mr. Kelsey's new counsel, Mr. Little, failed to object adequately to the

---

[1] Documents submitted for the Court's review are attached to and authenticated by declarations, attached as exhibits to this Memorandum, and are further referenced by the Court's stamped pdf page numbers on the attachment.

government's breach of his plea agreement or to request recission as a remedy. (Tr. Sentencing Hr'g, Doc.157, at 13:5-12.) This Court held that Mr. Kelsey had obstructed justice by testifying falsely – but not at the withdrawal hearing when he *denied* that he was guilty – rather, at the initial change of plea hearing when he *claimed he was guilty*. *Id.* at 18:19-24. But Mr. Little failed to raise this finding of innocence to the Court, as well.

The Court of Appeals rejected Mr. Kelsey's appeal because of counsel's failure to preserve the objection to the government's breach of the plea agreement, despite ruling that Mr. Kelsey's interpretation of the agreement was likely correct. (COA Opinion, Doc. 188, at 9-13.) His counsel did not appeal this Court's refusal to permit him to withdraw his plea, despite the Court's ruling that Mr. Kelsey's claims of guilt were false. *Id.*

Meanwhile, Mr. Kelsey made three important discoveries about the government's case. First, after Mr. Kelsey pleaded guilty, an associate of Smith sent Mr. Kelsey a copy of a recording in which Smith denied his guilt. (Jarosemich Decl., attached as Ex. 3, at 3-6.) The "Smith Recording" had been provided to the government three months before Mr. Kelsey pleaded guilty, *id*. at 3-4, ¶¶ 5-6, but the government never disclosed it. Second, Durham revealed to Mr. Kelsey, in a recorded conversation, that he had told the government that Mr. Kelsey had not coordinated the campaign expenditures or otherwise violated the law but that the government threatened him with prosecution unless he changed his story, and it gave him a false script to deliver to the grand jury. (Kelsey Decl., Ex. 2, at 9, ¶ 28.) Third, Durham confirmed this government misconduct on a recorded call a year later. *Id*. at 10, ¶ 32.

The extraordinary combination of attorney incompetence, violating the standard required by the Sixth Amendment, and government misconduct, violating the standard required by the Fifth Amendment, entitles Mr. Kelsey to remain on release while the Court rules on his Section 2255 motion.

## ARGUMENT

To grant bail pending a decision on a motion to vacate sentence under 28 U.S.C. § 2255, the

Court must find "a substantial claim of law based on the facts surrounding the petition" and "some circumstance making the motion for bail exceptional and deserving of special treatment in the interests of justice." *Dotson v. Clark*, 900 F.2d 77, 79 (6th Cir. 1990) (cleaned up). Mr. Kelsey presents several substantial claims of law that he received ineffective assistance of counsel and was the subject of prosecutorial misconduct. And he shows five exceptional circumstances deserving of release.

I.    **Mr. Kelsey raises substantial claims of law because of his counsel's ineffective assistance and the government's misconduct.**

A.    **Mr. Kelsey raises several substantial claims of law that he received ineffective assistance of counsel.**

Under 28 U.S.C. § 2255(a), a person convicted and sentenced may challenge his conviction "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack. . . ." Chief among the rights guaranteed by the Constitution is the right to effective assistance of counsel: "The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results." *Strickland v. Washington*, 466 U.S. 668, 685 (1984).

1.    **Mr. Kelsey received ineffective assistance of counsel when his counsel failed to object to the government's breach of the plea agreement.**

To be entitled to relief under *Strickland,* the movant must show "(1) his trial counsel's performance was deficient, and (2) the deficient performance prejudiced the defendant." *McPhearson v. United States*, 675 F.3d 553, 559 (6th Cir. 2012). In this case, the Sixth Circuit opinion establishes both prongs: (1) Mr. Kelsey's counsel failed to make a crucial objection to the government's breach of the plea agreement at his sentencing hearing; and (2) Mr. Kelsey was unable to rescind his plea agreement and conviction on appeal *specifically because* his counsel did not make the objection.

7

Because the Probation Office had recalculated Mr. Kelsey's Guidelines range to add two points for obstruction of justice and because the government had telegraphed that it would advocate for the two points if asked a question by the Court, (Gov't Position Regarding PSR, Doc. 135, at 3), it should have been obvious to any reasonable attorney that protecting Mr. Kelsey from this violation of his rights was counsel's primary mission at sentencing. Yet counsel fumbled the ball.

Counsel's failure to object to the error at sentencing constituted deficient performance. As the Court of Appeals ruled, "Kelsey's counsel failed to object adequately . . . ." (COA Opinion, Doc. 188, at 8.) After the government argued for the enhancement, Mr. Kelsey remarked to his counsel that the government had just breached the plea agreement. (Kelsey Decl., Ex. 2, at 8, ¶ 22.) But Mr. Little made only a half-hearted observation about the government's conduct and never said he was objecting to the government's action or to the district court's ruling. (COA Opinion, Doc. 188, at 10.) He failed to argue that the government's breach of the plea agreement entitled Mr. Kelsey to rescind the agreement and go to trial. *Id.* at 9. As the Court of Appeals explained, "[C]ounsel's remarks were too abbreviated and sufficiently ambivalent about the government's conduct to register as an objection." *Id.* And that conclusion is binding on this Court.

