UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA,

    Plaintiff / Respondent,

v.

BRIAN KELSEY,

    Defendant / Movant.

No. 3:21-cr-00264-1

**BRIAN KELSEY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF EMERGENCY MOTION FOR RELEASE PENDING DECISION ON HIS MOTION TO VACATE SENTENCE PURSUANT TO 28 U.S.C. § 2255**

Joy Boyd Longnecker
Barnes & Thornburg, LLP
1600 West End Avenue
Suite 800
Nashville, TN 37203-3494

Kent Wicker
WICKER / BRAMMELL PLLC
323 West Main Street, 11th Floor
Louisville, Kentucky 40202
(*Admitted pro hac vice*)

i

# INTRODUCTION

The government's Response is telling – not for what it *says*, but for four things left unsaid. First, the government does not deny that it threatened Jeremy Durham with prosecution if he did not change his story to match the statements that it drafted for him. It does not even get around to addressing the serious charges until page 23, and when it does, it never directly denies them.

Second, the government also ignores a critical argument in Mr. Kelsey's motion: that, regardless of *how or why* Durham's testimony changed when presented to the Grand Jury versus his initial statements to the government that Mr. Kelsey was innocent, the fact that his initial, exculpatory statements were never disclosed constitutes a *Brady* violation.

Third, the government was unable to determine, in the week that elapsed between the filing of Mr. Kelsey's motion and the government's response, whether it ever received an email with the Smith Recording. The destruction of, or failure to preserve, this evidence points to possible spoliation.

Fourth, the government tries to deny Mr. Kelsey's claim of ineffective assistance of counsel against Alex Little by pointing to the Sixth Circuit concurrence. As the government and this Court know well, the appellate court's only binding holding is the majority opinion, which very clearly states that "Kelsey's counsel failed to object adequately." (Doc. 188 at 9.) Then, the majority goes a step further and says that if it had applied *de novo* review, any ambiguity in the plea agreement would have inured to Mr. Kelsey's benefit, but under plain error review, it did not. *Id*. at 12-13.

The government's Response largely relies on the fact that Mr. Kelsey pleaded guilty, a fact which he regrets but does not deny. But the law is abundantly clear that a *habeas corpus* motion can succeed regardless of whether the defendant pleaded guilty. *See, e.g., Dando v. Yukins*, 461 F.3d 791, 802 (6th Cir. 2006). In this case, if the government's breach had been preserved, Mr. Kelsey would have withdrawn from the plea agreement. Given these substantial legal claims and exceptional circumstances, the Court should permit Mr. Kelsey to remain on release while the Court considers his motion.

# ARGUMENT

## I. The Emergence Of Three Recordings Exculpating Mr. Kelsey Is Truly Exceptional And Extraordinary.

The government spends most of its brief claiming that the standard for relief here is so high that a defendant could virtually never meet it.[1] To the contrary, when a defendant presents new evidence from an eyewitness to a supposed crime who states that the defendant is innocent, that is "extraordinary." *House v. Bell*, 547 U.S. 518, 537 (2006). The government complains that *House* is not a bail case (Resp. 5), but it is a *habeas corpus* case that sets forth the standard for what is "extraordinary." "Extraordinary" is an even higher standard to meet than "exceptional" because it means "very exceptional."[2] So if a new eyewitness statement of innocence meets the higher standard of being "extraordinary," it also meets the lower standard of being "exceptional." Regardless, to grant release pending a § 2255 motion, either "extraordinary or exceptional circumstances must exist." *Spalla v. Foltz*, 762 F.2d 1011, 1011 (6th Cir. 1985). Here, they do.