Properly objecting to preserve the record for appellate review is one of the basic duties of defense counsel: "At every stage of representation, defense counsel should take steps necessary to make a clear and complete record for potential review[, ] includ[ing by] making objections . . . ." *Criminal Justice Standards for the Defense Function* (American Bar Association, 4th Ed., 2017). The Sixth Circuit has often found that failure to object constitutes ineffective assistance of counsel. *See, e.g., Girts v. Yanai*, 501 F.3d 743, 755 (6th Cir. 2007) ("trial counsel was ineffective in failing to object to the prosecution's statements during closing argument"); *Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005) (same); *Washington v. Hofbauer*, 228 F.3d 689 (6th Cir. 2000) (failure to object to prejudicial character evidence was ineffective); *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996) (failure to object to mention of defendant's

post-*Miranda* silence was ineffective). In this case, counsel's failure to object was especially ineffective because it occurred at one of the "critical stages of the criminal process," the "sentencing hearing." *McPhearson*, 675 F.3d at 559.

Counsel's failure to object to an error at "sentencing" constitutes "deficient performance," *id.*, unless there exists a "reasonable tactical explanation," *id.* at 563. But the failure here was not the result of a strategic decision. Mr. Little admits this. (Little Decl., Ex. 4.) He attempted to object—he just did so inadequately. As Mr. Little told the Court of Appeals, he was not "remaining silent about his objection" so that he could raise the error later "if the case d[id] not conclude in his favor." (Kelsey Reply, COA Doc. 24, at 33.) He sprang up "immediately," and he thought his words did constitute an objection. *Id.* at 34. But the Court of Appeals disagreed and found his performance deficient. (Doc. 188 at 9-11.)

Nor was the government's breach of the plea agreement an error which counsel can be excused for not recognizing. In this case, Mr. Kelsey explicitly pointed out the error to his counsel, and counsel nodded his head in agreement. (Kelsey Decl., Ex. 2, at 8, ¶ 22.) "[C]ounsel's conversations with the defendant [are] critical to a proper assessment of counsel's . . . litigation decisions." *Strickland*, 466 U.S. at 691.[2] Here, the conversation shows that counsel apprehended the error. Counsel confirmed this on appeal, when he argued that not only *he* understood the error, but also *this Court* "understood" the error he was attempting to call to its attention. (Kelsey Reply, COA Doc. 24, at 28.) Therefore, the error was apparent to him. Because he knew of the error, saw no strategic reason not to object to it, and, indeed, thought he had objected to it, but "failed to object adequately," (Doc. 188 at 9), counsel was not "reasonably effective." *Strickland*, 466 U.S. at 687. Thus, his performance was "deficient." *Id.*

The "prejudice" required by *Strickland* is equally apparent from the Court of Appeals opinion.

---

[2] "Unfortunately, when a prosecutor does act unfairly, there is little a defendant can do other than rely on his or her attorney to lodge an appropriate and timely objection. A failure to make such an objection can have devastating consequences for an individual defendant." *Hodge*, 426 F.3d at 377.

Counsel's failure to object harmed Mr. Kelsey by preventing him from obtaining the relief from the breach that he was entitled to receive: recission of the plea agreement. *See Santobello v. New York*, 404 U.S. 257, 267 (1971) (Douglas, J., concurring); *United States v. Mandell*, 905 F.2d 970, 974-75 (6th Cir. 1990). Counsel should have requested explicitly that this Court withdraw Mr. Kelsey's guilty pleas as a result of the government's breach. *See* COA Opinion, Doc. 188, at 10. That is, after all, the relief he had sought in his motion to withdraw. And this Court "highly []likely" would have granted it. (Order granting release pending appeal, Doc. 177, at 7.) For while the government had claimed that it would not advocate for the enhancement, this Court recognized that "[t]hings seemingly changed at the sentencing hearing." *Id.* at 5. But because his counsel failed to object, Mr. Kelsey was prejudiced at this Court.[3]

Also, Mr. Kelsey clearly was prejudiced at the appellate court. Counsel's failure to object caused the Court of Appeals to analyze the issue under plain error review rather than *de novo* review. That difference was conclusive. The Court of Appeals found that, while Mr. Kelsey had the better argument regarding the meaning of the plea agreement, the agreement was at least somewhat ambiguous: "Both parties appear to recognize that there is at least some uncertainty about the government's obligations under Kelsey's agreement, even if Kelsey has the better reading of the agreement." (Doc. 188 at 13.) Under *de novo* review, "any potential ambiguity in the plea agreement would be [read] in Kelsey's favor." *Id.* (citing *United States v. Fitch*, 282 F.3d 364, 367 (6th Cir. 2002)). But under plain error review, the court construed the potential ambiguity against Mr. Kelsey, concluding that he failed to prove that

---

[3] The government may argue that Mr. Kelsey was not prejudiced at this Court because the Court may have applied the enhancement anyway. But that answers the wrong question—which is not whether Mr. Kelsey was prejudiced *by the government's breach*. *Santobello*, 404 U.S. at 262 ("We need not reach the question whether the sentencing judge would or would not have been influenced" by "the prosecutor's recommendation."). The question is whether he was prejudiced *by the ineffective assistance of counsel*, *i.e.*, whether "the deficient performance prejudiced the defendant." *McPhearson*, 675 F.3d at 559. The answer is "Yes" because, regardless of whether the Court would have applied the enhancement, if counsel had objected, the Court would have been forced to adjourn the sentencing hearing, *see Santobello*, 404 U.S. at 259, to give the defendant the opportunity to withdraw his plea, *see id.* at 267 (Douglas, J., concurring).

the error was "'clear or obvious'" (Doc. 188 at 13) (quoting *Puckett v. United States*, 566 U.S. 129, 135 (2009)). Because his counsel "fail[ed] to make a constitutional objection," Mr. Kelsey was subjected to "much more onerous" "[p]lain error review." *Burns v. Gammon*, 260 F.3d 892, 897-98 (8th Cir. 2001). As a result, he lost his appeal and his right to a trial. Therefore, "counsel's deficient performance prejudiced his defense," satisfied both prongs of the *Strickland* test, and constituted "ineffective assistance of counsel." *Id.*

On this ground, alone, the Court should grant the Section 2255 motion, vacate the conviction, and set the case for trial. For purposes of this motion and at the very least, Mr. Kelsey has raised a substantial claim of law that he received ineffective assistance of counsel.