The government also argues that the danger that the defendant may serve much of his sentence while the court considers his motion is not an exceptional circumstance, but then it quotes the Sixth Circuit opinion granting release to avoid the defendant "'hav[ing] spent time in custody beyond the length of his sentence.'" (Resp. 7, quoting *United States v. Bricker*, DE 26, No. 24–3286 (6th Cir. June 26, 2024).) It also quotes another court granting release because the "defendant's 'sentence would long have been served before the case could be docketed for determination by a panel of this Court.'" (Resp. 8, quoting *Boyer v. City of Orlando*, 402 F.2d 966, 968 (5th Cir. 1968)). Thus, "the risk that the sentence

---

[1] *But see United States v. Lyons*, No. 21-00079, 2024 WL 3898550, at *4-8 (D.D.C. Aug. 22, 2024). The government relies heavily on *Morgan v. United States*, No. 93-2267, 1994 WL 182141 (6th Cir. May 11, 1994), but there, the appellate court rejected a *pro se* motion incorrectly filed during direct appeal by a defendant who had lost his motion for bail pending appeal and had violated the terms of his release. That defendant clearly raised no exceptional circumstances.

[2] *Merriam-Webster.com Dictionary*, "Extraordinary," 1b: "exceptional to a very marked extent," available at https://www.merriam-webster.com/dictionary/extraordinary (retrieved Jan. 31, 2025).

2

could be served in whole or in significant part" before the motion to vacate is decided constitutes an exceptional circumstance. (Doc. 393: Mem. Op. and Order, *United States v. Lundergan*, Case No. 5:18-cr-00106 (E.D. Ky. Jan. 25, 2021) (citing *United States v. Sweet*, 630 F.3d 477, 480 (6th Cir. 2011)).[3]

### A. The government does not directly deny that it coerced Durham into reading a statement to the Grand Jury that was not true.

Two recordings of the government's only first-hand witness saying he was coerced to testify falsely are an exceptional circumstance that warrants release pending resolution of the motion to vacate. Remarkably, the government does not deny coercing Durham's grand jury testimony. The government's argument is simply that because Durham's statements on the recordings conflict with some of the statements he gave to the Grand Jury, the former must be false, and the latter must be true. (Resp. 24). But Durham says on the recording that he gave false testimony because the government threatened him. *See United States v. Finch*, 998 F.2d 349, 356 (6th Cir. 1993) (coercion is an affirmative defense). And nowhere in its Response does the government deny that Durham was threatened with prosecution if his statement did not conform to the statement it drafted for him. This is potentially serious misconduct, worthy of a hearing, and certainly worthy of releasing Mr. Kelsey prior to such a hearing.

The government's attempted explanation for why Durham would be lying now makes no sense. It says Durham is simply telling his former friend what he thought he "wanted to hear." (Resp. 24.)[4] But why would Mr. Kelsey want to hear an untrue story of government pressure and Mr. Kelsey's innocence if Durham and he really thought that Mr. Kelsey was guilty? And why would Durham feel guilty about what occurred in this case if Mr. Kelsey really were guilty? If Mr. Kelsey were guilty, perhaps Durham would have said he was sorry that he testified and was the reason Mr. Kelsey pleaded guilty to the crime

---

[3] So does the potential for an intervening change in the law, as existed in both *Boyer*, 402 F.2d at 967, and in this case, *NRSC v. FEC*, 117 F.4th 389 (6th Cir. 2024). *See infra* at 10.
[4] But Durham also claims he has left "drunken, sobbing voicemails" to others, saying the same thing. (Durham Recording 1 at 40:10.) Mr. Durham would not be telling his former friend what he "wanted to hear" if Mr. Kelsey never heard those voicemails. *See* Mot. for Discovery, Doc. 202, at 4-5.

he committed. But he didn't say that. He insisted that Mr. Kelsey was innocent and that he had told the government so. Then, the government pressured him to change his story, so he lied to the Grand Jury.[5]

That is not a "self-serving" statement. *Id.* It is a statement against interest. It opens Durham to prosecution for perjury. It is credible for the same reason it is an exception to the hearsay rule: because it "expose[s] the declarant to criminal liability." Fed. R. Evid. 804(b)(3). There is no plausible explanation for why Durham would say it other than that it is true. Thus, it is telling that the government did not refute it.