### 2. Mr. Kelsey received ineffective assistance of counsel when his counsel failed to appeal the Court's finding of no factual basis for his guilty plea.

In addition, Mr. Kelsey's counsel made other errors at the sentencing and in his appeal of it. First, he failed to appeal the Court's denial of the motion to withdraw the guilty plea. It would have been a strong appeal, since this Court found that Mr. Kelsey's statements at the change of plea hearing were false and that Mr. Kelsey's statements denying guilt at his plea withdrawal hearing were true: "The specific perjurious statements Mr. Kelsey made to the Court were at least two. One, he was not truthful when he told the Court that he was, in fact, guilty of Counts One and Five; and, two, he was not truthful when he told the Court that he, in fact, engaged in the behavior set forth in the factual basis section of his plea agreement." (Tr. of Sentencing, Doc. 157, at 18:19-24.) At a minimum, the ruling implies that Mr. Kelsey is not guilty of the charges against him. If his statements professing guilt at the entry of his guilty plea were false, then there was no factual basis for his guilty plea.

Federal Rule of Criminal Procedure 11(f) requires, "Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea." A guilty plea taken without a sufficient factual

basis must be reversed. *United States v. McCreary-Redd*, 475 F.3d 718, 723 (6th Cir. 2007). There is no harmless error exception. *United States v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995). Although the Court stated at the plea withdrawal hearing that it could rely on the statements in the plea agreement as a factual basis for the guilty pleas (Doc. 119 at 203-04), that was before the Court ruled at sentencing that the same statements, when made orally, were materially false. (Doc. 157 at 18:19-24.)

But the Court of Appeals could not reverse on the ground that Mr. Kelsey's plea lacked a sufficient factual basis because defense counsel did not appeal the issue. Failure to appeal a valid issue also constitutes a violation of a defense counsel's duty. *See Criminal Justice Standards for the Defense Function*, §4-9.2. As the Sixth Circuit has ruled, "The standard for ineffective assistance of appellate counsel mirrors the one governing the performance of trial counsel. In order to prevail, [an appellant] must demonstrate that counsel's performance fell below an objective standard of reasonableness and that, but for counsel's deficient performance, there is a reasonable probability that the outcome of his appeal would have been different." *Cowans v. Bagley*, 639 F.3d 241, 252 (6th Cir. 2011); *see also Goff v. Bagley*, 601 F.3d 445, 462–63 (6th Cir. 2010). The Sixth Circuit has often granted *habeas* relief because of appellate counsel's failure to raise a valid issue or otherwise prosecute an appeal in a reasonable manner. *See, e.g., McFarland v. Yukins*, 356 F.3d 688, 712 (6th Cir. 2004) (failure to raise issue of trial counsel's conflict of interest); *Ceasor v. Ocwieja*, 655 F. App'x 263, 287 (6th Cir. 2016) (appellate counsel's failure to file motion for evidentiary hearing). The failure here was unreasonable. For this reason, as well, the Court should vacate the judgment. At the very least, Mr. Kelsey has raised a substantial claim of law that counsel should have appealed this error.

### 3. Mr. Kelsey received ineffective assistance of counsel at his withdrawal of plea hearing when his lawyer gave materially inaccurate testimony.

Mr. Kelsey also received ineffective assistance at his withdrawal of plea hearing when one of his lawyers gave clearly incorrect testimony against him. Bruno testified falsely, or at least incompletely,

12

when he stated that he first he spoke to Mr. Kelsey about withdrawing his plea "[s]ometime in around February-ish, something like that." (Doc. 119 at 174:6-7.) In reality, Mr. Kelsey had emailed him, asking to withdraw his plea three months earlier, just five days after the change of plea hearing. (Kelsey Decl., Ex. 2, at 56.) Two days later, Mr. Kelsey sent him a rough draft of a motion to withdraw. *Id.* at 59-97. Bruno was not cross-examined on the issue, (Doc. 119 at 175:20-21), with the rough draft, which Mr. Kelsey had sent to his hearing counsel, (Kelsey Decl., Ex. 2 at Ex. M, Email, May 5, 2023, at 101-04). Earlier in the hearing, Mr. Kelsey had testified that he had shared this rough draft with counsel in November 2022. (Doc. 119 at 116:8-12.) But Bruno's erroneous testimony led the Court to the wrong conclusion—that Mr. Kelsey's request to withdraw his plea was merely a last-minute attempt to avoid sentencing. (Doc. 119 at 201:21-24; 197:23-198:16.)

Testifying against a client, in a false or misleading fashion, certainly falls below "an objective standard of reasonableness." *Strickland*, 466 U.S. at 688; *see also Nix v. Whiteside*, 475 U.S. 157, 166 (1986) ("counsel must take all reasonable lawful means to attain the objectives of the client [and] is precluded from . . . presenting false evidence . . . .").