The government points out that Durham was represented by counsel (Resp. 24), but Durham claims his attorney, Peter Strianse, was not present when he testified to the Grand Jury: "He wasn't even there that day. He was there the first two days. The third day he didn't even show up…if that tells you anything." (Durham Recording 1 at 1:22:49.) He also states that the other days, "Peter was just sitting there looking at his phone and looking around—because he had already had his victory lap. You know, he's over here like, 'Look at me. I got my client a f*cking immunity letter.' So he's not really like, 'Hey guys!'" *Id.* at 59:37.

The government attempts to impugn the recordings by calling them "surreptitious," (Resp. 9, 19), but as the government argues in every wiretap case and as the Sixth Circuit has found, the credibility of a witness's testimony—even given under oath—can be "greatly damaged" when "confronted by the record of his own voice." *United States v. Osborn*, 350 F.2d 497, 506 (6th Cir. 1965). Rightfully so, juries often credit an untrustworthy witness more when he does not know he is being recorded than when he is being forced to read a statement to a Grand Jury. *Id.*

Because the government has provided no evidence rebutting the Durham Recordings, they

---

[5] Furthermore, if the government believes that Durham is the type of witness who would lie to Mr. Kelsey's face and then repeat the lie in the presence of his wife, then it is unclear why the government would continue to rely on him as its chief witness for Mr. Kelsey's guilt. Either the government made no effort to reach Mr. Durham prior to filing its Response, or he refused to retract his statements to Mr. Kelsey. And the government failed to append a declaration refuting the charges from one of its own attorneys.

remain exceptional circumstances worthy of granting Mr. Kelsey release, pending further investigation, discovery, and a hearing on what transpired during Durham's interviews and grand jury testimony.

    **B.    The government does not deny that withholding Durham's initial, exculpatory statements constitutes a *Brady* violation.**

Although Mr. Kelsey argued that the government violated *Brady* when it failed to disclose Durham's initial, exculpatory statements, (Doc. 198 at 15-18), the government failed to respond to the argument at all. Here, Mr. Kelsey is arguing that Durham initially told the government that Mr. Kelsey was a "rule follower" who would not knowingly break the law. (Durham Recording 1 at 1:06:13.) The government failed to disclose those exculpatory remarks, which is a different kind of prosecutorial misconduct from pressuring Durham to present false testimony to the Grand Jury. *See id.* at 18-21.

The government does not deny that it withheld these remarks and does not deny that it drafted statements that Durham refused to sign. Therefore, the only evidence in the current record is Durham's recorded remarks about what he told the government and how he refused to sign or read certain statements to the Grand Jury. By failing to disclose these clearly exculpatory statements, the government violated *Brady*. By not responding to the argument, the government has waived any defense to it; therefore, Mr. Kelsey has presented a substantial claim of law.

    **C.    The government's claim that it does not know whether it failed to disclose the Smith Recording concedes the issue.**

The government claims that it does not know whether it committed a *Brady* violation regarding the Smith Recording because it does not know whether it ever received the Smith Recording. (Resp. 21.) But it takes only a matter of minutes to search an inbox for an email, and one of the three recipients of the email is one of the three signers of the Response. That the government fails to acknowledge receipt, even though read-receipt messages have been produced, (Doc. 205-1 at 10-14), implies that there may be an even more serious due process violation than suppression: spoliation. *See California v. Trombetta*, 467 U.S. 479, 489 (1984).