Bruno also testified in a way that implied that Mr. Kelsey never told him he was innocent. He said that, in general, he would have notified the Court if his client did not understand or agree with all the facts in the plea agreement and, at the least, would have asked for a continuance. (Doc. 119 at 161:6-165:2; 169:15-17.) Bruno was not cross-examined on the issue. *Id.* at 175:20-21. But Bruno knew that characterizations in the plea agreement were not correct because he had added them himself. After Mr. Kelsey had removed mention of his directing anyone from the plea agreement, it was Bruno—not Mr. Kelsey—who added language back into the plea agreement to say that certain donations took place at Mr. "Kelsey's implicit direction." When Mr. Kelsey protested the characterization, Bruno urged him to accept it, even though he knew it was untrue, to put the case to bed: "It is my opinion that there will need to be some 'direction' language in the plea agreement." (Kelsey Decl., Ex. 2 at Ex. I, Emails with Bruno,

13

Nov. 14, 2022, at 49.)

This, too, represents ineffective assistance of counsel because the Court wrongly concluded that Bruno fulfilled his ethical obligations in negotiating an accurate plea agreement, (*id*. at 207:10-20), and relied on Bruno's misleading testimony about his usual practices to rule against Mr. Kelsey's motion to withdraw his plea, (*id*. at 203-04; 205:8-14).

Also, a "number of courts, including [the Sixth Circuit], have found deficient performance where, as here, counsel failed to challenge the credibility of the prosecution's key witness." *See Higgins v. Renico*, 470 F.3d 624, 633 (6th Cir. 2006); *see also Davis v. Alaska*, 415 U.S. 308, 318 (1974).

Finally, "fail[ing] to seek a mental health expert" to explain a defendant's mental state when it is material to the claim at issue can "establish ineffective assistance of counsel." *Dando v. Yukins*, 461 F.3d 791, 798-802 (6th Cir. 2006). Here, the Court found the lack of an expert witness to explain Mr. Kelsey's mental state from his newborns and dying father to be worthy of noting. (Doc. 119 at 129:20-24).

In sum, it is hard to imagine a scenario of ineffective assistance worse than giving erroneous, prejudicial testimony. Here, it led the Court to the inaccurate conclusion that Mr. Kelsey had only recently expressed to his counsel discomfort with the factual basis in the plea agreement and had only recently asked his counsel about withdrawing his guilty plea. Mr. Kelsey certainly received ineffective assistance of counsel. At the very least, Mr. Kelsey has raised substantial claims of law arising from the hearing.

> **4.** **Mr. Kelsey received ineffective assistance of counsel when his counsel failed to file a motion to dismiss that the Sixth Circuit opined is likely to win at the Supreme Court.**

"[C]ounsel's failure to raise an issue whose resolution is clearly foreshadowed by existing decisions might constitute ineffective assistance of counsel." *Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999); *see also Bridges v. United States*, 991 F.3d 793, 804 (7th Cir. 2021). In a recent *en banc* ruling, the Sixth Circuit determined that, if presented with a case, the Supreme Court likely would enjoin the prohibition on campaign coordination to which Mr. Kelsey pleaded guilty. *Nat'l Republican*

*Senatorial Comm. v. Fed. Election Comm'n*, 117 F.4th 389 (6th Cir. 2024) (*en banc*). Thus, Bruno

provided Mr. Kelsey with ineffective assistance of counsel by not filing—or even reading—the motion

to dismiss that was drafted to advance that argument. *See* Kelsey Decl., Ex. 2, at 4, ¶ 8. At the very least,

the recent Sixth Circuit opinion makes this a substantial claim of law.

> **B.     Mr. Kelsey raises several substantial claims of law that the government committed misconduct.**

>> **1.     The government committed misconduct by suppressing the Smith Recording and Durham's initial, exculpatory statements.**

Under *Brady v. Maryland*, a bedrock of the Constitution's guarantee of due process of law, the

government has a duty to turn over all evidence which might be "favorable" to the accused. 373 U.S. 83,

87 (1963). There are three components to a *Brady* violation, and the government's failure to disclose the

Smith Recording and Durham's initial, exculpatory statements meets all three: (1) The evidence at issue

must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that

evidence must have been suppressed by the government, either willfully or inadvertently; and (3)

prejudice must have ensued. *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Jamison v. Collins*, 291

F.3d 380, 385 (6th Cir. 2002). A *Brady* violation may be grounds for relief on *habeas* or Section 2255

review. *Strickler,* 527 U.S. at 281; *Jells v. Mitchell,* 538 F.3d 478, 501 (6th Cir. 2008).

First, the Smith Recording is exculpatory because denials of guilt made outside the courtroom

are exculpatory: "[A]s far back as 1954 a case reported from the Supreme Court of the United States held

that a denial of guilt in an extrajudicial statement subsequent to an alleged crime is exculpatory." *Cagle

v. Davis*, 520 F. Supp. 297, 306 (E.D. Tenn. 1980) (citing *Opper v. United States*, 348 U.S. 84, 91 (1954)).

In *Opper*, the Supreme Court described exculpatory statements as those, like the Smith Recording, that

are "'denying guilt.'" *Cagle*, 520 F. Supp. at 306 (quoting *Opper*, 348 U.S. at 91, n. 7.)