5

The government next tries to claim that it is unclear what FBI investigation Smith is referring to on the recording. (Resp. 21.) Unless the government is aware of other FBI investigations into Smith, or Smith subjectively believed he was the target of multiple FBI investigations at the time of the recording, then it was clear that Smith was referring to this case when he said he "had nothing to do with" it. The recipient of the call understood it that way. (Doc. 198-3 at 3, ¶ 4.)[6]

Finally, it is nonsensical how many paragraphs the government devotes to listing the ways in which Smith claimed he was innocent of any conspiracy in this case, given its insistence on his guilt. (Resp. 21-22.) But the key difference between the recording Mr. Kelsey obtained from a third-party (not the government) and the other evidence of Smith's innocence that the government did produce to Mr. Kelsey, including Smith's passing multiple polygraph tests and his FD-302s, is that the recording was admissible, while the other evidence of Smith's innocence was not. *Contra* Resp. 22. The government provides *ad hominem* arguments against the person who recorded Smith's statement of innocence, *id*. at 21, but that only proves the value of the recording: it doesn't rely on the credibility of the person who recorded it because it contains Smith's own voice. At trial, if Smith were to claim on the stand that he is guilty and, by extension, so is Mr. Kelsey, then he can be impeached with the exculpatory recording. The Smith Recording is exculpatory, and failing to disclose it—or failing to preserve it and destroying it— violates Mr. Kelsey's due process rights.

**II.      The Government Fails To Rebut The Legal Precedents On Which Mr. Kelsey Relies For His Claims Of Ineffective Assistance Of Counsel.**

**A.      The government tries to convince this Court to rely on a concurring opinion to support its argument that Mr. Little was not ineffective.**

The government's primary argument that Mr. Little was not ineffective is that Judge Kethledge's concurring opinion found that the government did not breach the plea agreement. (Resp. 14.) But a

---

[6] The government also claims the Smith Recording is not exculpatory, but it rebuts neither *Cagle v. Davis*, 520 F. Supp. 297 (E.D. Tenn. 1980) nor *Opper v. United States*, 348 U.S. 84 (1954).

6

Case 3:21-cr-00264    Document 210    Filed 02/04/25    Page 7 of 12 PageID #: 2230

majority of the panel disagreed. (Doc. 188 at 13.)[7] The majority wrote that if there were an ambiguity in the agreement, under *de novo* review, Mr. Kelsey's interpretation was superior to the government's, *id.,* and he presumably would have won. The majority found that the agreement was at least somewhat ambiguous: "Both parties appear to recognize that there is at least some uncertainty about the government's obligations under Kelsey's agreement, even if Kelsey has the better reading of the agreement." *Id*. Therefore, if Mr. Little had objected, the majority stated that the "ambiguity in the plea agreement would be in Kelsey's favor," and Mr. Kelsey would have won the appeal. *Id*.

The government committed a breach, and it was intentional. As Mr. Little states, "Mr. Taddei appeared to read his statement off a piece of paper, suggesting that his supervisors had approved the statement that violated the plea agreement." (Doc. 198-4 at 3, ¶ 5.) The government baited the Court into asking it a question by setting the trap in its position on the PSR, and then it pounced on the question once asked. (Doc. 135, at 3). Further evidence that the breach was premeditated comes from the sentence the government asked the Court to impose in its sentencing memorandum: 41 months. (Doc. 136 at 1.) That is the top end of the guidelines range *if* the Court were to adopt the enhancement for which the government was prohibited from arguing. That is no coincidence. The government intended to argue for the enhancement, as it had signaled that it would, and it did. In so doing, it breached the plea agreement.

The Court of Appeals held that if Mr. Little had only said that the government "violated" the plea agreement, rather than that it "c[a]me pretty close to violating" the plea agreement, Mr. Kelsey would have preserved the error. (Doc. 188 at 9.) It was unreasonable not to state the objection clearly. The majority opinion also described the prejudice that ensued: because the defendant failed to object, it

---

[7] There are only two interpretations of the plea agreement, and Mr. Kelsey would have won under both with *de novo* review. If paragraphs 9(a) and 9(c) are read together, then "appropriate" in 9(a) limits the types of arguments that can be made under 9(c). Or if 9(a) and 9(c) conflict, then the ambiguity would have been read in Mr. Kelsey's favor under *de novo* review. Judge Kethledge's analysis lost because he reviewed only 9(c) and failed to consider 9(a). (Doc. 188 at 14-15.)