In *Cagle*, the prosecutor failed to disclose the exculpatory statement because he did "not consider

the fact, just his denial, saying 'I didn't do it,' to be exculpatory . . . ." 520 F. Supp. at 306. But the

prosecutor was "mistaken in his legal conclusion." *Id.* Likewise, Smith saying he "had nothing to do with" the alleged crime in this case is exculpatory: "statements . . . are 'exculpatory' when the accused person punctuates those statements with the assertion, 'I didn't do it.'" *Id.*

Smith's statement is not only exculpatory of himself, but it is also exculpatory of Mr. Kelsey because the government, in charging its crimes, relied on Smith being Mr. Kelsey's agent. In charging counts 2 and 3, the government stated that "SMITH was an agent of KELSEY." (Indictment, Doc. 1, at 9, 10.) Smith, in pleading guilty to count 2, agreed: "SMITH was an agent of KELSEY." (Smith Plea Agreement, Doc. 65, at 7.) In charging counts 4 and 5, the government stated that the excessive contributions were made and accepted "at the request and suggestion of, KELSEY and his agents." (Indictment, Doc. 1, at 11, 12.) Therefore, any statement that exculpates Smith from a criminal act by definition exculpates Mr. Kelsey, the alleged principal, from a criminal act. *See* Restatement 3d of Agency § 3.05, cmt. b (2006). (Limitations on an agent's actions limit his principal's legal relations.).

Also, Durham's initial statements to the government are exculpatory because Durham denied that Mr. Kelsey directed him on what to do with the funds at issue, denied that Mr. Kelsey ever made him his agent, and denied that Mr. Kelsey told him what the ACU should or should not do on his behalf.

Second, the government suppressed the Smith Recording and Durham's initial testimony because it did not produce information about either within the time required by law. Under Local Criminal Rule 16.01(a)(3)(A), "Information and material that is exculpatory within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny must be disclosed reasonably promptly upon discovering it." The government violated the rule by never disclosing the Smith Recording or the initial Durham testimony—or the false statements that it fed to Durham that he refused to sign. *See* Kelsey Decl., Ex. 2 at Ex. R, Durham Recording 1 at 22:59, 45:17; Ex. V, Durham Recording 2 at 2:23, 5:15.

Local Criminal Rule 16.01 was adopted January 24, 2020. (Admin. Order No. 199-2 at 1.) It marked a wholesale rewrite of the local criminal rule on discovery. *Id.* at 3, ¶ 10. The prior rule made no

mention of *Brady* material. (Admin. Order No. 199-1 at 18-19.) But the new rule required that exculpatory *Brady* material be disclosed "reasonably promptly upon discovering it." *Id.* at 19. This moved the government's disclosure of *Brady* material earlier in the process than some Sixth Circuit *Brady* analyses, which had required that it be given only in time for use at trial. The Sixth Circuit blessed this earlier timeframe. (M.D. Tenn. Notice, June 10, 2020.) The government violated Mr. Kelsey's due process rights under *Brady* by not complying with this earlier timeframe.

Third and finally, Mr. Kelsey was prejudiced by the suppression of the Smith Recording and the initial Durham testimony. A defendant is prejudiced when the evidence suppressed is material to his guilt or punishment. *Brady*, 373 U.S. at 87. "The test of materiality in the context of a plea is whether there is a reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but instead would have insisted on going to trial." *Tate v. Wood*, 963 F.2d 20, 24 (2d Cir. 1992); *see also United States v. Nagra*, 147 F.3d 875, 882 (9th Cir. 1998).

The Smith Recording was material because it was Smith's *admission* of guilt that was the immediate impetus for Mr. Kelsey's guilty pleas. (Kelsey Decl., Ex. 2 at 4-5, ¶ 9.) Smith entered his guilty plea and became a cooperating witness against Mr. Kelsey on October 19, 2022. (Minute Entry, Doc. 63.) The very next day, the government asked Mr. Kelsey whether he would enter into plea negotiations, and Mr. Kelsey consented. (Taddei Email, Oct. 20, 2022, Doc. 98-6, at 1.) Just five days later, the government presented Mr. Kelsey with a settlement offer, and two days after that, he hastily accepted the offer before the government's October 27, 2022 deadline. (Reply on Mot. to Withdraw Pleas, Doc. 104, at 1.) Thus, in a span of only eight days, Mr. Kelsey went from preparing a motion to dismiss to entering a notice to change his plea. If he had had recorded evidence to undermine Smith's guilt, Mr. Kelsey would not have pleaded guilty.

Likewise, Mr. Kelsey would have insisted on going to trial if the government had disclosed that its "star witness" had initially given testimony that contradicted his later grand jury statement. Mr. Kelsey

was permitted to review Durham's grand jury testimony before pleading guilty, which (unbeknownst to Mr. Kelsey) directly contradicted Durham's earlier statements regarding Mr. Kelsey's innocence. (Kelsey Decl., Ex. 2 at 4-5, ¶ 9.) In a case with no documentation of Mr. Kelsey directing anyone—only witness testimony—the Smith Recording and the Durham testimony impeach the government's two most important witnesses and exculpate Mr. Kelsey. The government's failure to timely disclose the Smith Recording and Durham's initial statements of Mr. Kelsey's innocence was material because Mr. Kelsey never would have pleaded guilty had he known what these witnesses really believed or that he could impeach their credibility at trial with compelling evidence the government either mistakenly or intentionally failed to provide him prior to his plea. Therefore, the suppression prejudiced him.

**2.      It is a substantial claim of law that the government coerced false testimony from Durham to the grand jury.**

The Durham Recordings are credible because they are statements against interest. In Durham Recording 1, he states that he is willing to tell the truth in private, not knowing that he was being recorded, but unwilling to do so in public because he fears the government will try to prosecute him because he "lied to the grand jury." (Durham Recording 1 at 120:02; *see also* 123:11; 130:44.) In contrast, Durham's statement to the grand jury is less credible because it was a statement in his own interest of receiving immunity. *See* Doc. 157 at 64:2-9. And the fact that his story did not change over a year later when he was recorded in the presence of his wife further corroborates that he is telling the truth in the recordings.