7

Case 3:21-cr-00264    Document 210    Filed 02/04/25    Page 8 of 12 PageID #: 2231

applied a lower standard of review, and Mr. Kelsey lost the appeal. Because the majority opinion established both prongs of the *Strickland* test, this Court must conclude **– as Mr. Little conceded in his Declaration (Doc. 198-4, ¶¶ 9-10) –** that Mr. Little provided ineffective assistance of counsel.

Most ineffective assistance of counsel arguments are defeated because the claimed error is really just a strategic or tactical decision that went wrong. Here, the government did not even attempt to offer a tactical reason for Mr. Little not to object. He just "failed to object adequately" (Doc. 188 at 9.) Nor did the government attempt to rebut *Burns v. Gammon*, 260 F.3d 892 (8th Cir. 2001), nor any of the other ineffective assistance of counsel cases in which the failure to object was pivotal to winning or losing.

The government claims wrongly that the plea agreement would not have been withdrawn. While it is true that resentencing by a different judge is another possible remedy, the government fails to admit that the court "ought to accord a defendant's preference considerable, if not controlling, weight." *Santobello v. New York*, 404 U.S. 257, 267 (1971) (Douglas, J., concurring).[8] The Sixth Circuit is even more explicit: the defendant must be allowed to "choose to withdraw his plea of guilt." *United States v. Mandell*, 905 F.2d 970, 975 (6th Cir. 1990). That is why this Court already stated, in granting bail pending appeal, that resentencing by another judge would be "highly unlikely." (Doc. 177 at 7.)

Finally, the government argues that Mr. Kelsey's alleged prior breach precluded him from relying on the plea agreement to claim a breach. (Resp. 14.) The government is right that the Court of Appeals never reached this argument, but if it had, it would have disposed of it quickly, as this Court did. A party waives its right to claim that the other party breached first if the party continues to enforce the contract after the first alleged breach. *White v. Empire Express, Inc.*, 395 S.W.3d 696, 715-16 (Tenn. Ct. App. 2012); *Madden Phillips Constr. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 815 (Tenn. Ct. App. 2009). When this Court asked the government whether the plea agreement was "still in effect on appeal," it

---

[8] In *Santobello*, as opposed to the Sixth Circuit panel opinion in this case, the concurring opinion was controlling in the 3-3-1 split decision. *See Marks v. United States*, 430 U.S. 188, 193 (1997).

answered, "Yes." (Doc. 176 at 11:20-22.) As this Court noted in its order granting release pending appeal, the government argued that, despite the attempt to withdraw, "'this Court should accept the original plea agreement.'" (Doc. 177 at 5) (quoting Doc. 135 at 3). Therefore, the government waived this argument.

The plea agreement was in place; the government breached it; and had Mr. Little properly objected, Mr. Kelsey would have won his appeal. The government has produced no law to say otherwise—except for Judge Kethledge's concurring opinion, which failed to garner another vote.

### B. The government's claim that giving prejudicial, false testimony to the Court is not ineffective assistance of counsel has no merit.

Mr. Bruno testified that he had an ethical duty to alert the Court if his clients had a problem with the factual basis for their guilty pleas or if they felt uncomfortable after pleading guilty. (Doc. 119 at 161:6-165:2; 169:15-17.) But that's not what he did. He added language to Mr. Kelsey's plea agreement that his client disagreed with, and then he urged his client to accept it. (Doc. 198-2 at 49.) Then, when his client asked him, "Is there anything you can do to withdraw my plea…?", rather than immediately report it to the Court, which he understood to be his ethical duty, he talked his client out of filing a motion to withdraw. Then, he claimed that this conversation never happened. (Doc. 119 at 174:6-7.) In reality, it occurred just five days after the guilty plea—days which included Thanksgiving holidays.