Coercing false testimony from Jeremy Durham constitutes a violation of Mr. Kelsey's Due Process and Sixth Amendment rights: the "principle that [the government] may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, [is] implicit in any concept of ordered liberty . . . ." *Napue v. Illinois*, 360 U.S. 264, 271 (1959); *see also Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). If the prosecutor procured or knowingly presented perjured testimony on material matters before the grand jury, dismissal of the indictment is an appropriate remedy. *United States v. Benny*, 786

F.2d 1410, 1420 (9th Cir. 1986), *cert. denied*, 479 U.S. 1017 (1986); *United States v. Claiborne*, 765 F.2d 784, 791 (9th Cir. 1985), *cert. denied*, 475 U.S. 1120 (1986).

To establish prosecutorial misconduct involving false testimony, a defendant must show (1) the statement was actually false; (2) the statement was material; and (3) the prosecution knew it was false. *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986), *cert. denied*, 484 U.S. 859 (1987). Such grand jury abuse overcomes the presumption of regularity for grand jury proceedings and, in appropriate cases, warrants dismissal of the indictment. *United States v. Samango*, 607 F.2d 877, 881 (9th Cir. 1979). Such conduct is arbitrary and capricious and therefore violates due process or it must be condemned in the exercise of the courts' supervisory powers. *United States v. Al Mudarris*, 695 F.2d 1182, 1185 (9th Cir. 1983), *cert. denied*, 461 U.S. 932 (1983); *see also United States v. Shakir*, No. 3:98-00038, 2006 U.S. Dist. LEXIS 117024, at *7-8 (M.D. Tenn. Dec. 27, 2006).

The government's misconduct in Durham's grand jury appearance easily meets the standard for vacating Mr. Kelsey's conviction. According to the Durham Recordings, he told the government Mr. Kelsey was "the poster child" of "a rule follower," who "did it the way he was supposed to." (Durham Recording 1 at 1:06:13, 25:01.) "You were trying to do what you thought was legally right." (Durham Recording 2 at 3:40.) Although the government charged Mr. Kelsey with directing state funds to be used for a federal race, Durham denied that Mr. Kelsey ever directed him or anyone else to do so: "And they were like, 'No, he was directing you.' I'm like, 'Naw.'" (Durham Recording 1 at 1:00:50; *see also* 22:07; 23:05; 24.44; 38:09; 45:03; Durham Recording 2 at 2:45.) That negates counts 2 and 3 of the Indictment. It also corroborates Mr. Kelsey's testimony to the Court at his plea withdrawal hearing: "I didn't tell these people to make these donations." (Doc. 119 at 119:12-13.) Durham even told the government that Mr. Kelsey specifically told him multiple times not to call him to ask about the funds: "I made them write that down. I was like, 'He said not to call him.'" (Durham Recording 1 at 25:02; *see also* 24:37; 1:11:34.)

Durham also denied that Mr. Kelsey coordinated with ACU, which spent money on ads in favor

of his campaign, thus negating counts 4 and 5 and, by extension, count 1. Durham was clear that Mr. Kelsey never asked him to coordinate with Dan Schneider, Executive Director of ACU. In the recording, when Mr. Kelsey asked him, "I mean, but did I ever—did I ever tell you to tell him anything or what to do with it or how to spend it?", Durham responded, "I didn't even know who he was." *Id.* at 36:33.

Nor did Durham claim that Mr. Kelsey had somehow made him his agent. When the government questioned Durham about the meeting at which Mr. Kelsey gave his donation to the Standard Club PAC, Durham told them that Mr. Kelsey did not ask him to do anything: "They were like, 'Why were you there?' and I was like, 'I think that he probably hoped that I would take the ball.' 'Did he tell you to?' 'No.'" *Id.* at 22:27; *see also* Durham Recording 2 at 10:45. Thus, Mr. Kelsey neither coordinated campaign communications with the ACU, nor told Durham to do so as his agent.

Yet the government threatened to prosecute Durham unless he changed his testimony to implicate Mr. Kelsey in a crime: "They then were feeding me stuff." *Id.* at 15:48. And it was not true: "the statement that they wanted me to read, I'm like, 'That's not true.' I got upset." *Id.* at 22:59; *see also* 45:17; Durham Recording 2 at 5:03. When Durham initially refused to read the statements, the prosecutors began "threatening" him that they would withdraw his immunity letter and prosecute him instead: "I was saying stuff, and they were like, 'You're lying! You're about to lose your immunity.'" (Durham Recording 1 at 1:05:22.) "I mean, they were threatening me like hard core." *Id.* at 48:26.

Ultimately, Durham gave in to the coercion and falsely told the grand jury that Mr. Kelsey did "explicitly direct" him on what to do with the money. (Durham Grand Jury Stmt. at 18:12-17, Doc. 148, at 50.)[4] Durham now describes his grand jury testimony as a mixture of his truthful testimony and the government's false testimony: "It was just like a negotiation." (Durham Recording 1 at 45:23.) The result

---

[4] He never did tell the grand jury that Mr. Kelsey told him to coordinate campaign communications with the ACU, which is what Mr. Kelsey pleaded guilty to. *Id.* at 53, 59.

was "kind of a compromise." *Id*. at 37:49. The government's active role in knowingly procuring this false testimony and using it to indict an innocent person equals gross misconduct worthy of dismissing the indictment. Certainly, this misconduct and the *Brady* violations are substantial claims of law.