The government says that Bruno was not representing Mr. Kelsey at the withdrawal hearing, but the case it cites does not say that, and he—and the Court—said he was. (Doc. 119 at 9, 135.) The government also makes no effort to rebut Bruno's duty to avoid presenting false testimony, found in *Nix v. Whiteside*, 475 U.S. 157, 166 (1986). If giving factual testimony as a witness was adverse to Mr. Kelsey's interests—and it would not have been had he told the truth—then Bruno should have resigned.

### C. The government misconstrues this Court's rulings.

While the government correctly states that this Court rejected the arguments that would have been in Mr. Kelsey's motion to dismiss, that was before the Sixth Circuit ruled that those same arguments

9

would likely be adopted soon by the Supreme Court. *NRSC*, 117 F.4th at 389. It would be the height of injustice to imprison Mr. Kelsey when it is apparent the Supreme Court will enjoin his charged statute.

The government's argument that Mr. Kelsey violated Count 1 regardless of whether the prohibition on campaign coordination violates the First Amendment, is a circular one. The government claims that Mr. Kelsey would have impeded the FEC from performing its duties, even if coordinated expenditures were legal, because he conspired with the ACU to falsely report that its expenditures were independent. (Resp. 19.) But the FEC would have no reason to care whether the expenditures were coordinated or independent but for coordinated expenditures being unlawful. So there would be no enforcement duty that he impeded.

The government also misses that this Court's reliance on the alleged facts in the plea agreement occurred *before* the Court found that Mr. Kelsey was not telling the truth when he averred that the facts were accurate. Throughout its Response, the government wrongly relies on this Court's statements at the entrance of the guilty plea that the plea agreement's factual basis established a crime, and that it was accurate. But later, at sentencing, the Court ruled that Mr. Kelsey did not "engage[] in the behavior set forth in the factual basis." (Doc. 157 at 18.) The Court was correct to make this finding, and it was ineffective for Mr. Little not to appeal on this ground.

## CONCLUSION

While the motion to vacate is not yet fully briefed, Mr. Kelsey has undoubtedly raised several substantial claims of law. The most obvious is that Mr. Little failed to object adequately, dooming Mr. Kelsey's appeal, a conclusion determined by the Sixth Circuit and by Mr. Little. The case is exceptional because Mr. Kelsey has produced *three* exculpatory recordings from eyewitnesses. The government will suffer no prejudice if Mr. Kelsey's reporting date is delayed, but Mr. Kelsey will certainly be prejudiced if he prevails but is wrongfully incarcerated in the meantime. Therefore, the Court should grant Mr. Kelsey's release pending the resolution of his underlying motion to vacate.

Respectfully submitted,

*/s/ Joy Boyd Longnecker*
Joy Boyd Longnecker
Barnes & Thornburg, LLP
1600 West End Avenue
Suite 800
Nashville, TN 37203-3494

*/s/ Kent Wicker*
Kent Wicker
WICKER / BRAMMELL PLLC
323 West Main Street, 11th Floor
Louisville, Kentucky 40202
(502) 780-6185
kent@wickerbrammell.com
(*Admitted Pro Hac Vice*)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been served through the CM/ECF system, which will send notice of electronic filing on this 4th day of February, 2025.

| | |
|---|---|
| Kathryn W. Booth<br>U.S. Attorney's Office<br>719 Church Street Suite 3300<br>Nashville, TN 37203<br>kathryn.booth@usdoj.gov | David Pritchard<br>Assistant United States Attorney<br>167 North Main Street, Suite 800<br>Memphis, TN 38103<br>david.pritchard2@usdoj.gov |

John P. Taddei
U.S. Department of Justice Public Integrity Section
1301 New York Ave. NW Ste 10th Floor
Washington, DC 20530
john.taddei@usdoj.gov

*/s/ Joy Boyd Longnecker*
Joy Boyd Longnecker