**II.     Mr. Kelsey's strong bases for vacating his conviction, in light of other compelling evidence disputing the charges, constitute "exceptional circumstances" warranting release pending a decision on the motion to vacate.**

**A.     The Court of Appeals has largely decided the issue of ineffective assistance of counsel already.**

Appellate courts generally do not decide claims on ineffective assistance of counsel on direct appeal, but the opinion on appeal here comes as close as possible. The Court of Appeals found that counsel failed to make a proper objection to the government's argument about obstruction, dooming Mr. Kelsey's argument to plain error review. (COA Opinion, Doc. 188, at 9.) That finding constitutes "deficient performance" under *Stickland*. It also found that Mr. Kelsey's argument that the government breached the plea agreement was likely correct: "Both parties appear to recognize that there is at least some uncertainty about the government's obligations under Kelsey's agreement, even if Kelsey has the better reading of the agreement." *Id.* at 12. Had it utilized *de novo* review, "any potential ambiguity in the plea agreement would be in Kelsey's favor." *Id., citing Fitch*, 282 F.3d at 367. Whether it is called an "uncertainty" or "ambiguity," the result is that if counsel had preserved the error, Mr. Kelsey would have prevailed on appeal and been able to rescind his plea agreement. That difference between what occurred and what would have occurred but for the "deficient performance" constitutes "prejudice" under *Stickland*. There can be no more exceptional circumstance than an appellate court that has effectively decided the ineffective assistance of counsel issue already.

**B.     The Durham Recordings are exceptional.**

In addition to showing prosecutorial misconduct, the Durham Recordings, alone, make this motion for release "exceptional" and even "extraordinary." To grant release, "extraordinary or

exceptional circumstances must exist." *Spalla*, 762 F.2d at 1011. A "trustworthy eyewitness account[]" meets the even more exacting standard of being "extraordinary" when it is "new reliable evidence" to support a claim of actual innocence. *House v. Bell*, 547 U.S. 518, 537 (2006) (it even overcomes the bar to a second, defaulted *habeas corpus* petition—unlike the first and timely petition here). As this Court asked at the plea withdrawal hearing, when people who have pleaded guilty claim innocence, "They come forward with some kind of objective evidence . . . that suggests innocence. What's that here?" (Doc. 119 at 131-32.) The Durham Recordings are that here. They are exceptional.

Likewise, the Smith Recording is exceptional. The emergence of three recorded statements, from the two primary witnesses against Mr. Kelsey, saying that he is innocent, is truly exceptional.

### C. The government can present little evidence to contradict its own witnesses who, it is now known, have proclaimed Mr. Kelsey's innocence.

A third exceptional circumstance relates to the profound weakness of the government's evidence against Mr. Kelsey, now that its two star witnesses have been shown for what they are. When a case relies heavily on witness testimony, withholding exculpatory evidence of prior witness statements is especially prejudicial. *See Smith v. Cain*, 565 U.S. 73, 76 (2012); *Kyles v. Whitley*, 514 U.S. 419, 454 (1995). Here, the campaign donations were all legal donations unless some sort of statements were made as to how they were to be used. The government would have produced *no* conclusive documentary evidence of any such conversations. The toll records between Mr. Kelsey and Durham are easily explained because the two were colleagues and talked often on a number of subjects. (Howard letter to Klopf, 10/1/2021, Doc. 98-5, at 5-6, 53-68.) As Durham explains the calls, "We were personal friends, too, and we weren't just political people." (Durham Recording 2 at 11:48.) This is hardly evidence of a crime. None of the written communications donating money to various groups mention Mr. Kelsey directing funds or telling anyone at ACU to spend money on his behalf.

On the contrary, the documentary evidence in the case exonerates Mr. Kelsey. Four pieces are

worth highlighting. The first exculpatory documentary evidence is the call logs showing an absence of communications between Mr. Kelsey and anyone at ACU, with whom he allegedly coordinated, during the relevant period from when the ACU endorsed Mr. Kelsey on June 2, 2016, to when they ran ads on his behalf in late July 2016. The government's false theory that Mr. Kelsey was communicating with his now-wife was debunked by toll records which show no phone calls or text messages between the two from April to October 2016. (Bunning Decl., attached as Ex. 5, at 2, ¶ 2.)

The second piece of documentary evidence is Mr. Kelsey's contemporaneous memorialization of his statement to Smith when he donated funds to the Standard Club PAC, which was blessed by his campaign finance counsel: "At my lawyer's recommendation, I made the following statement to Josh Smith in handing him the check to the Standard PAC: 'There are no strings attached to this money whatsoever. You can spend it however you want. I suggest you speak to an attorney before you spend it.' And then I promptly left dinner to drive home because I would not arrive until midnight." (Langhofer Decl., Ex. 1, at 11.) The statement is corroborated by the government interviews of all three people who were in the room to hear it. The statement aligns with Smith's claim in the recording that he did nothing wrong because Mr. Kelsey never told him how to spend the funds. It also aligns with Durham's recorded statements that Mr. Kelsey did not tell him to act as his agent. (Durham Recording 1 at 22:27; *see also* Durham Recording 2 at 10:45.) And because Mr. Kelsey did not speak to Smith again until after the ACU ads ran, the statement precludes any theory that Smith acted as Mr. Kelsey's agent.

The third piece of exculpatory documentary evidence negates Miller's testimony. It is a spreadsheet notation Mr. Kelsey made to his campaign staff after speaking to Miller on the phone on July 12, 2016. The notation states, "7/12 called BK back and said he is trying to collect a check in the morning from someone else." (Kelsey Decl., Ex. 2 at Ex. B, Miller notation, July 12, 2016, at 16.) In hindsight, one can speculate that Miller may have believed that he was speaking ambiguously of a check to his federal PAC that he would soon collect from the Standard Club PAC. But Mr. Kelsey did not understand

Miller's cryptic statement this way. The notation proves that he thought Miller was speaking of a donation directly to his congressional campaign. Mr. Kelsey made the notation on a spreadsheet shared with several campaign staff members that directed them to track down and collect maximum $2,700 pledges, like the one he thought he had received from Miller, to deposit them directly into Mr. Kelsey's congressional campaign account. His notation ensured that someone on staff would look into the matter, call Miller to inquire about the check, and try to receive it—the exact opposite of what one would want to happen if involved in a criminal conspiracy with Miller in which the check needed to go to an entity other than Mr. Kelsey's congressional campaign account. *See* Andrew Greer Decl., Ex. 6 at 2, ¶ 2.

The fourth, most crucial piece of exculpatory documentary evidence establishes that Smith, Durham, and Miller were not receiving direction from Mr. Kelsey—or acting as his agent. The evidence is an email exchange between Miller and Durham regarding wanting to help Mr. Kelsey's campaign but not knowing how to do so. Miller emailed Durham to tell him he was receiving more money from Smith's PAC and asked Durham what to do with it. Durham confessed, "I dunno… maybe send that to ACU too." (Kelsey Decl., Ex. 2 at Ex. S, Miller emails with Durham, 7/21/2016, at 116.) The exchange negates several elements of the government's case. It shows that Smith did not tell Miller what to do with the funds because if he had, Miller would not have had to ask Durham. Thus, Smith was not acting as Mr. Kelsey's agent nor being directed by Mr. Kelsey. Also, it negates Miller's grand jury testimony that Mr. Kelsey was directing things because, if he were, Miller would not have had to ask Durham for direction. Finally, if Durham were receiving direction from Mr. Kelsey, he would have called him and asked what to do with the money. Yet there were no phone calls between Mr. Kelsey and Durham between when Miller sent the email and when Miller sent the money to the ACU. More importantly, if Durham had received direction from Mr. Kelsey earlier, he would have known exactly what to do with the funds. Instead, he answered, "I dunno," and he was forced to guess, saying only "maybe" to send the money to ACU. As he later confirmed regarding the email, "I didn't know what I was supposed to do."

(Durham Recording 2 at 4:31.) Miller replied, "Could hold that for future." Neither was being directed.

Because the documentary evidence exculpates Mr. Kelsey, and because the government's witnesses actually never implicated him, Mr. Kelsey can mount a strong, compelling defense to the government's case, constituting an "exceptional circumstance" warranting his release.

### D.     This Court has found that Mr. Kelsey's statements that he was guilty are false.

Finally, it is truly exceptional that the Court has found that Mr. Kelsey's inculpatory statements at the change of plea hearing were false, and the exculpatory statements were true. (Doc. 157 at 18:19-24.) It is not the Court's place, at this stage of the proceedings, to make definitive rulings on guilt or innocence. The Court's ruling, though, at least poses the question of whether an innocent man has been convicted. And it is this circumstance that makes "the motion for bail exceptional and deserving of special treatment in the interests of justice." *Dotson*, 900 F.2d at 79. The Court should continue Mr. Kelsey's release, and after considering the motion, vacate his conviction.

## CONCLUSION

For these reasons, Mr. Kelsey respectfully requests that this Court promptly stay the issuance and/or enforcement of any voluntary surrender date to allow sufficient time for this emergency motion to be fully briefed and adjudicated. Thereafter, Mr. Kelsey also asks that this Court grant this emergency motion and order that Mr. Kelsey be released on his present conditions until thirty days after the Court has ruled on his contemporaneously filed motion to vacate his sentence pursuant to 28 U.S.C. § 2255. Mr. Kelsey has shown substantial grounds for vacating his conviction, based both on the ineffective assistance of his counsel and on the government's misconduct. And he has shown exceptional circumstances warranting release, including a binding Court of Appeals decision and the emergence of not one, or two—but three recordings from key government witnesses, denying his culpability.

Respectfully submitted,

*/s/ Joy Boyd Longnecker*
Joy Boyd Longnecker
Barnes & Thornburg, LLP
1600 West End Avenue
Suite 800
Nashville, TN 37203-3494

*/s/ Kent Wicker*
Kent Wicker
WICKER / BRAMMELL PLLC
323 West Main Street, 11th Floor
Louisville, Kentucky 40202
(502) 780-6185
kent@wickerbrammell.com
(*Admitted Pro Hac Vice*)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served through the CM/ECF system, which will send notice of electronic filing on this 23rd day of January, 2025.

Kathryn W. Booth
U.S. Attorney's Office
719 Church Street Suite 3300
Nashville, TN 37203
kathryn.booth@usdoj.gov

David Pritchard
Assistant United States Attorney
167 North Main Street, Suite 800
Memphis, TN 38103
david.pritchard2@usdoj.gov

John P. Taddei
U.S. Department of Justice Public Integrity
Section
1301 New York Ave. NW Ste 10th Floor
Washington, DC 20530
john.taddei@usdoj.gov

*/s/ Joy Boyd Longnecker*
Joy Boyd Longnecker